UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 7920

| | |
|---|---|
| DEKA INVESTMENT GmbH, DEKA INTERNATIONAL S.A. LUXEMBURG, DEKA FUNDMASTER INVESTMENTGESELLSCHAFT mbH, INTERNATIONAL FUND MANAGEMENT S.A. LUXEMBURG, and METZLER INVESTMENT GmbH, | Civil Action No. _____ |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | **DEMAND FOR JURY TRIAL** |
| WACHOVIA CORPORATION, WELLS FARGO & COMPANY, G. KENNEDY THOMPSON, THOMAS J. WURTZ, DONALD K. TRUSLOW, LANTY L. SMITH, and ROBERT K. STEEL, | |
| Defendants. | |

RECEIVED
SEP 1 5 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE .......................................................................... 10

III.  THE PARTIES..................................................................................................... 10

    A.  PLAINTIFFS ............................................................................................ 10

        1.  The Deka Plaintiffs ..................................................................... 10

        2.  Metzler .......................................................................................... 11

    B.  DEFENDANTS ......................................................................................... 12

        1.  Wachovia ...................................................................................... 12

        2.  Individual Defendants ................................................................. 13

IV.  CONTROL PERSON ALLEGATIONS/GROUP PLEADING ....................... 14

V.  BACKGROUND .................................................................................................. 16

    A.  THE U.S. MORTGAGE CRISIS ............................................................... 16

        1.  Subprime Mortgages Become Attractive to Lenders................. 17

        2.  The Proliferation of Financial Instruments Backed By U.S. Residential Mortgages ............................................................... 19

    B.  INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY EARLY 2006............................................................................................. 23

    C.  INDICATORS THAT SECONDARY MARKETS FOR MBSS AND CDOS WERE DETERIORATING BY FEBRUARY 2007.................................................. 25

VI.  DEFENDANTS' FRAUDULENT SCHEME ................................................... 28

    A.  WACHOVIA PUBLICLY TOUTS THE "PRISTINE CREDIT QUALITY" OF THE GOLDEN WEST PORTFOLIO ................................................................... 28

    B.  WACHOVIA CONCEALS THE TRUTH ABOUT THE GOLDEN WEST PORTFOLIO ....... 30

        1.  Defendants Mislead Investors by Claiming that Pick-a-Pay Mortgages Were Originated With Strict Underwriting Guidelines .......... 31

        2.  Defendants Mislead Investors By Repeatedly Citing LTV Ratios That Did Not Accurately Reflect The Current Risks Inherent In The Pick-a-Pay Portfolio.......................................................... 32

3.      Defendants Mislead Investors Because The 7.5% Annual Payment Cap and 10-Year "Recast" Period Did Not Eliminate The Risk Of "Payment Shock," But Merely Delayed It ................................................. 34

C.      WACHOVIA CASTS ASIDE ITS TRADITIONAL LENDING PRACTICES AND ADOPTS A RISKIER APPROACH ................................................................... 35

1.      Underwriting Standards Were Weakened to Increase Originations and Boost Profits ..................................................................... 37

2.      Wachovia Incentivized Employees to Push Pick-a-Pay Loans on Unsuspecting, Poorly-Qualified Borrowers ............................... 38

3.      Appraisals Related to Wachovia's Loans Were Improperly Inflated ....... 41

D.      WACHOVIA CONCEALS THE TRUTH ABOUT ITS HOLDINGS OF CDOS AND RMBS ..................................................................................................... 42

E.      WACHOVIA'S FALSE AND MISLEADING STATEMENTS CONCERNING ITS PICK-A-PAY PORTFOLIO, CDO AND RMBS HOLDING AND EXPOSURE TO SUBPRIME-RELATED LOSSES ARE USED TO PROP UP FINANCIAL RESULTS .......... 43

VII.    THE TRUTH BEGINS TO EMERGE ............................................................. 45

A.      WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING GROWING LOSSES IN ITS PICK-A-PAY LOAN PORTFOLIO ...................................... 45

B.      WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS EXPOSURE TO SUBPRIME RMBSS AND CDOS ...................................................... 50

C.      IN THE WAKE OF ITS COLLAPSE, THE TRUE EXTENT OF WACHOVIA'S FRAUD IS REVEALED ........................................................................................ 54

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 55

A.      MAY 7, 2006 PRESS RELEASE ................................................................. 56

B.      MAY 8, 2006 CONFERENCE CALL ............................................................ 57

C.      MAY 12, 2006 CONFERENCE CALL .......................................................... 58

D.      MAY 16, 2006 CONFERENCE CALL .......................................................... 59

E.      JULY 20, 2006 CONFERENCE CALL .......................................................... 59

F.      DECEMBER 28, 2006 AMERICAN BANKER ARTICLE ................................... 60

G.      JANUARY 23, 2007 CONFERENCE CALL .................................................... 61

H.      WACHOVIA'S 2006 FORM 10-K .............................................................. 62

I.      APRIL 16, 2007 CONFERENCE CALL ........................................................ 65

J.      WACHOVIA'S FIRST QUARTER 2007 FORM 10-Q ...................................... 69

K.      MAY 17, 2007 PRESS RELEASE .............................................................. 69

L.   JULY 20, 2007 CONFERENCE CALL ........................................................ 70

M.   WACHOVIA'S SECOND QUARTER 2007 FORM 10-Q ............................... 73

N.   OCTOBER 19, 2007 CONFERENCE CALL ................................................ 74

O.   WACHOVIA'S THIRD QUARTER 2007 FORM 10-Q .................................. 75

P.   NOVEMBER 9, 2007 CONFERENCE CALL ............................................... 75

Q.   NOVEMBER 14, 2007 CONFERENCE CALL ............................................. 78

R.   JANUARY 22, 2008 CONFERENCE CALL ................................................ 80

S.   JANUARY 30, 2008 CONFERENCE CALL ................................................ 85

T.   FEBRUARY 13, 2008 CONFERENCE CALL ............................................. 86

U.   WACHOVIA'S 2007 FORM 10-K ........................................................... 89

V.   MARCH 12, 2008 CONFERENCE CALL ................................................... 89

W.   APRIL 14, 2008 CONFERENCE CALL ..................................................... 91

X.   JULY 22, 2008 AND SEPTEMBER 9, 2008 CONFERENCE CALLS .............. 95

IX.   WACHOVIA'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER .................... 96

A.   DEFENDANTS KNEW THAT WACHOVIA DID NOT EMPLOY STRICT
     UNDERWRITING STANDARDS IN ITS ORIGINATION OF PICK-A-PAY LOANS ........... 97

B.   DEFENDANTS KNEW THAT EMPLOYEES WERE INCENTIVIZED TO PROMOTE
     PICK-A-PAY LOANS WITHOUT REGARD TO RISK MANAGEMENT
     STRATEGIES ..................................................................................... 97

C.   HIGHLY UNUSUAL AND SUSPICIOUS INSIDER STOCK SALES BY THOMPSON
     AND OTHER INDIVIDUAL DEFENDANTS CREATE A STRONG INFERENCE OF
     SCIENTER ......................................................................................... 98

D.   GOVERNMENT INVESTIGATIONS CREATE A STRONG INFERENCE OF
     SCIENTER ....................................................................................... 100

     1.   The SEC's Investigation Into Defendant Steel ....................... 100

     2.   The SEC Launches an Investigation into Golden West's Lending
          Practices ............................................................................ 101

     3.   The SEC Recovers More Than $7 Billion From Defendant
          Wachovia Securities ............................................................. 101

E.   WACHOVIA'S NUMEROUS AND EGREGIOUS VIOLATIONS OF GAAP AND
     SEC REGULATIONS IN ITS FINANCIAL REPORTING CREATE A STRONG
     INFERENCE OF SCIENTER .................................................................. 102

X.   WACHOVIA'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH
     GAAP AND SEC REGULATIONS ............................................................. 103

A.     OVERVIEW OF WACHOVIA'S GAAP AND SEC REGULATION VIOLATIONS ......... 103

B.     APPLICABLE ACCOUNTING PRINCIPLES AND SEC REGULATIONS ...................... 105

C.     WACHOVIA'S SPECIFIC VIOLATIONS OF GAAP ................................................ 111

       1.      Mounting Loan Losses Went Unrecorded ............................................... 111

       2.      Goodwill was Carried at Amounts Far in Excess of Realizable Value ......................................................................................................... 114

       3.      Wachovia Consistently Overstated the Value of Certain Investments ............................................................................................. 117

       4.      Wachovia Misrepresented and Failed to Follow Its Disclosed Accounting Policies .............................................................................. 125

       5.      Wachovia Failed To Consolidate Certain Off-Balance Sheet Arrangements ..................................................................................... 127

       6.      Wachovia's Financial Statements Should Have Been Restated ............. 129

       7.      Overstated Underwriting Revenue on CDO Securitizations .................. 132

       8.      Wachovia Manipulates ARS Auctions to Hide Losses........................... 134

       9.      Wachovia Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting................... 141

XI.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 144

XII.      APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE ........................................................................ 144

XIII.     LOSS CAUSATION............................................................................................ 145

COUNTS.......................................................................................................................... 154

COUNT I FOR VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER FOR ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS .......................................................... 154

COUNT II FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)........................................... 156

COUNT III COMMON LAW FRAUD FOR INDUCING PLAINTIFFS TO PURCHASE WACHOVIA STOCK ............................................................... 157

COUNT IV COMMON LAW FRAUD FOR INDUCING PLAINTIFFS TO HOLD THEIR WACHOVIA STOCK .................................................................... 158

COUNT V NEGLIGENT MISREPRESENTATION FOR INDUCING PLAINTIFFS TO
    PURCHASE WACHOVIA STOCK ............................................................................ 160

COUNT VI NEGLIGENT MISREPRESENTATION  FOR INDUCING PLAINTIFFS
    TO HOLD WACHOVIA STOCK .................................................................................. 162

COUNT VII CIVIL CONSPIRACY .......................................................................................... 165

XIV.   PRAYER FOR RELIEF ................................................................................................ 166

JURY DEMAND ...................................................................................................................... 167

Plaintiffs Deka Investment GmbH, Deka International S.A. Luxemburg, Deka Fundmaster Investmentgesellschaft mbH, and International Fund Management S.A. Luxemburg (the "Deka Plaintiffs") and Metzler Investment GmbH ("Metzler") (collectively, the "Plaintiffs"), by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents; press releases; new articles; analysts' statements; conference call transcripts and presentations; and transcripts from speeches and remarks given by the defendants. Plaintiffs make the following allegations against Wachovia Corporation ("Wachovia" or the "Company"), Wells Fargo & Company ("Wells Fargo") as successor-in-interest to Wachovia, G. Kennedy Thompson ("Thompson"); Thomas J. Wurtz ("Wurtz"), Donald K. Truslow ("Truslow"), Lanty L. Smith ("Smith"), and Robert K. Steel ("Steel") (collectively, "Defendants"). Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This action arises from Wachovia's ill-conceived plan to ride the wave of the U.S. housing market long after it had crested and its subsequent attempts to conceal the failure of that disastrous business plan. Well after it was known within Wachovia that its plan had failed miserably, Wachovia deceived investors by repeatedly assuring them that Wachovia's conservative underwriting and origination practices, high-quality credit standards, and risk management strategy made it immune from the effects of a deteriorating mortgage market and that, unlike its competitors, it would emerge from the mortgage industry meltdown unscathed.

2.      In actuality, Wachovia knew that its poorly-timed expansion into the mortgage industry and its high-risk portfolio of subprime assets meant that, as the mortgage market weakened, it stood to lose billions of dollars.  In an attempt to conceal its precarious financial situation and maintain its stock price at an artificially high level, Wachovia adopted a strategy of deliberate and willful deception, outright denying that it was sitting on one of the largest and most toxic portfolios of subprime assets in the banking industry.

3.      Wachovia's demise began in May 2006, when it announced that it would acquire Golden West Financial Corp. ("Golden West"), a California-based residential mortgage portfolio lender, for more than $24 billion.  By this time, many analysts were already predicting that the U.S. housing market had reached its peak and that the housing bubble was about to burst. Nevertheless, Wachovia, led by then-CEO G. Kennedy Thompson, went on a campaign to convince investors that it had bagged "a crown jewel" of the mortgage business.

4.      Golden West's signature product was the Pick-a-Payment ("Pick-a-Pay") mortgage, a "payment option" adjustable rate mortgage so named because borrowers could choose from four different payment options every month.  The first two options amortized the mortgage in the same manner as more conventional products, with borrowers making a payment that covered principal and interest sufficient to pay off the loan in either a 30 or 15 year term. The third option provided for an interest-only payment.  The last, and, as detailed herein, the most nefarious option, allowed the borrower to elect to pay a minimum amount that did not even cover monthly accrued interest.  The remaining interest was then added to the outstanding principal.  This creates what is known as "negative amortization," because with each minimum monthly payment, the borrower's total debt rises, which ultimately locks in the borrower to a

much higher monthly payment when the mortgage automatically "recasts" in five or ten years to the fully-amortizing amount.

5.     Throughout mid-2006, while Wachovia was conducting its due diligence of Golden West and its $124 billion Pick-a-Pay and other adjustable-rate mortgage loan portfolio, the U.S. housing market continued to deteriorate.  New home sales stalled, and median home sale prices reached a plateau.  Interest rates were on the rise.  Most significantly, mortgage default rates began to spike as low introductory rates on mortgages originated twelve to twenty-four months earlier began to reset to fully-indexed levels.  Certain markets, such as California and Florida, which had experienced the biggest upswings during the preceding housing boom, were poised for the biggest declines.  These events also began to affect secondary markets on which collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBSs") were traded as investors became leery of the increasing risk and sought to unwind their positions.

6.     Investors and analysts expressed concern that Golden West's portfolio, which was heavily concentrated with adjustable rate mortgages, especially in California, would be impacted by these changing economic conditions.  However, in the face of a shifting tide, Wachovia pressed onward, determined to continue its expansion into new markets.  During numerous conference calls and presentations, Thompson reassured investors and critics of the Golden West merger by describing it as a "low risk" transaction and emphasizing the "strong credit culture" and "pristine credit quality" of the Golden West loan portfolio.

7.     The Golden West merger closed on October 1, 2006.  Thompson proudly proclaimed, "The combination of Wachovia and Golden West greatly enhances our market presence, product set and mix of businesses, enabling us to deliver a stronger value proposition

for our customers and shareholders." The combined company had an estimated $700 billion in assets and a $107 billion market capitalization.

8.    Although Wachovia outwardly projected a celebratory mood, the storm clouds continued to gather. On October 4, 2006, just days after the Golden West merger was consummated, five federal agencies published final guidance in the *Federal Register* on non-traditional mortgage product risks, which included "payment option" adjustable-rate mortgages, such as the then-newly-minted Wachovia Pick-a-Pay mortgage. The guidance explicitly counseled lenders to, *inter alia*, "maintain sound loan terms and underwriting standards despite competitive pressures," "verify the borrower's income," "adopt more robust risk management practices," and "maintain capital at levels that reflect portfolio characteristics." Further, lenders were advised to pay attention "to appropriate legal review and to using compensation programs that . . . improperly encourage lending personnel to direct consumers to particular products."

9.    From October 2006 to September 2008, unbeknownst to investors and contrary to its public statements, Wachovia arrogantly proceeded with its plan to integrate Golden West in defiance of the guidance of five federal agencies.

10.    First, Wachovia, which historically had focused on traditional, fixed-rate mortgages, became captivated by the Pick-a-Pay product and its potential to boost earnings in the short term. Thus, at a time when all indications suggested that the mortgage market was cooling and other mortgage lenders began failing, Wachovia threw all its resources behind expanding the Pick-a-Pay loan program, without disclosing that the risks were materially higher and the value of these mortgages was materially lower than represented at the time.

11.    Second, throughout 2007 and 2008, as competitive pressure mounted, Wachovia dove deeper and deeper into the abyss by employing methods to continue to feed its Pick-a-Pay

4

addiction and disguise the fact that its portfolio was becoming increasingly risky.  As detailed herein, these methods included, *inter alia*, relaxing underwriting standards, incentivizing employees to sell Pick-a-Pay mortgages over conventional mortgages, and using out-dated information to track borrower delinquency and assess credit risk.  As a result, Wachovia repeatedly overstated the value of its loan portfolio and failed to take adequate loan reserves to preserve its capital position.

12.     Third, when the effects of the housing market decline began to ripple through secondary markets, Wachovia concealed the extent of its holdings of collateralized debt obligations and mortgage-backed securities.  With Wachovia's "burgeoning asset-backed and mortgage-backed securities businesses," it was in a position to know that the value of those holdings had significantly declined; nevertheless, it failed to take adequate write-downs in a timely manner, further distorting its balance sheet and allowing it to keep its stock at levels that did not accurately reflect its financial position.

13.     From 2006 through 2008, Wachovia adamantly denied that it was experiencing any problems.  To allay investors' doubts, Wachovia repeatedly issued reassuring but inaccurate statements indicating that Pick-a-Pay mortgages were distinguishable from and superior to other subprime mortgages because: (1) Wachovia employed strict underwriting guidelines, which required "FICO driven credit scoring" and "diligent and methodical documentation standards" to ensure that "borrowers always qualified at the fully indexed rate"; (2) annual payment increases were capped at 7.5% to limit immediate "payment shock" from adjustable rate resets; (3) there was a ten-year delay before Pick-a-Pay mortgages recast to the fully-amortizing rate; (4) low loan-to-value ratios at origination created an equity cushion in the event of default; and (5) employees were trained on Pick-a-Pay and "responsible cash-flow management."

14.    Moreover, Defendants told investors on numerous occasions that Wachovia was immune from the effects of the mortgage industry meltdown.  In one conference call on January 23, 2007, Defendant Thompson stated, "we just don't think we are going to be impacted by it like some in that business will be. We are very comfortable with that."  This statement was false when made because, while not disclosed at the time, delinquencies in Pick-a-Pay mortgages and losses on CDOs and RMBSs were mounting materially.

15.    In April 2007, Wachovia even went so far as to assure investors that "if anything, we think that any changes [in the mortgage industry] might in fact **benefit** us relative to our competition … [I]t would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion other than we are very responsible underwriters and servicers of these clients."

16.    By November 2007, Wachovia began to sink under the weight of its deception as it was forced to announce charge-offs for losses in its loan and trading portfolios, including growing delinquencies in Pick-a-Pay mortgages, as well as losses on previously-concealed holdings of subprime CDOs and RMBSs.  Wachovia also announced for the first time that it would "bring the Golden West portfolio on to a consistent methodology with the rest of the company in how we treat these loans."  Up to that point, investors were unaware that Wachovia's earnings did not reflect that loans that had gone delinquent for more than six months remained on the books.  These partial, but misleading, disclosures continued into 2008, as Wachovia leaked out information concerning increasing losses and further write-downs, which were attributed to "market disruptions," but which, in reality, were indications that Wachovia had hidden from investors the true value of its assets and the inherent risks in its loan and trading portfolios.

17.     In April 2008, Wachovia, which only weeks earlier had assured investors that its capital and liquidity positions remained stable, announced (i) plans to raise $7 billion in capital in two concurrent, dilutive stock offerings, (ii) a reduction in quarterly dividend, and (iii) increases in loan loss reserves, particularly to cover escalating losses in Pick-a-Pay mortgages. Wachovia also implicitly acknowledged that its allegedly "strict underwriting standards," which were supposed to ensure a low-risk loan portfolio, were a complete farce when it announced implementation of a new model to better estimate credit costs in the Pick-a-Pay portfolio and tightening of home mortgage lending standards so as to require minimum credit scores and verification of borrowers' assets and employment before making loans.[1]  However, as investors would soon learn, these remedial measures were all too little, too late.

18.     By the end of the summer of 2008, Thompson had been ousted as Chairman and CEO and the Pick-a-Pay product had undergone a major overhaul, which many considered an admission by Wachovia that "a lot of borrowers were put into loans they either didn't understand or couldn't afford and that a further surge in defaults is inevitable."[2]  Interim CEO Lanty Smith admitted, "there's been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it."

19.     In a last ditch effort to hold off the rushing waters, new-CEO Robert K. Steel appeared on the CNBC program "Mad Money" in mid-September 2008, and told host Jim Cramer that out of $500 billion in loans, only $10 billion were bad.  To prevent further immediate declines in Wachovia's stock, which had been steadily declining for months, Steel also reassured investors that "We thought about bringing partners in to work with us on the

---

[1] *See* "Wachovia tightens home mortgage standards," April 11, 2008, TRIANGLE BUSINESS JOURNAL, available at http://www.triangle.bizjournals.com/triangle/stories/2008/04/07/daily43.html.

[2] *See* Dean Foust, "Pick-A-Pay Goes Away…," BUSINESS WEEK, June 30, 2008, available at http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

portfolio. But, for now, we feel like we can work through this, and that's the strategy. … [Wachovia] ha[s] a great future as an independent company..."  Steel's remarks were so clearly false when made that they have led to an SEC investigation.

20.    Only two weeks later, as speculation mounted that Wachovia was on the verge of being placed in receivership by the FDIC, Wachovia's deception was finally and completely revealed when, on September 29, 2008, it was announced that Wachovia would be acquired by Citigroup in a deal worth approximately $1 per share – a market capitalization loss of approximately $109.8 billion from 2007.

21.    Wachovia was subsequently acquired by Wells Fargo in a stock-for-stock transaction worth approximately $12.7 billion, or roughly $6.50 per share.  In the wake of Wachovia's collapse, investors finally learned what Wachovia had concealed since its ill-fated acquisition of Golden West, as Wachovia announced in October 2008 a net loss of $23.9 billion, which included $6 billion to increase loan loss reserves, as well as $1.9 billion in net charge-offs. Moreover, expectations for total losses in the Pick-a-Pay portfolio increased to 22% from just 12% in the prior quarter.  Wachovia's quarterly loss was the largest quarterly net loss by a bank ever and the largest loss incurred by a U.S. financial institution since the subprime mortgage meltdown began.  The October 2008 loss, when combined with the $10 billion in losses taken earlier in the year, wiped out nearly all the profit Wachovia has earned since 2001.

22.    To make matters worse, the October 2008 disclosure was just the tip of the iceberg.  According to an article published by *Bloomberg*, Wells Fargo Chief Executive Officer John Stumpf said as recently as December 10, 2008 that "Wachovia's $482.4 billion loan portfolio will produce $60 billion in losses over the next three years, with about 60 percent

coming from option adjustable-rate mortgages."[3]   This stands in stark contrast to Defendant

Steel's remarks just months earlier that losses in the loan portfolio were expected to be

approximately $10 billion.

23.    On February 27, 2009, Wells Fargo admitted in its 2008 Form 10-K that:

> Certain of the loans acquired from Wachovia have evidence of
> credit deterioration since origination and it is probable that we will
> not collect all contractually required principal and interest
> payments. . . . ***Of the $446.1 billion of loans acquired in the***
> ***Wachovia merger, $93.9 billion were determined to be credit-***
> ***impaired.***

24.    The Deka Plaintiffs purchased over $43 million in Wachovia common shares

between May 2006 and September 2008 in reliance on financial information and disclosures

which, unbeknownst to the Deka Plaintiffs, were materially false and misleading.   The Deka

Plaintiffs lost over $26 million as a result of their purchases of these securities and their decline

in value as it was revealed that, contrary to Wachovia's assurances, the inherent risks in

Wachovia's loan portfolio and its exposure to subprime assets meant that Wachovia stood to lose

billions as market conditions worsened.

25.    Plaintiff Metzler Investment GmbH purchased over $17 million in Wachovia

common shares between May 2006 and September 2008 in reliance on financial information and

disclosures which, unbeknownst to Plaintiff, were materially false and misleading.  Metzler lost

over $11 million as a results of its purchases of these securities and their decline in value as it

was revealed that, contrary to Wachovia's assurances, the inherent risks in Wachovia's loan

portfolio and its exposure to subprime assets meant that Wachovia stood to lose billions as

market conditions worsened.

---

[3] *See* Ari Levy, "Wells Fargo's Purchase of Wachovia Tested by Economic Crisis," January 1, 2009, available at
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aJx1Gt0NKWgo.

## II.     JURISDICTION AND VENUE

26.     The claims herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t-1; and common law.

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1332.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the false and misleading statements and omissions were made in or issued from this District.  Wachovia has a substantial presence in New York.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.    THE PARTIES

### A.     PLAINTIFFS

#### 1.     The Deka Plaintiffs

30.     Plaintiff Deka Investment GmbH ("DI"), formerly Deka Deutsche Kapitalanlagegesellschaft GmbH, was formed through a merger between Deka Investment Management GmbH and Deka Deutsche Kapitalanlagegesellschaft GmbH on April 1, 2002. DI's predecessor was originally founded on August 16, 1956 and remains the foundation of all the investment activities undertaken by entities under the DekaBank Deutsche Girozentrale

("DekaBank") umbrella, including DI.  DI manages assets of more than € 100 billion

approximately in equity, bonds and money market funds.  DI controls the underlying mutual

funds and acts as attorney-in-fact for them.

31.    Plaintiff Deka International S.A. Luxemburg ("DIL"), a mutual fund company

established under the laws of Luxembourg, is a subsidiary of DekaBank.  DIL manages assets of

more than € 2 billion.  DIL acquired ordinary shares of Wachovia through open-market

purchases.

32.    Plaintiff Deka FundMaster Investmentgesellschaft mbH ("DFM") is an

investment management company established under the laws of Germany.  DFM is a subsidiary

of DekaBank.  DFM manages assets of more than € 1.8 billion in equity, bonds, and money

market funds.  DFM acquired Wachovia shares through open-market purchases on the New York

Stock Exchange ("NYSE").

33.    Plaintiff International Fund Management S.A. Luxemburg ("IFM") is an

investment fund manager established under Luxembourg law and a subsidiary of DekaBank.

IFM suffered losses in connection with its purchases of shares of Wachovia.

34.    Plaintiffs DI, DIL, DFM, and IFM (collectively, the "Deka Plaintiffs") acquired

1,492,110 shares of Wachovia through open-market purchases suffering losses.

### 2.    Metzler

35.    Plaintiff Metzler Investment GmbH ("Metzler") is an investment company under

German law and a subsidiary of one of Germany's oldest private banks in uninterrupted family

ownership.  Its main offices are at Grosse Gallusstrasse 18, in Frankfurt am Main, Germany.

Metzler manages over € 20 billion in assets of retail and institutional investors in mutual fund

products under the Metzler legal umbrella.

11

36.     Metzler acquired 518,026 shares of Wachovia through open-market purchases suffering losses.

**B.     DEFENDANTS**

**1.     Wachovia**

37.     At all relevant times herein, defendant Wachovia Corporation ("Wachovia" or the "Company") was a diversified financial services company, which operated as a financial and bank holding company, headquartered in Charlotte, North Carolina.  It was one of the nation's largest financial services providers offering a broad range of commercial and retail banking and brokerage services, along with corporate and investment banking products and services. Wachovia had operations in twenty-one states, and maintained nationwide retail brokerage, mortgage lending and auto finance businesses.  As of December 31, 2007, Wachovia ranked as the fourth largest bank in the United States with total assets exceeding $780 billion.  According to the Mortgage Bankers' Association, Wachovia was the seventh leading provider of consumer mortgage loans in the nation.

38.     On December 31, 2008, Wachovia merged with Wells Fargo & Co. ("Wells Fargo").  As part of the merger, Wells Fargo acquired all outstanding shares of Wachovia's preferred securities, which were converted into shares of a corresponding series of Wells Fargo preferred stock having substantially the same rights and preferences.  As a result of the merger, Wells Fargo also acquired all of Wachovia's businesses and obligations, including all of its outstanding debt.

39.     Wells Fargo is named herein as a Defendant as the successor-in-interest to Wachovia.

## 2.   Individual Defendants

40.    Defendant G. Kennedy Thompson served as Wachovia's Chief Executive Officer ("CEO") and President from April 18, 2000 until he retired at the request of Wachovia's Board of Directors on June 1, 2008.  During that time, Defendant Thompson signed Wachovia's Forms 10-K and 10-Q pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, was quoted in Wachovia's press releases and participated in conference calls with securities and market analysts.  Defendant Thompson also signed the Registration Statements for the merger with Golden West and for the merger with A.G. Edwards.  Thompson also signed the Registration Statement for Wachovia's April 14, 2008 common stock offering.  Defendant Thompson is responsible for the materially false and misleading statements complained of herein.  As an executive officer, Defendant Thompson was responsible for the day-to-day operations of the Company.

41.    Defendant Thomas J. Wurtz served as Chief Financial Officer ("CFO") and Senior Executive Vice President from January 31, 2006 until on or about July 24, 2008. During that time period, Defendant Wurtz signed Wachovia's SEC filings, including, but not limited to, Wachovia's Forms 10-K, 10-Q and 8-K, and participated in conference calls with securities and market analysts.  Defendant Wurtz also certified Wachovia's Forms 10-K and 10-Q pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  Defendant Wurtz also signed the Registration Statements for the mergers with Golden West and A.G. Edwards, and the Registration Statement for Wachovia's April 2008 Offering.  Defendant Wurtz is responsible for the materially false and misleading statements complained of herein.  As a senior executive officer of Wachovia, Wurtz was responsible for day-to-day operations of Wachovia and his behavior is central to Wachovia's misconduct.

13

42.    Defendant Donald K. Truslow served as Chief Risk Officer ("CRO") from 2000 until October 2008.  As CRO, Truslow reported to CEO Thompson and was responsible for the oversight of Wachovia's operational, credit, interest rate, balance sheet and market risk. Defendant Truslow is responsible for many of the materially false and misleading statements complained of herein.

43.    Defendant Lanty L. Smith was, at all times relevant herein, a member of Wachovia's Board of Directors.  Smith also served as Chairman of Wachovia's Board since May 2008 and as interim CEO of Wachovia from June 1, 2008 to July 9, 2008, following the departure of Thompson.  Prior to his appointment as interim CEO, Smith was also a member of the Board's Audit Committee and Corporate Governance & Nominating Committee.

44.    Defendant Robert K. Steel was named Chief Executive Officer of Wachovia on July 9, 2008.

45.    The defendants identified in ¶¶ 40-44 are collectively referred to herein as the "Individual Defendants."

## IV.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING

46.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Wachovia, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through Wachovia's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Wachovia officers and/or directors.

47.    It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential, proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

48.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein.  The Individual Defendants knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of securities laws.

49.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded

securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions violated these specific requirements and obligations.

50.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or the opportunity to prevent the issuance or cause them to be corrected.   Accordingly, they are responsible for the accuracy of the public reports and statements detailed herein.

## V.    BACKGROUND

### A.    THE U.S. MORTGAGE CRISIS

51.    The current crisis in the U.S. residential mortgage market is a byproduct of the market of approximately seven years ago.  At that time, the Federal Reserve began cutting interest rates dramatically, and the rate on a 30-year fixed rate mortgage was at the lowest levels seen in nearly 40 years.  This presented a unique opportunity for many individuals to achieve the American dream of homeownership.  The combination of increased demand for homes and lower interest rates fueled a building boom in new homes, a dramatic rise in home prices and increases in origination and lending to new homeowners.  At the same time, lower interest rates and increased liquidity in capital markets broadly depressed risk premiums, and lenders and investors sought riskier opportunities to bolster their investment returns.  This lead to the creation of new financial instruments that bundled newly-originated, riskier mortgages into securities, which re-packaged and spread this risk to investors in secondary markets.

52.    Wachovia was an active participant in both the origination and securitization channels during this period.  Thus, to understand Wachovia's fraud, it is necessary to briefly

understand the market forces that converged to create what *The Economist* has called the "biggest financial bubble in history."

### 1.    Subprime Mortgages Become Attractive to Lenders

53.    For lenders, the historically-underserved "subprime borrower" became a very attractive source of potential profit.  In broad terms, a subprime borrower is generally one who has a high debt-to-income ratio (usually 50% or greater), an impaired or minimal credit history, or some other characteristic that is associated with a higher risk of default.  As explained in examination guidance issued by federal regulators:

> The term "subprime" refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories. Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase. Such loans have a higher risk of default than loans to prime borrowers.[4]

54.    Lenders typically rely on the Fair Isaac Credit Organization ("FICO") credit score to classify a borrower as "prime", "nonprime", or "subprime."  FICO defines the FICO score, which ranges from 300 to 850, as "the standard measure of U.S. consumer risk" and "the recognized industry standard in consumer credit risk assessment."  A borrower with a FICO score below 660 is generally labeled "subprime."

55.    Additionally, "subprime," when used to describe mortgages, may refer to loans sharing certain underwriting characteristics that increase the likelihood of default, often because the borrower cannot satisfy the underwriting criteria employed for conforming, prime loans.  The

---

[4] *See* Office of the Comptroller of the Currency, *et al.*, "Expanded Guidance for Subprime Lending Programs," available at http://www.fdic.gov/news/news/press/2001/pr0901a.html.

underwriting features associated with subprime mortgages include: (1) high loan-to-value ("LTV") ratios, often in excess of 80%; (2) minimal or no down payment; (3) low introductory, or "teaser" rates; (4) the option to pay less than the monthly principal and interest payment; and (5) minimal or no documentation or verification of borrower income or assets (otherwise known as "stated income," "no income/no asset verification," "NINA" or "no-doc" loans). In some cases, depending on the collateral and the lender's underwriting criteria, loans bearing some of these hallmarks may have been classified as "Alt-A" or "nonprime," a category falling somewhere between prime and subprime.

56.    The LTV ratio was particularly important in assessing the risk associated with a subprime loan. The LTV ratio compares the amount loaned to the total appraised value of the property. For example, if a borrower obtains a mortgage for $70,000 to purchase a house worth $100,000, the LTV ratio is 70%. Lower LTV ratios are indicative of less risk for two reasons. First, a borrower with low loan balance relative to the value of the property is less likely to default, because he has too much equity at stake to risk losing. Second, in the event of default, the built-in equity cushion protects the lender from loss, because even after the costs of foreclosure are factored in, the lender is still at a greater likelihood of recouping the original loan amount.

57.    Once lenders whet their appetite, they became increasingly willing to undertake additional risk (*e.g.*, loans with higher LTV ratios and less borrower documentation) in exchange for the boost in profits. Subprime mortgage originations grew from $173 billion in 2001 to a record level of $665 billion in 2005, which represented an increase of nearly 300%.[5] As competition for this lucrative new pool of borrowers increased, lenders offered consumers a new

---

[5] *See* Eric Petroff, "Who Is To Blame For The Subprime Crisis?", available at http://investopedia.com/printable.asp?a=/articles/07/subprime-blame.asp.

array of loan products, oftentimes without consideration as to whether borrowers really understood the terms or ultimately had the ability to repay.

### 2.    The Proliferation of Financial Instruments Backed By U.S. Residential Mortgages

58.    Lenders were also motivated to engage in riskier lending practices because of the expansion in the market for securities backed by pools of mortgages. These mortgage-backed securities ("MBSs") and collateralized debt obligations ("CDOs") enabled lenders to sell mortgages to third parties, thereby transferring the risk of delinquencies and defaults on the mortgages they originated. Thus, lenders could generate profits by ramping up originations, regardless of loan quality.

59.    MBSs and CDOs are both types of asset-backed securities ("ABSs"). ABSs are not a new concept. The Government National Mortgage Association ("Ginnie Mae") had been bundling and selling securitized mortgages as ABSs for years. However, the collateral underlying Ginnie Mae's ABSs was subject to strict criteria that earned these securities AAA ratings from the credit rating agencies. As the real estate market exploded, the ABS was used as the platform to propagate new, more creative financial instruments that often bundled and re-bundled subprime mortgages or loans to borrowers with less-than-stellar credit.

60.    For instance, the residential mortgage-backed security ("RMBS") bundled subprime residential mortgages. To create an RMBS, an originator or underwriter purchased a large number of individual residential mortgages (often numbering in the thousands) from banks and/or non-bank mortgage lenders (*i.e.*, Wachovia). Generally, the purchased mortgages underlying an RMBS possessed similar characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that they could be pooled together and rated accordingly.

61.     Once the originator or underwriter purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold them to a "special purpose vehicle" ("SPV").  An SPV is a separate, bankruptcy-remote legal entity created by the originator in order to transfer the risk of the underlying mortgages off the originator's balance sheet.  The SPV takes title of the individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool.  RMBSs are issued in several unequal classes called tranches, ranging from "High Grade" (AAA and AA-rated bonds), "Mezzanine" (BBB- to B-rated bonds), or an unrated equity tranche sometimes called the "residual."

62.     The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages through the prioritization of payments and the apportionment of losses among the different classes of bonds. Typically, the AAA-rated tranche of the RMBS received first priority on cash flows from the borrowers on the underlying mortgages (otherwise known as "remittance payments") but received a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders received the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experienced defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

63.     In most instances, an RMBS originator or underwriter worked closely with one of the three rating agencies, Moody's Corp. ("Moody's"), Standard & Poor's ("S&P") or Fitch, to determine the right combination of mortgages to include as collateral for a given RMBS. The goal for an originator or underwriter was to fill each mortgage pool with high interest paying but

riskier collateral that would still allow for an AAA-rated class of RMBS.  As set forth above, riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans.  By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV.  This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

64.    Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors.  The SPV transferred proceeds from the sale of the bonds to the originator in consideration for the underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

65.    The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), illustrates the creation and structure of a typical RMBS issuance:



66.     While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective.  Wachovia, among others, was also involved in developing more complex structured finance products designed to profit from Mezzanine subprime RMBS, most notably Collateralized Debt Obligations, or CDOs.

67.     Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  It is created in very much the same way as RMBSs, the key difference being that while RMBSs are backed by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches.

68.     Just as with RMBSs, CDO originators amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO.  Instead of warehousing residential mortgages, a CDO originator collected tranches of RMBS.  In the course

of this process, the CDO originator had to evaluate the quality of the RMBS tranches that would be used to collateralize the CDO. In other words, the originator had to decide if it was creating a "Mezzanine CDO," which typically would be collateralized by lower BBB/BB-rated RMBS tranches, or a "High Grade CDO," which typically would be collateralized by AAA/AA-rated RMBS tranches.

69.    CDO originators, like Wachovia, earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors.

### B.    INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY EARLY 2006

70.    By late 2005, three key indicators used by industry experts to assess the state of the mortgage market pointed in the direction of a slowdown in mortgage markets. First, as illustrated by the chart below, the Housing Price Index, which measures changes in home prices, peaked in mid-2005 and then began to decline precipitously in 2006:



OFHEO HOUSE PRICE INDEX HISTORY FOR USA
Seasonally-Adjusted Price Change Measured in Purchase-Only Index

71.    Second, as housing prices declined, interest rates began to rise from their historically-low levels:



72.    This combination was devastating for U.S. borrowers who over-extended themselves by purchasing homes based on their ability to pay initial lower monthly payments marketed by lenders as part of "payment-option" loan products (such as Wachovia's Pick-a-Pay) or other adjustable rate mortgages ("ARMs").  The original theory behind these mortgages was that as long as home values continued to rise, the borrower could use the increased equity to "catch-up" on their payments and refinance the mortgage when the low introductory or adjustable rate was about to expire.

73.    Unfortunately, with rising interest rates, declining home prices and expiring introductory rates, many borrowers began to experience "payment shock" as monthly payments skyrocketed to account for recasting of interest rates and resetting of payments to fully-amortizing levels.  As a result, beginning in 2005, mortgage default rates, the third indicator of the state of the mortgage market, rose drastically, particularly for subprime loans, as illustrated in the chart below:



Mortgage delinquency rates, 2001–07

NOTE: The data are monthly. Prime-mortgage data extend through April 2007, and subprime-mortgage data extend through May 2007. Delinquency rate is the percent of loans ninety days or more past due or in foreclosure. Prime mortgages include near-prime mortgages.
SOURCE: First American LoanPerformance.

74.    The sharp increases in mortgage delinquency rates, coupled with stagnant housing prices, should have alerted banks, like Wachovia, to the possibility that subprime and other ARM borrowers would not be able to repay loans.  Wachovia, which repeatedly touted its conservative approach, its sophisticated risk modeling tools, and its active and diligent risk management, must have been aware of the spike in loan delinquencies beginning in mid-2005 and must have witnessed a similar spike in delinquencies in its own mortgage loan portfolio.

### C.    INDICATORS THAT SECONDARY MARKETS FOR MBSS AND CDOS WERE DETERIORATING BY FEBRUARY 2007

75.    The spike in mortgage delinquencies also impacted the value of RMBSs and CDOs, which Wachovia had amassed in its loan portfolio and which were tied to the revenue streams that the underlying subprime mortgages were supposed to generate.  This rise in delinquencies, in conjunction with declining home values and rising interest rates, lead to tightening lending standards, making it that much more difficult for subprime borrowers to

refinance their way out of resetting mortgages they could not afford, and which, in turn, exacerbated already-deteriorating market conditions.

76.     By February 2007, it was widely recognized that this convergence of factors would materially impair even the highest rated MBSs and most senior tranches of CDOs. This decline in value was reflected in a specialized index, the ABX.HE ("ABX Index"), which was designed in January 2006 by a consortium of banks, including Wachovia, to track the value of subprime RMBS tranches. Specifically, the ABX Index measures the cost of purchasing protection for a subprime RMBS. Thus, if the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value. Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgages.

77.     As set forth in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted, evidencing that the cost of insuring subprime RMBSs had increased dramatically. This corresponds to the rise in payment delinquencies reported at the same time. Investors thus anticipated that the risks associated with subprime RMBS would almost certainly cause large losses.

**Figure 5: ABX.BBB 06-2**



Source: Markit

78.    Since CDOs were backed by subprime RMBS tranches, even highly-rated CDOs were in danger of suffering severe devaluation.  On February 18, 2007, the front page of the *New York Times* Business Section referred to a report by Mason and Rosner titled, "How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?", which concluded that credit ratings of RMBSs and CDOs bore little relation to reality and that, "[g]iven the high proportion of CDO investments in mezzanine RMBS," "even investment grade rated CDOs will experience significant losses."[6]

79.    By February and March 2007, the ABX Index for BBB and BBB- RMBS tranches had suffered substantial declines, with some BBB- tranches having dropped approximately 60%

---

[6] *See* Mason and Rosner, "How Resilient are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?," Feb. 15, 2007, p. 30 and p. 2 (www.hudson.org/files/publications/Mason_RosnerFeb15Event.pdf).

of par.  Market analysts predicted that values were "going to zero."[7]  Likewise, CDO prices plummeted at every Mezzanine CDO level, including the "super senior" levels that had been retained by Wachovia during its securitization process.

80.    Thus, the escalating risks associated with RMBS and CDO were well documented and understood early in 2007.  What was unknown was that Wachovia had built up billions of dollars of these securities in its portfolios because it had retained a sizeable share of the Mezzanine CDO tranches that it created.  Wachovia managed to keep this information hidden until January 2008.  As these investments became completely illiquid to the point of being virtually worthless, Wachovia propped up their value for years by reassuring investors that it had undertaken appropriate risk-management strategies, including hedging against losses.  However, Wachovia, a "vertically-integrated" mortgage originator and wholesaler with "burgeoning asset-backed and mortgage-backed securities businesses," knew that these stop-gap measures were wholly inadequate to deal with the oncoming capital and liquidity crisis it would face once the truth about the value of these assets was revealed.

## VI.    DEFENDANTS' FRAUDULENT SCHEME

### A.    WACHOVIA PUBLICLY TOUTS THE "PRISTINE CREDIT QUALITY" OF THE GOLDEN WEST PORTFOLIO

81.    Wachovia announced on May 7, 2006 that it planned to expand its nationwide footprint as a mortgage originator by acquiring California-based mortgage lender, Golden West.

82.    Up to this point, Wachovia was a diversified financial services company, engaged primarily in traditional lending activities.  It was not known for subprime mortgage origination. In fact, Wachovia had been widely credited for its conservative lending practices.  Defendant Thompson promoted this image of the Company at a meeting of bankers in January 2006, where

---

[7] See Jody Shenn and Shannon D. Harrington, "Subprime Mortgage Derivatives Extend Drop on Moody's Reviews," Bloomberg, Feb. 22, 2007.

he commented on the "toxic" loans being marketed by other mortgage lenders: "I have literally been amazed at the terms offered by some mortgage lenders, though thankfully not at Wachovia…"  Analysts were increasingly amazed too, and many doubted Wachovia's strategy and timing in acquiring a California-based mortgage lender with a very different business model.

83.     This prompted a campaign by Defendants to convince investors of the soundness of the decision to acquire Golden West.  From the outset, this meant materially misstating the risks associated with Golden West's signature product, the Pick-a-Pay loan.  For instance, the May 7, 2006 press release announcing the merger, which was filed with the SEC on May 8, 2006 on Form 8-K, and which was incorporated by reference into certain offering materials, proudly declared that Golden West was "a risk-averse residential mortgage portfolio lender," known for its "pristine credit quality," which would "generate superior long-term growth in earnings per share."  In a conference call with analysts on May 8, 2006, Thompson described Pick-a-Pay as "an elegantly simple option ARM product that is low risk because of, number one, the product features … and two, because of [Golden West's] rigorous underwriting process."  Thompson also flatly denied that the Golden West acquisition marked Wachovia's entrance into the subprime market when he said, "They have no subprime origination at Golden West, so a very conservative portfolio."

84.     While housing prices tumbled and interest rates rose, Defendants continued their campaign into the summer of 2006.  In an August 2006 presentation, Thompson characterized Golden West as a "top 10 mortgage originator" with a "low risk $121 billion consumer loan portfolio."

85.     On October 1, 2006, Wachovia completed the acquisition of Golden West. Golden West shareholders received 1.051 shares of Wachovia plus $18.6461 in cash for each

share of Golden West stock. The total cost of the acquisition was $24.3 billion. Wachovia raised the cash for the Golden West acquisition primarily through debt and other offerings. Subsequent to the Golden West acquisition, Wachovia's 2006 Annual Report evinced a strong combined entity with a market capitalization of $108 billion and stated assets of $707 billion.

86.    Despite Defendants' promotion of the acquisition, analysts still suspected that Wachovia paid a substantial premium for Golden West after the real estate market had already peaked. Nevertheless, as detailed herein, Defendants repeatedly made false and misleading statements concerning the risks inherent in the Pick-a-Pay product and the degree to which Wachovia's $120 billion Pick-a-Pay loan portfolio would be impacted by changing market conditions. Indeed, Wachovia made numerous statements indicating that it had no subprime exposure at all. As set forth herein, Wachovia's efforts to conceal the truth about its exposure to deteriorating market conditions were compounded by its failures to take adequate loss reserves, write down assets in a timely manner, and employ appropriate internal controls and risk management strategies.

### B.    WACHOVIA CONCEALS THE TRUTH ABOUT THE GOLDEN WEST PORTFOLIO

87.    Golden West's signature product, the Pick-a-Pay loan, lies at the center of Wachovia's fraud. From May 2006 until October 2008, Defendants repeatedly reassured investors that the Pick-a-Pay loan was distinguishable from and superior to other option ARM and subprime products offered by competitors. Defendants made these assurances because, by the time the Golden West acquisition was consummated in October 2006, it was already apparent that the mortgage market was headed for a crash. By denying the impact of changing market conditions, Wachovia was able to keep its share price artificially inflated and report increasing profits while competitors with similar exposures were beginning to crumble and fail.

88.    Like other payment option ARMs, the Pick-a-Pay mortgage gave borrowers four different payment options every month.  The first two options provided for a full payment of interest and principal due, in an amount sufficient to satisfy the loan in either 15 or 30 years. The third option provided for payment of accrued interest, while maintaining the previous loan balance.  The fourth option allowed the borrower to make a minimum payment that was less than the accrued interest for that period, with the remaining unpaid portion of interest added to the outstanding principal balance of the loan.

89.    A borrower who makes only the minimum payment experiences "negative amortization," because with each payment, the outstanding principal balance of the loan actually increases.  In a real estate market that is stable or rising, the borrower's election of a payment that leaves him further away from payoff is rationalized by the notion that the borrower can "catch-up" by refinancing at a later date and using equity gained as the result of increasing housing prices.  However, by October 2006, when the Golden West deal closed, these market conditions no longer existed.

90.    Nevertheless, Defendants repeatedly touted four product features that immunized the Pick-a-Pay loan portfolio from the vagaries of the market:  (1) Golden West's (and subsequently, Wachovia's) strict underwriting guidelines; (2) low LTV ratios of approximately 70%; (3) an annual payment cap of 7.5%, which limited immediate "payment shock" from adjustable-rate resets; and (4) a 10-year delay before Pick-a-Pay mortgages "recast" to fully-amortizing rates.

### 1.    Defendants Mislead Investors by Claiming that Pick-a-Pay Mortgages Were Originated With Strict Underwriting Guidelines

91.    From the moment the Golden West acquisition was announced, Defendants latched onto Golden West's "conservative underwriting standards," as the key factor that ensured

that their $120 billion Pick-a-Pay loan portfolio, unlike portfolios of subprime lenders, was "low risk." During a May 8, 2006 investor conference call, Defendant Thompson was effusive: "They are obsessed, and we have been so impressed as we have visited with Golden West and studied their process, they are obsessed with conservative underwriting, and as a result, their credit quality in every environment over that 43-year-period has been outstanding … We love the conservative model."

92.     As discussed in more detail, *infra*, at Section VI.C, Golden West did not employ strict underwriting criteria at all. In fact, many Pick-a-Pay loans were originated without regard to a borrower's FICO score and without verification of employment or assets. Unbeknownst to investors, Wachovia quickly adapted similar lax underwriting criteria once the Pick-a-Pay loan was embraced and launched throughout the organization.

> **2.      Defendants Mislead Investors By Repeatedly Citing LTV Ratios That Did Not Accurately Reflect The Current Risks Inherent In The Pick-a-Pay Portfolio**

93.     The focus on low LTV ratios at origination was also deliberately deceiving. As explained, *supra* at ¶ 56, mortgages with a low LTV are both less likely to default and less costly to lenders if they do. With respect to the risk of default, a borrower with substantial equity has a stake in the property and is thus less inclined to risk losing that investment. In contrast, borrowers with little or no equity, *e.g.*, Pick-a-Pay borrowers making minimum payments insufficient to cover monthly accrued interest, have little incentive to continue making payments. From the lender's perspective, if the borrower defaults, a lower loan balance relative to the value of the property (*i.e.*, a low LTV ratio) increases the likelihood that the lender can recoup the amount still outstanding, less foreclosure costs.

94.     By repeatedly emphasizing the low LTV ratios of Pick-a-Pay loans ***at origination***, Defendants deliberately concealed the impact of changing market conditions on the Pick-a-Pay

loan portfolio, and specifically, the ever-increasing risks of default.  In fact, Defendants knew that LTV ratios had risen dramatically from the time the loans were originated.  This was due to the fact that as the majority of borrowers elected to make only minimum payments, their loan values increased.  Moreover, Golden West's highly-acclaimed "robust" appraisal process proved short-sighted as property values were on the decline, particularly in the geographic areas where the loan portfolio was most concentrated.

95.    Defendants ignored and indeed, denied, this reality, consistently maintaining throughout 2006, and as late as December 2007, that the average LTV ratio was approximately 71%.  On November 9, 2007, at a conference at the BancAnalysts Association of Boston, Defendant Truslow explained,

> The average loan to value at origination was about 71%. We do some refresher work from time to time, where at the property level we go out and order AVMs or automated -- actually values that are generated by automated valuation models I think is what it stands for and actually if you take a look at the most recent run across our book the loan to value and aggregate ***is actually a little better than*** the 71%.  (emphasis added).

96.    Although Defendant Truslow conceded that a portion of loans categorized as non-performing had LTV ratios greater than 90%, he dismissed this statistic as not being very significant: "Very little about 90% we've been very careful of where we have gone about 90% loan to value and the performance there has been very good."

97.    It wasn't until April 2008, that Defendants finally admitted that the repeated reference to LTV ratios at origination was virtually meaningless.  At that time, Defendants made a fundamental change to their loss reserve model to take this shifting LTV dynamic into account.  This necessitated a massive increase in loan loss reserves, as it was revealed that 14% of Wachovia's $120 billion loan portfolio had LTV ratios exceeding 100%.

98.     Only in late 2008 did Defendants finally acknowledge that the average LTV ratio for the entire Pick-a-Pay portfolio had risen from the often-cited 71% to a shocking 95%.  The risks of default and loss severity at 95% are entirely different and hardly fall within the description of "low risk" that Defendants had promoted.

### 3.     Defendants Mislead Investors Because The 7.5% Annual Payment Cap and 10-Year "Recast" Period Did Not Eliminate The Risk Of "Payment Shock," But Merely Delayed It

99.     Finally, Defendants' attempts to distinguish Pick-a-Pay from other payment option ARMs based on the 7.5% annual payment cap and 10-year recast period were false and misleading, because these features did not alter the underlying problem associated with payment option ARMs, namely that the subprime borrower, with an already high debt-to-income ratio and/or unverified income or assets, would eventually be faced with a payment he could not afford, especially in a market where interest rates were rising and home values were declining.

100.    The 10-year recast period repeatedly emphasized by Defendants was also misleading because Pick-a-Pay loans actually would recast much sooner if borrowers elected to make only the minimum payment each month.  This is due to the fact that in order to curtail negative amortization, the borrower's minimum monthly payment increased to fully-amortizing levels once the LTV ratio reached 125%.  Where the borrower's LTV ratio was greater than 85% at origination, the cap was even lower, with loans recasting to fully-amortizing levels when the LTV ratio reached 110%.  As economic conditions worsened, Wachovia failed to acknowledge that more borrowers were electing to make only minimum monthly payments.  With housing values declining at the same time, this meant that LTV ratios were rise faster, thereby accelerating the time table for recasting.

101.    The effects of accelerated recasting of Pick-a-Pay loans were readily apparent to Wachovia.  In 2006, as low "teaser" rates on mortgages originated one, three or five years earlier

began to reset to current rates, many borrowers experienced "payment shock" as minimum monthly payments doubled or tripled to fully-amortizing levels, and as a result, mortgage delinquencies skyrocketed.

102.    Contrary to Defendants' assurances, Pick-a-Pay mortgages operated the same way as other payment option arms, except in slow motion.  Thus, the 7.5% cap on payment increases and seemingly-longer period before the mortgage "recast" just meant that it might take longer for Pick-a-Pay borrowers to reach the unaffordable payment threshold and delinquency, but eventually, they would get there, just as with other payment option ARMs.

103.    The delinquencies and bankruptcies experienced by many competitors should have been a call to action for Defendants.  Instead, Defendants utilized their competitors' failures as an opportunity to trumpet Pick-a-Pay's purported superiority and to justify Wachovia's low loan loss reserves as compared to other subprime lenders.  However, in actuality, Defendants knew but failed to inform investors that the Pick-a-Pay portfolio was living on borrowed time, because Pick-a-Pay would eventually succumb to the same market forces that were afflicting other loan portfolios with similar subprime exposure.

### C.    WACHOVIA CASTS ASIDE ITS TRADITIONAL LENDING PRACTICES AND ADOPTS A RISKIER APPROACH

104.    As previously explained, prior to the Golden West acquisition, Wachovia had a reputation as a conservative lender of traditional fixed rate mortgages.  However, Wachovia had a strong desire to "expand its footprint" into new markets, particularly in Western states where Golden West's portfolio was concentrated.  This quest for growth became an obsession, and Defendants literally banked on Pick-a-Pay as the means to that end.

105.    After the Golden West merger was completed, Wachovia, blinded by its ambition to expand West, allowed the Pick-a-Pay product to infiltrate the entire company.  Within the first

few months of integration, Golden West executives "took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature 'Pick-a-Payment' loans."[8]

106.    Thus, at a time when all indications suggested that the tide had turned on the housing and mortgage markets, Wachovia ramped up its efforts to expand the Pick-a-Pay product throughout the organization. In April 2007, Defendants announced that 800 employees were being trained to offer Pick-a-Pay loans and would be deployed to key locations. Wachovia promoted the Pick-a-Pay loan via TV commercials, brochures, and on its website. This aggressive marketing continued even after many banks stopped offering similar loans.[9] In fact, as late as April 2008, with the number of loan delinquencies increasing, LTV ratios rising, and mortgage lenders failing, Wachovia was still running television ads promoting Pick-a-Pay loans.

107.    To a large extent, Wachovia achieved its goal. By 2007, it had become the second largest provider of payment option ARMs, a category that includes Pick-a-Pay loans. By 2008, Pick-a-Pay loans accounted for approximately 70% of Wachovia's mortgage portfolio.

108.    But the price of this success was concealed. Defendants repeatedly assured investors that Wachovia would "not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices" or "struggle for higher originations at the expense of damaging the business model." In actuality, Wachovia was willing to abandon conservative underwriting standards and implement incentives that weakened internal controls

---

[8] Dean Foust, "Wachovia: Golden West Wasn't Golden," BUSINESS WEEK, June 4, 2008, available at: http://www.businessweek.com/magazine/content/08_24/b4088026392160.htm.

[9] Rick Rothacker, "Wachovia mortgage program stirs concerns," CHARLOTTE OBSERVER, March 31, 2008 ("Wachovia has expanded into these mortgages at a time when others are pulling back. Charlotte-based Bank of America, for example, stopped making the loans last year.").

and risk management practices in order to satisfy its appetite for the short term profits generated by Pick-a-Pay loans and its hunger to grow at all costs.

### 1. Underwriting Standards Were Weakened to Increase Originations and Boost Profits

109.    Wachovia had repeatedly touted Golden West's "conservative underwriting standards." However, in actuality, Wachovia failed to employ even the most basic underwriting standards in connection with its Pick-a-Pay loans. First, Wachovia did not require a minimum credit score. Credit scores are routinely required for many loans, but for its largest and riskiest loan – the Pick-a-Pay – Wachovia inexplicably failed to set any kind of minimum standard.

110.    Second, Wachovia did not verify borrower income. The IRS allowed lenders to easily verify borrower incomes by using IRS Form 4506T in connection with a loan application. By verifying borrowers' incomes with the IRS, Wachovia could easily have prevented borrowers from overstating their income, which would have allowed Wachovia to make a more accurate determination regarding their ability to repay loans. According to an April 6, 2008 NEW YORK TIMES article, over 90% of home loan borrowers should have been required to provide IRS Form 4506T with their applications. However, as the NEW YORK TIMES reported, income was only verified on 3-5% of all home loans funded in 2006. Wachovia's failure to verify borrower incomes substantially increased the risk associated with its mortgage portfolio.

111.    The truth about Wachovia's underwriting criteria did not come to light until April 11, 2008, when it was reported in the press that Wachovia would begin to require minimum credit scores and verify borrowers' assets and employment.[10]

---

[10] See "Wachovia tightens home mortgage standards," TRIANGLE BUSINESS JOURNAL, April 11, 2008, available at: http://triangle.bizjournals.com/triangle/stories/2008/04/07/daily43.html.

112.    Wachovia had emphasized its "conservative underwriting" as the feature that set it apart from its competitors.  Instead, its lack of even the most basic standards had fueled the Pick-a-Pay loan frenzy, substantially increasing the risks associated with the Pick-a-Pay loan portfolio.

### 2.    Wachovia Incentivized Employees to Push Pick-a-Pay Loans on Unsuspecting, Poorly-Qualified Borrowers

113.    To make matters worse, as the economy deteriorated throughout 2007, the pool of borrowers became smaller and smaller.  Thus, Wachovia found other ways to drive demand, namely by resorting to lending practices that took advantage of borrowers who could least afford it – those with substandard credit and insufficient income.

114.    A training script published in the CHARLOTTE OBSERVER provides a sample sales pitch Wachovia encouraged employees to use when selling Pick-a-Pay loans.   The script illustrates how Wachovia trained employees to target less-qualified borrowers:

> "If you're like us, there's more coming out than in some months, and we start putting more and more charges on our credit card. . . . What can we do?  Uncle Sam isn't going to take less.  Or the car company.  Or the credit card company.  The children need to be cared for.  You can't get along without insurance.  Plus, you need to eat, and keep the lights on.  That leaves your mortgage payment. . . . What if you could pay a lot less on your mortgage some months when you need flexibility?"

115.    What Wachovia did not tell potential borrowers was that the cost of "flexibility" was mounting – and often insurmountable – debt.  Wachovia employees were urged to downplay the consequences of negative amortization and emphasize to customers the increased cash flow Pick-a-Pay loans provided.  BUSINESS WEEK reported that a Wachovia training video "instructed

[loan officers] to avoid using terms like 'negative amortization' in favor of euphemisms like 'deferred interest.'"[11]

116.    In addition to being less than transparent in communicating the risks, Wachovia then took it one step further, and marketed the selection of a Pick-a-Pay loan as a wise financial decision.  In an MSNBC.com article, former Wachovia mortgage consultant Sharren McGarry ("McGarry") described how Wachovia told her to promote Pick-a-Pay loans:

> The pitch included sales literature comparing two brothers.  One took the Pick-a-Pay loan, made the minimum payment and put money in the bank.  The second brother got a conforming loan. Five years later, both brothers needed to pay their children's college tuition.  "(The brother with the conforming loan) didn't have money in the bank," said McGarry. . . . "That's how they sold it."

117.    In addition to training, Wachovia ensured that employees were properly motivated by offering lucrative incentives to sell Pick-a-Pay loans as compared to other loan products.  For instance, a Wachovia call center document obtained by the CHARLOTTE OBSERVER showed Wachovia awarded sales representatives 120% of their incentive pay for selling at least four Pick-a-Pay loans per month.  Wachovia also set minimum monthly quotas for sales of Pick-a-Pay loans.  If loan officers failed to meet these quotas, they were disciplined, and sometimes fired.

118.    A former Wachovia mortgage consultant in Texas told the CHARLOTTE OBSERVER that he was supposed to sell two Pick-a-Pay loans per month.  "That's all we heard about was Pick-a-Pay . . . If you sold a 30-year fixed (rate mortgage), they'd say, 'Why didn't you sell a Pick-a-Pay?'"

---

[11] *See* Foust, *supra* at fn. 8.

119.    Another former Wachovia loan officer quoted in the same article said she left Wachovia because of the intense pressure to sell Pick-a-Pay loans.

120.    McGarry says she was required to ensure that Pick-a-Pay loans accounted for roughly half of her total sales.  When McGarry did not meet her quota, she said her manager "frequently reminded [her] that her job requirement was that [she] do 45 percent of [her] volume in the Pick-a-Pay loan."  In June 2008, her manager wrote a "Corrective Action and Counseling" warning for McGarry failing to meet the bank's production expectations.

121.    Other sources corroborate McGarry's story.  For instance, an internal Wachovia memorandum cited by the CHARLOTTE OBSERVER said if sales quotas were not met, "it may lead to further corrective action up to and including termination[.]"

122.    Wachovia's decision to implement these aggressive sales tactics and employee incentives directly contravened guidance published by bank regulators in October 2006, which expressed concern that the expansion of nontraditional mortgage loans, such as Pick-a-Pay, "exposes financial institutions to increased risk relative to traditional mortgage products."[12] Bank regulators explicitly counseled that "communications with customers, including advertisements, oral statements, promotional materials, and monthly statements, should provide clear and balanced information about the relative benefits and risks of these products, including the risk of payment shock and the risk of negative amortization."[13]  Moreover, lenders were warned that "[l]ending personnel should be monitored" and "attention should be paid … to using

---

[12] *See* Interagency Guidance on Nontraditional Mortgage Product Risks, Wednesday, October 4, 2006, 71 Fed. Reg. 58609-07, p. 58613.

[13] *Id*. at  58616-7.

compensation programs that do not improperly encourage lending personnel to direct consumers to particular products."[14]

123.    Wachovia consistently maintained that procedures were in place to prevent exactly the kind of escalating risks that bank regulators predicted.  However, unbeknownst to investors, the only procedures that ultimately mattered to Wachovia were those that produced consistent profits and growth.  Thus, "conservative underwriting" fell by the wayside while aggressive and opaque sales tactics were encouraged and rewarded.  As a result, Wachovia greatly increased the concentration of risky loans in its portfolio.

124.    Wachovia's and Golden West's lending practices are currently the subject of several ongoing investigations by the SEC and the Justice Department.

### 3.    Appraisals Related to Wachovia's Loans Were Improperly Inflated

125.    The appraisal process employed by Golden West, and after the merger, by Wachovia, was supposed to provide additional protection from Pick-a-Pay losses, because proper valuation of the underlying collateral ensured that Wachovia could recoup the original loan amount in the event of default and foreclosure.

126.    On April 16, 2007, Defendant Wurtz spoke reassuringly about the Golden West appraisal process:

> [T]he Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to the quality of the appraisals.  Most appraisals are completed by in-house appraisers and the appraisal process, I can tell you, it's very robust. Over the last several months since our teams have worked more closely with one another through integration, our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger.

---

[14] *Id.* at 58618.

127.    However, after Wachovia's acquisition of Golden West, Wachovia discontinued the policy of exclusively employing in-house appraisers in connection with Pick-a-Pay loans. Instead, Wachovia utilized outside, third-party appraisers to value the property, and relegated in-house appraisers to reviewing these third-party appraisal reports.

128.    In contrast to Wachovia's in-house appraisers, who were rewarded based on the long term accuracy of the appraisal, the outside, third-party appraisers received a one-time payment at the time the loan closed.   Thus, they did not have the same "cradle-to-grave" mentality that motivated in-house appraisers, and as a result, these third-party appraisals were more likely to overvalue the property.  This contributed to a further distortion in LTV ratios in the Pick-a-Pay loan portfolio.

129.    Plaintiffs believe that additional discovery will uncover further evidence that Wachovia misrepresented the value of the underlying loan portfolio, which meant that even at origination, LTV ratios were false and misleading and investors were exposed to a substantial undisclosed risk of loss inherent in the Pick-a-Pay loan portfolio.

**D.    WACHOVIA CONCEALS THE TRUTH ABOUT ITS HOLDINGS OF CDOS AND RMBS**

130.    During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed by pools of subprime mortgages.  At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those same CDO securities.

131.    After the extent of Wachovia's holding of subprime-related securities was revealed, Defendants repeatedly issued quarterly and annual reports that materially overstated the value of those holdings.  Indices tracking the market prices of CDOs indicated that with respect to certain of Wachovia's holdings, the value had completely evaporated.  Yet, Wachovia, itself a large participant in the securitization market, turned a blind eye to this reality and instead

implemented a strategy in which Wachovia took incremental, but insufficient and untimely, write-downs in an effort to conceal the truth about its exposures and the financial impact of carrying billions of dollars of worthless assets on its balance sheet.

132.    The risks associated with such subprime CDOs were well understood no later than February 2007.  By October 2007, the market had completely dried up.  Thus, Wachovia knew that taking incremental write-downs on certain of its assets was an exercise in futility, but it persisted in doing so in order to maintain its façade of financial well-being.

### E.    WACHOVIA'S FALSE AND MISLEADING STATEMENTS CONCERNING ITS PICK-A-PAY PORTFOLIO, CDO AND RMBS HOLDING AND EXPOSURE TO SUBPRIME-RELATED LOSSES ARE USED TO PROP UP FINANCIAL RESULTS

133.    Each quarterly and annual report that Wachovia filed with the SEC between July 2006 and October 2008 contained a discussion of Wachovia's "tier 1 capital ratio" and stated that Wachovia's balance sheet was "strong and well capitalized under regulatory guidelines." Capital adequacy means the level of capital a bank must hold to cover its exposure to the risk of its activities on and off balance sheet, and it is one of the primary metrics investors consider when evaluating the financial strength of institutions such as Wachovia.

134.    Contrary to its statements in its SEC filings, Wachovia's balance sheet was neither strong nor well capitalized.  As an initial matter, throughout 2007 and 2008, Wachovia failed to disclose the extent of its holdings of RMBSs and CDOs, all of which were rapidly declining in value.  Moreover, although in November 2007, Wachovia claimed that its portfolio was hedged, because the risks associated with its CDO and RMBS exposures were transferred to "AAA rated financial guarantors,"[15] Wachovia knew by mid-2007 that certain of these guarantors were over-exposed and did not have adequate resources to make good on these

---

[15] See Form 8-K, dated November 8, 2007, p. 3.

guarantees. For instance, Wachovia's wholly-owned subsidiary, BluePoint Re Ltd., a financial guaranty reinsurance company, began to buckle under the weight of its exposures to asset-backed securities throughout 2007. Consequently, Wachovia's 2007 financial results included a complete write-down of its $300 million investment in BluePoint Re. Just like certain of the counterparties to Wachovia's hedging transactions on its own trading portfolio, BluePoint Re experienced a credit downgrade and was eventually forced into bankruptcy. Thus, Wachovia knew first-hand that its trading portfolio was not as insulated from risk as it led investors to believe.

135. Furthermore, the Pick-a-Pay loan portfolio concealed the degree of losses Wachovia stood to incur as market conditions deteriorated. Wachovia had assured investors that conservative underwriting and built-in product features separated Pick-a-Pay from other payment option ARMs. Wachovia relied on these purported aspects of Pick-a-Pay loans to justify maintaining low loan loss reserves. However, because Wachovia did not employ strict underwriting standards and because Pick-a-Pay's features postponed, but did not prevent, the inevitable "payment shock" leading to increased defaults, there really was no backstop on the losses Wachovia stood to sustain. Thus, Wachovia's earnings were overstated in each and every quarter beginning as early as October 2006, because Wachovia failed to take loan loss reserves that accurately reflected the degree of risk inherent in the Pick-a-Pay portfolio.

136. The combination of inadequate loan loss reserves and insufficient write-downs of assets, which enabled Wachovia to meet earnings guidance every quarter, created the impression that Wachovia was liquid and adequately capitalized. This resulted in an artificially inflated stock price throughout 2006 and 2008, when it appeared that Wachovia was outperforming its competitors. In reality, unbeknownst to investors, the worst was yet to come.

## VII.    THE TRUTH BEGINS TO EMERGE

### A.    WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING GROWING LOSSES IN ITS PICK-A-PAY LOAN PORTFOLIO

137.    On October 19, 2007, Wachovia gave an indication that there were problems in its Pick-a-Pay loan portfolio when it announced that both charge-offs and nonperforming assets increased in the third quarter of 2007 as compared to the prior quarter.    Specifically, nonperforming assets rose $881 million, which resulted in nonperforming assets as a percentage of loans rising from .47% in the second quarter of 2007 to .63% for the third quarter of 2007.  Of this amount, $587 million was attributable to an increase in consumer real estate loans and $127 million was attributable to consumer foreclosed real estate.  Although Defendants were forced to acknowledge that "most of the increases in nonperforms does come out of the legacy Golden West portfolio," they carefully placed the blame for these increases elsewhere, noting that "problems in these markets really for all lenders seem to be across the board without regard to originating FICO, the type of loan or the condition of the property."  External forces, namely "continued weakness in the housing market and the possibility for slowing consumer sector," were also responsible for the fact that Wachovia "anticipate[d] that nonperforming loans on [the] consumer mortgage book [would] continue to increase over the next few quarters and that losses will be up, albeit at fairly modest charge-off rates."

138.    At the same time, Defendants attempted to mitigate the impact of this disclosure by distancing themselves from other lenders.  Defendant Truslow explained, "I think the fact that the way those [Golden West] loans were underwritten and how collateral was appraised et cetera, I think we are probably faring in much better shape than other lenders in those markets."  This was intentionally misleading, because as discussed herein, underwriting standards had already been sacrificed to increase originations, and the appraisal process had been revamped.  Thus,

these stopgap measures that would protect Wachovia from the same fate as its competitors did not exist.

139.    Further evidence that the Pick-a-Pay portfolio was heading for trouble came to light on November 9, 2007, when Defendant Truslow announced at the BankAnalysts of Boston conference that:

> In the fourth quarter what we're going to do is implement a consistent, bring the Golden West portfolio on to a consistent methodology with the rest of the company in how we treat these loans and we will take write offs at a 180 days past due. And so what that means is in the fourth quarter there'll be a little bit of an acceleration of charge offs into the fourth quarter that by historical standards would've taken place in subsequent quarters and we have baked basically that acceleration into the guidance that we gave in our third quarter earnings call for the fourth quarter which were charge offs of between 25 and 30 basis points. I just want to point that out.

140.    Wachovia cleverly tried to disguise the true nature of the problem by referring to the portfolio as "Golden West" rather than "Pick-a-Pay," but it could not hide that prior to this disclosure, it had employed a different accounting methodology to Pick-a-Pay loans that apparently allowed Wachovia to avoid recognizing losses on nonperforming loans for more than 6 months after they were past due.  Thus, Wachovia had no choice but to brace investors for a spike in charge-offs in the fourth quarter of 2007, as well as loan loss provisions in an amount between $500 and $600 million.  However, these charge-offs and provisions for loan losses should have occurred months earlier, but were deliberately delayed in order to keep Wachovia's share price artificially inflated.

141.    On January 22, 2008, Wachovia issued another partial disclosure, which hinted at the danger lurking in the Pick-a-Pay loan portfolio.  As an initial matter, the impact of the change in accounting methodology announced in November 2007, *i.e.*, recording estimated losses when a loan reaches 180 days past due, as opposed to waiting an indeterminate time to charge-off

nonperforming loans, was severe. Wachovia reported that of the $80 million in losses in the Pick-a-Pay loan portfolio for the fourth quarter of 2007, $63 million – or nearly 80% – was attributable to this accounting methodology change. Furthermore, nonperforming assets just in the Pick-a-Pay loan portfolio increased $1 billion in the fourth quarter of 2007.

142.    During the January 22, 2008 investor conference call, Wachovia also reiterated that "the average current loan-to-value across the portfolio [was] basically unchanged from origination, coming in around 72%." However, Wachovia implicitly admitted the misleading nature of this often-emphasized statistic when it explained that "there's a wider distribution of values around that average" and that "[nonperforming Pick-a-Pay] loans [had] an average current estimated loan-to-value of about 81%."

143.    On that same conference call, Defendants were asked about the percentage of Pick-a-Pay borrowers making minimum payments. This statistic was significant because in a deteriorating market, it was increasingly important to consider the effects of negative amortization on LTV ratios. However, Defendants were unable to provide a clear answer. Defendant Truslow claimed, "I don't believe [the percentage of borrowers making minimum payments] has gone up. The tricky part is, and what I don't know is, that it's different borrowers every month so it's hard to look at a static percentage and assume it's the same borrowers. But I don't believe it's gone up. But we're going to have to check that." Thus, Wachovia continued its practice of revealing incongruent pieces of information in each disclosure, which allowed Wachovia to appear forthcoming, but which, in reality, served to mask Wachovia's precarious financial position.

144.    On April 14, 2008, just weeks after reassuring the market of its liquidity, the strength of its underwriting practices and the adequacy of its loss reserves, Wachovia stunned

investors and analysts when it announced plans to raise $7 billion in capital in two concurrent, dilutive stock offerings and a reduction in the quarterly common stock dividend. Wachovia's first quarter earnings release explained that these actions were necessary "to enhance its capital base and operational flexibility."

145.    In addition, Wachovia reported a loss of $350 million, or $.20 per share, for the first quarter of 2008. The loss was attributed to a $2.8 billion increase in credit loss reserves, including $1.1 billion specifically for Pick-a-Pay loans. For the first time, Wachovia revealed that LTV ratios for 14% of the $120 billion Pick-a-Pay portfolio were above 100%. Furthermore, late payments had nearly doubled to 3.1% and the effects of negative amortization would be greater than previously reported, as roughly 68% of Pick-a-Pay borrowers elected to make only the minimum payment in March 2008, and 52% of Pick-a-Pay borrowers had elected to make only minimum payments in the last 6 months.

146.    At this same time, Wachovia shockingly reported that it would begin tightening lending standards. This was the first indication investors received that Wachovia failed to adhere to the strict underwriting standards that were supposed to produce a low risk loan portfolio. Wachovia also revealed that it would begin to use a new model to take into account deteriorating market conditions, and specifically, the impact of rising LTV ratios and negative amortization on borrower behavior. Once again, this was the first time that investors were given a sense that Wachovia had not been tracking these risk factors in its portfolio but instead had used an inappropriate model to assess risk. This, in turn, justified maintaining lower, and what proved to be inadequate, loan loss reserves, which in turn, produced higher earnings reports.

147.    During the investor conference call on April 14, 2008, analysts attempted to pinpoint the reasons why Wachovia's assessment of its capital position and level of risk, particularly in its Pick-a-Pay portfolio, suddenly shifted.  As one analyst commented:

> [I]t strikes me that there's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook. You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut, and then five or six weeks later coming to a different conclusion or some other metrics as well. But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically.

148.    Defendants continued to claim that the downturn in the economy was responsible, but as the analyst's comments implied, those same conditions existed months before, when Defendants projected a much stronger outlook.  Thus, the only thing that had really changed was that as the risks inherent in the Pick-a-Pay portfolio materialized, Defendants could no longer utilize incomplete disclosures and clever accounting to obscure Wachovia's true financial predicament.

149.    On June 2, 2008, Wachovia announced that Defendant Thompson would retire at the request of the Company's board.  Although the board claimed that "No single precipitating event caused the Board to reach this decision," analysts believed that Defendant Thompson's relentless campaign to defend the Golden West acquisition, even as losses mounted and credit quality deteriorated in the Pick-a-Pay loan portfolio, led to his ouster.[16]

150.    Then, on June 30, 2008, Wachovia's Pick-a-Pay loan program came to an abrupt end, when Wachovia announced that the Pick-a-Pay minimum payment option would be eliminated and pre-payment penalties on Pick-a-Pay mortgages were being suspended.  The June

---

[16] *See* Dean Foust, "Wachovia: One Thompson Deal Too Many," BUSINESS WEEK, June 2, 2008, available at http://www.businessweek.com/bwdaily/dnflash/content/jun2008/db2008062_952319.htm;

30, 2008 announcement was a striking admission that the Pick-a-Pay loan program had failed, because it exposed the fact that Pick-a-Pay was no different from any other payment option ARM.    Thus, although Defendants previously distinguished Pick-a-Pay loans based on "conservative underwriting," "low LTVs at origination," and purportedly unique product features, such as payment caps and longer recasting periods, the truth was that there were no stopgaps in place to stave off losses, and Defendants had known for at least a year that the Pick-a-Pay loan portfolio was plagued by accumulating negative amortization and skyrocketing rates of default.    As the Pick-a-Pay loan portfolio spun out of control, Defendants tried to contain losses by giving borrowers a chance to refinance out of mortgages "they either didn't understand or couldn't afford."[17]

151.    In July 2008, Wachovia announced further increases in its loan loss reserves, which reflected "higher expected loss factors for consumer real estate," including a substantially-increased allowance for Pick-a-Pay losses.    Moreover, Wachovia reported a goodwill impairment of $6 billion, largely attributable to the overvaluation of the Golden West franchise.    This forced Defendants to finally admit that "Golden West was a mistake and that [Defendants] [had] to deal with the consequences of it."

### B.    WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS EXPOSURE TO SUBPRIME RMBSS AND CDOS

152.    On October 19, 2007, Wachovia gave the first partial indication of its exposure to losses on subprime RMBSs and CDOs when it reported that it had taken a $1.3 billion write-down in the Corporate and Investment Bank's trading portfolio for the third quarter of 2007. However, Wachovia assured investors that "the majority of the lower market valuations in the

---

[17] *See* Dean Foust, "Pick-a-Pay Goes Away…," BUSINESS WEEK, June 30, 2008, available at:
http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses."

153.    To further mitigate the impact of this disclosure, Defendant Thompson reminded investors during a conference call on the same day that Wachovia had an "institutional bias" against subprime and had avoided subprime in its origination efforts.    Thompson also downplayed the significance of Wachovia's subprime exposure by explaining that this $1.3 billion write-down stemmed from "AAA subprime paper" held in Wachovia's trading portfolio, which had unexpectedly and rapidly declined in value.

154.    This disclosure was deliberately misleading in at least two ways.  First, because it failed to provide any information concerning the types and amounts of RMBSs and CDOs that Wachovia actually held, it gave the false impression that to the extent that Wachovia held subprime securities, those securities were the more-highly rated "AAA", as compared to mezzanine and other lower-rated RMBSs and CDOs that were more risky and prone to devaluation as market conditions deteriorated.  As would later be revealed, this was not true.

155.    Second, it failed to disclose that Wachovia's exposure to subprime was not limited to its trading portfolio.  To the contrary, the Pick-a-Pay loan portfolio was full of subprime-related assets that were equally exposed, if not more so, to substantially increased risk of loss as the housing and mortgage markets continued their downward spiral.

156.    Thus, while investors were given the hint of a problem, they were still unaware and had no way of determining that Wachovia's $1.3 billion write-down was materially insufficient, because it did not reveal the true value of these mortgage-related assets.  Moreover, because the nature and amounts of Wachovia's holding of subprime assets remained undisclosed,

investors could not discern the true degree of risk, nor the full extent of losses that were likely to be incurred as lower-rated subprime assets and Pick-a-Pay subprime loans embedded in Wachovia's trading and loan portfolios sustained further losses. Indeed, these assets had been materially impaired months earlier, and according to market indices, by October 2007, certain tranches of Wachovia's CDOs had lost nearly 70% of their value.

157. On November 8, 2007, only weeks after the filing of Wachovia's Form 10-Q and announcement of the $1.3 billion write-down, Wachovia filed a Form 8-K, which reported that further deterioration in the markets for subprime RMBSs and CDOs had adversely impacted the Company's outlook for the remainder of 2007. Accordingly, Wachovia announced that the value of the CDOs held in its trading portfolio had declined by an additional $1.1 billion. The Form 8-K revealed, for the first time, that this was largely attributable to $1.23 billion of mezzanine-grade CDO exposures, which Wachovia held in its trading portfolio as of September 30, 2007.

158. Wachovia also disclosed for the first time that its total net exposure to subprime RMBSs and CDOs was estimated at $2.73 billion as of October 31, 2007. Of this amount, $2.1 billion were AAA-rated subprime RMBSs, leaving only $680 million in riskier subprime CDOs after the $1.1 billion write-down. Wachovia reassuringly told investors that "the remaining exposures are, we think, fairly modest."

159. As with the October disclosure, the November 8, 2007 announcement only partially revealed the truth concerning Wachovia's subprime exposure. First, Wachovia's statements that it held mostly AAA-rated securities were clearly false, as nearly two-thirds of the $1.1 billion write-down was taken against mezzanine-grade CDOs. Second, Wachovia's emphasis on "total net exposure" subtly concealed a more insidious truth, which Wachovia would soon be forced to reveal.

160.    That truth came to light on January 22, 2008, when Wachovia announced its earnings for the fourth quarter of 2007, which were included in a Form 8-K filed on the same day.  At that time, Wachovia disclosed that its subprime holdings were not $2.73 billion, as it stated in November 2007, but actually closer to $6.9 billion.  This $4.2 billion discrepancy between the subprime holdings reported on the November 2007 Form 8-K as compared with the January 2008 Form 8-K was due to the fact that in November 2007, Wachovia had reported its subprime holdings on a ***net basis***, whereas the January 2008 Form 8-K reflected ***total gross exposures***.  As it turned out, Wachovia had retained $4.2 billion of subprime securities in the course of attempting to securitize those assets.  Wachovia had hedged that exposure through agreements that purportedly transferred the risks of those exposures to Wachovia's counterparties, and so it had netted that amount out in calculating its subprime holdings.  This was deliberately deceiving, because it gave no indication that Wachovia ***gross*** exposure was significantly greater than investors were lead to believe.

161.    As an initial matter, the amounts that Wachovia claims to have hedged do not square with disclosures by certain counterparties concerning those agreements.  Specifically, ABMAC and MBIA, two of the largest Monoline insurers, have released data showing that Wachovia transferred in excess of $7 billion of super senior CDO risks just to those two parties alone.

162.    Furthermore, by January 2008, Wachovia knew that its hedges with the Monoline insurers were insecure, as the credit ratings of these entities had been downgraded, and there was a strong likelihood that they would not be able to make good on any of their financial guarantees. Only later was Wachovia forced to acknowledge this reality as, throughout 2008, it ultimately

recognized $411 million of losses − a write-down of 26% − attributable to its Monoline exposure.

163.    The January 2008 earnings release also included a further round of write-downs on Wachovia's CDO holdings, totaling $970 million.  However, this write-down still did not bring Wachovia's portfolio in line with reality.  Wachovia knew as the result of its attempts to "de-risk" its CDO portfolio that the market for certain mezzanine and junior tranches of these CDOs was completely dried up.  Thus, taking these incremental write-downs was an attempt to perpetuate the myth that Wachovia was financially sound and well-capitalized.

164.    On April 14, 2008, Wachovia announced another $1.6 billion in market valuation losses, "reflecting lower valuations in virtually all asset classes."  Furthermore, Wachovia conceded that certain of its holdings remained overvalued as it announced that, rather than continue to take write-downs on certain assets, it had moved those assets out of the trading portfolio and into other investment portfolios, which, as an accounting matter, did not require "mark-to-market" valuations.

165.    By July 2008, Wachovia had written down the value of the $2.1 billion of retained CDOs by $1.69 billion, or 79.7%.  However, Wachovia knew by February 2007 that the value of these assets was substantially impaired.  Moreover, in October 2007, when it first began to write down those assets, Wachovia knew that the write-downs were insufficient and did not accurately reflect the true value of these assets, which by that point, were illiquid and nearly worthless.

## C.    IN THE WAKE OF ITS COLLAPSE, THE TRUE EXTENT OF WACHOVIA'S FRAUD IS REVEALED

166.    On September 26, 2008, Wachovia and Citigroup initiated negotiations regarding a possible acquisition of Wachovia by Citigroup.  Three days later, under pressure from the FDIC that seizure of Wachovia's assets was imminent, it was that Citigroup had agreed to

acquire Wachovia for $2.16 billion in stock and assumption of Wachovia's senior and subordinated debt totaling approximately $53 billion.  Under the terms of the agreement, Citigroup agreed to absorb up to $42 billion in losses on Wachovia's $312 billion loan portfolio, with the FDIC absorbing losses beyond that.  In exchange for the FDIC's bearing the risk of loss, it would receive $12 billion of preferred stock in Citigroup.

167.    News of the proposed Citigroup-Wachovia deal sent Wachovia's stock price reeling, as the price per share plummeted from $10 per share to $1.84 at the close of trading on September 29, 2008.  Wachovia's market capitalization literally appeared to evaporate overnight.

168.    On October 3, 2008, Wachovia agreed to be acquired by Wells Fargo in an all-stock transaction worth approximately $15.4 billion.

169.    On October 22, 2008, Wachovia announced its largest ever quarterly loss.

170.    By February 27, 2009, Wells Fargo admitted in its 2008 Form 10-K that:

> Certain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments. . . . ***Of the $446.1 billion of loans acquired in the Wachovia merger, $93.9 billion were determined to be credit-impaired.***

(Emphasis added).

## VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS

171.    Based on the foregoing, Defendants made numerous false and misleading statements during the relevant time period concerning the risk concealed in its loan portfolio and in its holdings of subprime-related securities.  Defendants further mislead investors by referring to Wachovia's conservative underwriting practices and institutional bias against subprime as justification for maintaining lower loan loss reserves as compared to competitors.  Because Defendants concealed their actual exposure to subprime-related assets, they also failed to take

write-downs in a timely manner that reflected the deteriorating value of those assets. Thus, throughout the relevant time period, Wachovia's earnings and capital position were continually overstated and false and misleading because they did not take into account the degree of loss Wachovia stood to incur as market conditions spiraled downward.

### A.    MAY 7, 2006 PRESS RELEASE

172.    On May 7, 2006, Wachovia announced its plans to acquire Golden West in a press release. Defendants made materially false and misleading statements in the Company's May 7, 2006 press release.

173.    Defendant Thompson stated:

> We believe this combination of our two companies, both known for exceptional customer service and ***pristine credit quality***, will generate superior long-term growth in earnings per share . . . For four decades, Golden West has taken industry-wide challenges in stride and ***maintained a singular focus as a risk-averse residential mortgage portfolio lender***. The result is an astonishing 25-year track record of 17 percent compound annual growth in earnings per share and virtually no credit losses realized even in the toughest year in its history.

174.    Defendant Thompson's statement was materially false and misleading when made because Golden West was not risk-averse, and the credit quality of its borrowers was not pristine. In fact, Defendants knew that Golden West originated subprime, adjustable rate mortgages without so much as verifying borrower income and assets, and without even requiring borrowers to have a minimum credit score. Moreover, Golden West's signature product, the Pick-a-Pay loan, was inherently risky, particularly in a deteriorating real estate market as already existed in May 2006, because as home values declined and LTV ratios increased, borrower defaults would also rise. Thus, Defendants mislead investors as to the true nature of the risks in connection with the acquisition of Golden West and as a result, Defendants exposed the Company to the worst mortgage-related losses in its history.

### B.    MAY 8, 2006 CONFERENCE CALL

175.    Defendants made materially false and misleading statements during a May 8, 2006 conference call.   Defendants' statements regarding the Golden West acquisition were critical to investors as real estate prices were declining nationwide.  In fact, just 3 days earlier, a *CNNMoney* article declared, "The housing bubble has finally started to deflate."  Even Herbert Sandler, Golden West's CEO mentioned – and dismissed – the growing "real estate crisis" during the May 8, 2006 call.  Sandler said:

> The question is, is there anything in the environment or anything going on?  So, I was listening to the brilliant Bloomberg today and MSNBC today, and I heard all the brilliant comments that were called in.  Well, they are worried about the option ARM.  We are going to have a real estate crisis.  They are selling at the high.  I mean that's a bunch of garbage.  I've never heard anything so irrelevant in my life.

176.    Defendants falsely and misleadingly claimed that Golden West's "low risk" portfolio and "conservative underwriting" would insulate them from the declining real estate market.  Specifically, Defendant Thompson stated Golden West was "obsessed with conservative underwriting . . ."  and that Pick-a-Pay was "low risk because of, number one, the product features of [Pick-a-Pay] and two, because of their underwriting process."  Thompson falsely added, "They have no subprime origination at Golden West, so *a very conservative portfolio*."

177.    Thompson's assertions that Golden West's portfolio was "conservative" and "low risk" were materially false and misleading.  The Pick-a-Pay loan was inherently risky.  The potential for negative amortization created by the Pick-a-Pay loan increased the risk of default for the borrower and decreased the bank's ability to mitigate losses in the event of such a default.  The riskiness of the Pick-a-Pay product was amplified by Wachovia's failure to require a minimum credit score or verify borrower income.  Far from being "conservative" and "low risk,"

Golden West's underwriting practices, as adopted and perpetuated by Wachovia, were recklessly insufficient.

### C.    MAY 12, 2006 CONFERENCE CALL

178.    Wachovia held another investor conference call on May 12, 2006.  During the call, Defendant Wurtz made materially false and misleading statements regarding the recasting of interest rates on Pick-a-Pay loans and the resulting increase in required minimum payments. Specifically, analysts and investors expressed concerned that recasting could increase the likelihood of default.  However, Defendant Wurtz misled investors regarding the risks associated with recasting:

> **Gerard Cassidy, RBC-Analyst**
>
> Can you share with us on the deferred interest how long does it take a typical person who takes out one of these mortgages . . . if they were to choose the minimum payment from day one?  How long does it take them to get to those caps of 110% and 125%?
>
> **Tom Wurtz, Wachovia – CFO**
>
> It takes a long time.  Probably about at least four or five years, probably in the average environment six or seven years, something like that.

179.    Wurtz added:

> [I] would attribute Golden West's success to . . . making certain that the borrower can pay at the contractual interest rate for the loan . . . [T]hey don't anticipate when they make the loan that the borrower will be unable to repay the loan should they choose to make the full amortizing payment.

180.    Wurtz' May 12, 2006 statement was materially false and misleading when made because Defendants knew that Golden West did not "make certain" that borrowers would be able to repay their loans.  Indeed, neither Golden West, nor later, Wachovia, even instituted the most basic underwriting procedures, such as verifying income, requiring a minimum credit score, or

training personnel to only offer Pick-a-Pay loans to qualified borrowers. Moreover, Defendants knew but failed to acknowledge the acceleration of negative amortization that was likely to occur as real estate values declined, particularly in Florida and California, where most Pick-a-Pay loans originated, which would cause Pick-a-Pay loans to recast sooner. Thus, contrary to Defendants' statements, Pick-a-Pay loans were indistinguishable from ARMs offered by competitors, and investors were mislead about the degree to which Wachovia was insulated from risk as a result of Pick-a-Pay features such as longer recasting periods and caps on payment increases.

### D.    MAY 16, 2006 CONFERENCE CALL

181.    Defendants made materially false and misleading statements during a May 16, 2006 UBS Global Financial Services Conference.

182.    When asked whether he was concerned about increasing negative amortization in the Golden West portfolio, Defendant Thompson responded: ***"I'm really not concerned.  And I'm not concerned because of the conservative underwriting standards that the company has."***

183.    Defendant's May 16, 2006 statements were materially false and misleading when made because Defendants knew that Golden West's underwriting standards were not conservative at all.  Consequently, the increase in negative amortization was a warning sign that deteriorating conditions in the real estate market were already impacting Golden West's Pick-a-Pay loan portfolio.  However, Defendants' dismissive comments concealed this risk and mislead investors into believing that Golden West's purported "conservative underwriting" made the Pick-a-Pay loan a better product than other ARMs offered by competitors, which would insulate Wachovia from the effects of a declining real estate market.

### E.    JULY 20, 2006 CONFERENCE CALL

184.    Defendants made materially false and misleading statements during a July 20, 2006 conference call.

185.    Defendant Thompson, in particular, repeated his false and misleading claim about Golden West's supposedly "conservative" underwriting:

> We had an assumption going in that credit underwriting at Golden West was really good, and boy, do we feel strongly about that after a couple months of working with them.  They are professionals. Their reputation is wonderful, as you know, and everything we've seen says, if anything, ***they're even better than the market seems to think they are.***

186.    Defendant Thompson's foregoing statement was materially false and misleading because as detailed herein, Golden West's underwriting was recklessly deficient.  Golden West originated subprime ARMs without verifying income or requiring a minimum credit score. These reckless underwriting practices, adopted and expanded by Wachovia, led to extraordinary losses, and ultimately, caused Wachovia's collapse.

### F.    DECEMBER 28, 2006 *AMERICAN BANKER* ARTICLE

187.    In a December 28, 2006 article, *American Banker* reported additional materially false and misleading statements made by Defendants.  In the article, Wachovia COO Robert McGee stated, with regards to investor concerns over negative amortization, that:

> [Investors] are really overreacting . . . The credit and the risk isn't any different than when people draw from a home equity line . . . [T]here is still a huge amount of equity in these properties.

188.    McGee's statement was materially false and misleading because by late 2006, the depressed housing market was causing homeowner equity to decline – particularly in California where the bulk of Golden West's loans was concentrated.  Thus, declining homeowner equity and increased negative amortization were very serious issues.  McGee's statements falsely led investors to believe that Pick-a-Pay loans were different and were not experiencing the same problems as other ARMs offered by competitors.  Moreover, McGee's statement that there was "a huge amount of equity in these properties" was materially false and misleading when made,

60

because it was based on outdated information relating to LTV ratios *at origination*, which failed to account for the impact of declining home values and increased negative amortization.

### G. JANUARY 23, 2007 CONFERENCE CALL

189. Defendants made many false misleading statements during a January 23, 2007 conference call. First, Defendant Truslow stated:

> The allowance for credit losses, as has been mentioned, wound out up year at 3.5 billion dollars when you take in the reserve for unfunded commitments or 84 basis points. ***We recognize that on the surface when you stack this up against peers it looks low***, but as we've been saying for a couple of quarters, the addition of Golden West will have a dilutive impact on that reserve to loan ratio and that we have brought over a very large portfolio of loans that have had no losses for many years and ***the outlook for 2007 is for a track record that will continue with very de minimus losses*** and so the impact when you bring such a low loss content portfolio into the overall mix will just naturally dilute that ratio. As a matter of fact, after you bring over Golden West and look at our 420 billion dollar resulting portfolio, something like 45% of the total portfolio is now in the form of first lien residential consumer mortgage loans which by their very nature have a very, very low loss content. So I just encourage you as you look at that ratio and compare across peers you have really got to take our loan mix into consideration and the loan mix at Wachovia is probably pretty unique relative to a lot of peers.

190. Defendant Thompson stated:

> But I am very, very comfortable with the disclosures at Golden West and with the disclosure that we will follow through with at Wachovia. In fact, we …welcomed the new disclosure that came out of the changes in how Option ARMs would be disclosed. We think anything that tightens up those kinds of things will help our product line because ***it is very conservative and we will – we just don't think we are going to be impacted by it like some in that business will be***. We are very comfortable with that. . . .

> I think that the point that Tom was making about introducing the Option ARM into Wachovia's channels is absolutely key and while other Option ARM originators are seeing – and other mortgage originators are seeing volume drop fairly significantly, we think this introduction into our branch system and into our mortgage system is going to produce growth in Pick-a-Pay outstandings which **will make our numbers pretty good in the mortgage business going forward.**

191.    Defendants' January 23, 2007 statements were materially false and misleading when made because Defendants knew that Pick-a-Pay loans were not "unique" and were, in fact, indistinguishable from other payment option ARMs offered by competitors.    Additionally, Defendants mislead investors by claiming that Wachovia was not "going to be impacted … like some in [the Option ARM] business will be."    In actuality, Defendants knew but failed to disclose that they had substantially overpaid to acquire Golden West's portfolio of subprime payment option ARMs, that Pick-a-Pay was as susceptible to the affects of a deteriorating real estate market as competitors' payment option ARMs, and that there were no conservative underwriting standards to insulate the Company from losses.    Furthermore, Defendants mislead investors by touting certain product features of Pick-a-Pay loans to justify their failure to take adequate loan loss reserves losses in a declining housing market.

**H.    WACHOVIA'S 2006 FORM 10-K**

192.    On February 28, 2007, Wachovia filed its annual report on Form 10-K for 2006 ("2006 10-K").    In its 2006 10-K, Defendants stated:

> The accrual of interest is generally discontinued on commercial loans and lease that become 90 days past due as to principal or interest, or where reasonable doubt exists as to collection, unless well secured and in the process of collection. Certain consumer loans that become 120 days past due are placed on nonaccrual status. Consumer real estate secured loans that become 180 days past due are placed on nonaccrual status, with the exception of certain non-traditional loans which are placed on nonaccrual status at 90 days past due. Generally, consumer loans that become 180 days past due are charged off. When borrowers demonstrate over an extended period the ability to repay a loan in accordance with the contractual terms of a loan classified as nonaccrual, the loan is returned to accrual status.

193.    The foregoing statement was materially false and misleading when made because it misstated Wachovia's accounting practices related to charge-offs. Nearly a year later, Defendants admitted in a January 22, 2008 disclosure that prior to the fourth quarter of 2007, Wachovia "recognize[ed] the losses at the time of an actual property sale." Thus, Wachovia's 2006 10-K statement was false and violated numerous provisions of GAAP and SEC Regulations, because Wachovia delayed recognition of losses in contravention of its own stated accounting policies, which artificially inflated earnings.

194.    In its 2006 10-K, Wachovia also made misleading statements about its credit quality: "***We are optimistic about our outlook for credit quality as we enter 2007 given the highly collateralized nature of our loan portfolio.*** While we expect modest increases in credit costs, we believe overall credit quality will remain strong."

195.    This statement was materially false and misleading when made because Wachovia knew or recklessly disregarded that its relaxed underwriting practices, combined with declining home values and increased negative amortization, left a greater percentage of its loans under-collateralized.

196.    Defendants Thompson and Wurtz certified that the information contained in the 2006 10-K was accurate by signing a statement, which said:

Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statement, and other financial information included in this report, fairly present in all material aspects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;

The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financing reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financing reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in according with generally accepted accounting principles;

197.    The 2006 10-K was also materially false and misleading because Defendants omitted the following material facts:

- Defendants failed to employ even basic underwriting and loan origination practices. Since Defendants originated the vast majority of its home loans without verifying income or assets, and without requiring a minimum credit score, Defendants were incapable of accurately determining their borrowers' abilities to repay loans;

- A significant portion of Defendant's mortgage portfolio was inadequately collateralized; and

64

- Defendant's loan loss provisions did not properly reflect the risk facing the Company.  Defendant's inadequate loss provisions also falsely inflated Wachovia's reported income.

## I.    APRIL 16, 2007 CONFERENCE CALL

198.    Wachovia held a conference call on April 16, 2007 to discuss its 2007 first quarter earnings.  During this call, Defendants made many materially false and misleading statements.

199.    Defendant Thompson:

> [L]ooking forward, with the integration of Golden West on track, we feel confident about the superior credit quality of our mortgage portfolio, the prospects for cross-selling our product set in Golden West markets, and originating pick-a-pay mortgages through traditional Wachovia channels.

200.    In response to an analyst's question about whether Wachovia might "get caught up in" the declining housing market, Thompson replied:

> I don't think so … We don't fear it, and we don't fear it because the guidance that we've seen would impact most people in the option ARM and fixed pick-a-pay kind of business. *But it does not affect us.* And I think that goes to the very conservative underwriting standards and servicing standards that the Sandlers implemented at Golden West and we are changing none of that. So, *if anything, we think that any changes might in fact benefit us relative to our competition.*
>
> I also think that many competitors were underwriting to the introductory or teaser rate.  And Golden West has never done that.  We've always underwritten to a fully indexed rate, which we will continue. I think if you look at the credit history and right up to the current moment, it would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion other than we are very responsible underwriters and servicers of these clients.

201.    Defendant Truslow:

65

We did see a jump in non-performing assets during the quarter as they increased $383 million, and we ended the quarter at 40 basis points of loans, which is still very low by historical standards. … *[W]e believe that the loans which make up the increase have little or no loss content* and therefore our outlook for charge-offs and provision for the remainder of the year is unchanged.

First, the largest portion of the increase, 194 million, is in the Golden West portfolio. … 90 days is important because you'll remember that we moved loans at 90 days to non-perform in the Golden West portfolio.

*[T]he Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to the quality of the appraisals.* Most appraisals are completed by in-house appraisers and the appraisal process, I can tell you, it's very robust. Over the last several months since our teams have worked more closely with one another through integration, our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger. Additionally, when loans have been classified as non-performing, the historical pattern as you can see is that few of those loans are actually foreclosed. Borrowers have equity that they certainly want to protect, and the level of that equity typically gives them options to sell the property, refinance it or otherwise cure the past due.

In addition, the customer outreach process at Golden West emphasizes early intervention at the first signs of delinquency. And the company has been very successful at counseling borrowers through difficult times. And the fact that the loans are on the balance sheet rather than packaged into securities provides us with additional flexibility in working with customers as well.

So standing back and looking at loans categorized as non-performing in the Golden West portfolio as at the end of the quarter, *the average loan-to-value is around 74%* and the actual level of foreclosed properties at the end of the quarter remained very low at just $23 million representing only 141 accounts and only 23 of those were in California. Furthermore, the loan-to-value of the foreclosed properties is 77%. So good cushion there, and *those are our current appraisals* as we've taken those properties back onto the balance sheet, and again suggests that meaningful cushion is available to cover the loan balance upon sale. So standing back and understanding the unique practices at Golden West, it's fairly easy to comprehend why this portfolio has done so well even in distressed mortgage markets in the past.

202.    Defendant Truslow then addressed concerns related to Wachovia's involvement in subprime mortgage markets:

> I want to add just two quick notes that seem to be of interest in the market today. First to comment about subprime residential mortgages, clearly there have been emerging challenges in the subprime mortgage market, particularly surrounding firms who are active in originating lower quality loans and then selling them in securities form. I'll tell you that defining subprime mortgage loans can be tricky and typically see them talked about in the press as loans with low FICO scores, say 620 or below, and weak collateral margins. But in reality, we as many lenders use a lot of different factors in underwriting consumer loans to include the level of the borrower's net worth, our relationship history with them, debt to income, etcetera. But for sake of discussion, if we use a definition of a consumer mortgage loan that has a FICO score of 620 or below and has a loan-to-value of over 80%, so a pretty conservative measure particularly on the loan-to-value side, the loans in our portfolio that fit that definition total only about a billion three or just over 0.5% of our consumer mortgage portfolio.
>
> And then of the billion three there's a little over $800 million that consists of loans to customers where we've got a good relationship and a good track record, most of these originated through our branches, and these loans tend to perform very well and very differently than just sterile loans bought at low FICO scores in the market, and an additional 140 million of the billion three consists of Community Reinvestment Act-related loans. And so backing out those two pools of loans leaves just a little over $300 million against that billion three. So a very, very low amount on our balance sheet.
>
> Second quick note is around Alt-A. We do originate Alt-A mortgages primarily for distribution in our Wachovia Mortgage company channel and our mortgage operation in the Corporate and Investment Bank under the trade name Verities. I will tell you that our experience with these loans has been very good and continues to be good. Over time, we have chosen to hold some of these loans for investment purposes in our portfolio and our accumulated loan portfolio in the loan account totals around $3.4 billion of these loans, and most of them have been with us for a while and are now well seasoned and the portfolio has performed very well.

So just in quick summary, as we discussed in our guidance during the January call, I think we are seeing a modest inflection in credit costs, certainly from the very low levels that we experienced last year, but we're pleased with the quality of the portfolio and think that the credit quality remains very strong on the loan account.

203. Defendant Wurtz continued:

Obviously, the mortgage market is turning out to be more of a challenge than we had anticipated. This obviously affects the performance of Golden West. Originations for the industry are projected to be down from 2006 levels and fixed rate loans are more in favor than ARMs. While these factors will impact our revenue for the mortgage business, *we're extremely confident that the credit performance of the Golden West portfolio will remain very strong* and that the integration of our businesses will be seamless. We've made great progress in broadening our origination channels for the Golden West product set and we're also very encouraged by the sales of checking products in the World Savings branches.

*One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices.* So while it looks like the composition of our income statement may look a little different for the year than what I envisioned back in January, I still think we're on track to meet the bottom line guidance we previously provided.

NPAs (non-performing assets) were up 28%, driven primarily by Golden West mortgage portfolio. This is entirely consistent with our expectations. Don Truslow will provide further details later in our call, but *the loss content on these incremental mortgage NPAs is expected to be negligible*. First, only a small portion of Golden West loans that reach 90 days past due ever reach foreclosure; and finally when they do, *losses are very minimal*.

204. Defendant's April 16, 2007 statements were materially false and misleading when made because Defendants knew that Wachovia did not employ "conservative" lending practices; the loss content in its mortgage portfolio was greatly understated; and its then-current average LTV ratios were higher than disclosed, particularly in distressed markets where Pick-a-Pay loans were concentrated. Moreover, Defendant's statements that Wachovia would not be affected and would benefit from the subprime mortgage crisis were materially false, misleading and reckless

68

when made because they perpetuated the belief among investors that Wachovia was not exposed to the same risk of loss relative to its competitors.

### J.    WACHOVIA'S FIRST QUARTER 2007 FORM 10-Q

205.    In its First Quarter 2007 10-Q, which Defendants filed with the SEC on May 4, 2007, Defendants included materially false and misleading statements regarding its management of credit risk:

> The low level of net charge-offs reflects a continuing solid credit environment, ***the highly collateralized nature of our loan portfolio and our careful management of the inherent credit risk in our loan portfolio***.    The Golden West portfolio has a long record of extremely low net charge-offs, including, virtually none for the past eight years, reflecting strong underwriting and credit risk management.

206.    The foregoing statement was materially false and misleading when made because Defendants knew that Wachovia's loan portfolio was no longer "highly collateralized"; nor was credit risk being carefully managed.    In fact, by May 2007, Defendants knew but failed to disclose that neither Golden West nor Wachovia employed conservative underwriting standards; Wachovia had relaxed underwriting standards in order to continue its pace of origination in a slowing real estate market; and loans that were "highly collateralized" at origination were impacted by declining home values and accumulating negative amortization, which caused LTV ratios to rise.

### K.    MAY 17, 2007 PRESS RELEASE

207.    Defendants made materially false and misleading statements in a May 17, 2008 press release.    Specifically, Defendant Wurtz made materially false and misleading statements concerning the expected performance of the Pick-a-Pay loan portfolio:

> The Fixed-Rate Pick-a-Payment loan continues to be an attractive product in this environment. Increases in nonperforming assets are not unexpected; however, ***World Savings' conservative underwriting practices and low loan-to-collateral values give us confidence the portfolio will continue to perform favorably in this environment.***

208.    Defendant Wurtz' foregoing statements were materially false and misleading when made because neither Golden West nor its successor, Wachovia, employed conservative underwriting practices.    Furthermore, Defendants knew that declining home values and accumulating negative amortization were driving LTV ratios upward, which made the Pick-a-Pay loan portfolio much riskier and more likely to incur losses than Defendants lead investors to believe.

**L.    JULY 20, 2007 CONFERENCE CALL**

209.    Defendants made materially false and misleading statements during Wachovia's July 20, 2007 conference call with investors.

210.    While acknowledging "the turbulence in the capital market," Defendant Truslow reassured investors that Wachovia was "in very good shape." Defendant Truslow further stated:

> [T]he turbulence is causing some disruption in the market. But in the end it's probably a very healthy correction to a market that had become very aggressive in its willingness to accept ever-increasing leverage levels, weaker structures, and thinner pricing. ***But we view the risk to Wachovia what's currently happening is very modest.***

211.    Defendant Truslow also made materially false and misleading statements concerning Wachovia's exposure to subprime markets. Defendant Truslow stated:

> And ***given we don't have a subprime focus in our business*** and that our home equity loan exposure is both modest and mostly all in the form of very high-quality prime equity lines combined with the low loss content of our nonperforming loans, we are very comfortable with our allowance coverages at the end of the quarter. . . . As for subprime and our capital markets businesses and in our origination businesses, we shied away from diving into

this business over the last few years, as that market took off. Really for two reasons. One is given the firm's prior experience in the subprime market in the late '90s and also, importantly, the view of our Capital Markets Group that the risk in this arena has been underpriced for quite some time. So we just haven't felt that it's been a business that's made good sense for us and therefore *we have actively managed our business to minimize our exposure to the subprime market.* So as a result *there's been little impact to our businesses with the turbulence in the subprime markets, and we don't anticipate any meaningful potential impact to earnings from subprime going forward.*

212.    Discussing Wachovia's potential losses within its mortgage portfolio, Truslow stated:

Given the environment, again, we are not surprised to see the residential nonperforms trend up; as we noted last quarter, it is what we've been expecting, and I would anticipate that we will continue to see some trend up over the next few quarters as well. *But because of the way these loans are underwritten, we are not seeing any meaningful increases in losses in the portfolio. And we don't expect to see any rises in losses as we look forward over the next few quarters.* And so the underwriting process and how these things are booked and what we are ultimately relying upon, holding up very, very well, as expected.

213.    Discussing potential "payment shock" from recasting loans, Truslow stated:

I do want to remind everybody that our Pick-a-Pay product, which is our option payment ARM, is structured with caps that limit the amount a customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment, that would be a $75 increase from one year to the next. *And therefore, just want to point out that payment shock in our option ARMs is just not an issue here at all. So it's really not an issue with the product.*

214.    Discussing Wachovia's LTV ratios, Truslow stated:

The average loan-to-value of the residential non-performing loan book using updated appraisal information where we have gone out and we have refreshed the appraisal information on the book, is at a low 72% as of quarter-end, giving us good cushion against those loans.

215.    Discussing the Golden West acquisition, Defendant Thompson stated:

71

I think we are going to be happy that we did this deal long-term, and we are going to be happy that we did it because of the experience that we are having in the West as we use the branches that we acquired. And I think on the mortgage side, this product, this Pick-a-Pay product is going to be very attractive when yield curves go back to normal and as the housing market comes out of – the recovery. So, yes, we are going through a little pain with it now. But I think a year out, 18 months out, two years out, we are going to be very happy that we did this deal.

216.    Discussing Wachovia's nonperforming assets ("NPAs"), Thompson stated:

But if you compare our mortgage company to almost any other in the industry, *our NPAs are outstanding.* And our NPAs at a company level would have to be considered outstanding in comparison to our peer group.

217.    Defendants' July 20, 2007 statements were materially false and misleading when made because:

- Defendants vastly understated Wachovia's credit risks. Wachovia's acquisition of Golden West exposed Wachovia to billions of dollars worth of risky mortgages at a time, and in places, where housing markets were declining. Moreover, as a result of Wachovia's reckless underwriting practices, these mortgages were extended to borrowers who routinely elected to make minimum payments and who were incapable of repaying their loans once they recast to fully-amortizing levels.

- Defendants had significant exposure to subprime markets both as a result of its lending practices. In fact, Defendant's claim that it "actively managed [its] business to minimize [its] exposure to subprime markets" is contradicted by the fact that Defendants continued to expand Pick-a-Pay loan origination using lax underwriting criteria at the same time that the loan portfolio was already showing signs of strain. Moreover, Defendants concealed the extent of subprime assets held in Wachovia's trading portfolios.

- Defendants' repeated claims that its underwriting standards would protect Wachovia from significant losses were materially false and misleading. Defendants' underwriting standards were reckless and inadequate. It was not until much later, when Defendants disclosed that they would begin to "verify income and employment history before making loans,"[18] that investors discovered that even minimal underwriting standards had not been in place.

---

[18] *Wachovia adjusts mortgage underwriting guidelines*, SACRAMENTO BUSINESS JOURNAL, Apr. 11, 2008.

- Defendants misled investors concerning the risk of payment shock and potential for default associated with Pick-a-Pay loans, because Pick-a-Pay's features, such as the payment cap and 10-year recast period, merely delayed, but did not eliminate, the time it took before borrowers were faced with payments they could not afford.

- Defendants misled investors by claiming to possess a "good equity cushion" on Pick-a-Pay loans based on LTV ratios. First, Defendants knew that declining home values and rising negative amortization meant that the LTV ratios were rising rapidly. Second, Defendants knew that the average LTV ratio for the loan portfolio overall was misleading, because the spread around the average had increased, which meant that the in many cases, the equity cushion had been depleted.

**M.    WACHOVIA'S SECOND QUARTER 2007 FORM 10-Q**

218.    Wachovia filed its Second Quarter 2007 10-Q with the SEC on July 30, 2007. The 10-Q contained additional materially false and misleading statements regarding the Company's credit risk:

> Consumer net charge-offs were $249 million, up from $112 million in the first six months of 2006. . . . The low level of net charge-offs reflects the highly collateralized nature of our portfolio and our careful management of inherent credit risk. Our consumer real estate portfolio has a long record of relatively low net charge-offs, ***reflecting strong underwriting and credit risk management***.

219.    The foregoing statement was materially  false and misleading when made, because as set forth herein, Defendants' underwriting standards were reckless and inadequate.  In addition, as discussed, *infra* at Section X, contrary to Defendants' statements, the "low level of net charge-offs" resulted from Defendants' failure to follow Wachovia's disclosed accounting policies, and did not reflect "the highly collateralized nature" of the portfolio or "careful management of inherent credit risk."  In particular, Pick-a-Payment loans were not charged off until the underlying collateral was sold, which, in many instances, occurred months after the loan went into default.  Thus, Defendants presented a distorted view of Wachovia's financial position

relative to its competitors and misled investors about the degree of credit risk contained in the Pick-a-Pay loan portfolio.

### N.    OCTOBER 19, 2007 CONFERENCE CALL

220.    Defendants made additional materially false and misleading statements during an October 19, 2007 conference call.

221.    Discussing the Company's purportedly "low" LTV ratios, Defendant Truslow stated:

> "[N]onperforming loans continue to have a loan – low loan-to-value on average and, therefore, we believe it represent relatively low loss content. Loan-to-values at the origination of these nonperforming loans averaged 75%. Periodically, we go through and we update those values using AVM estimated value analysis, and we did that in August. And that's all done at the loan level and so when we ran this analysis in August, we saw a little bit of deterioration in the loan-to-value numbers, but they were still at a very conservative 77%.

222.    Discussing, and partially disclosing Wachovia's exposure to subprime, Defendant Thompson stated:

> *[W]e have an institutional bias here against subprime.* We avoided it in our origination efforts and we avoided it in – for the most part in our securitization efforts. And so, frankly, when we had a little bit of a breakdown in having AAA subprime in some of our portfolios that we took losses on. I do think that it is really quite amazing that we could take $300 million of losses on AAA paper. I mean we didn't – we didn't expect it, that that paper could degenerate that fast with that kind of swiftness.

223.    Defendants' October 19, 2007 statements were false and misleading because Defendants knew the Company's LTV ratios were artificially inflated and that the Company's subprime exposure was significant.   Wachovia was not, and its directors could not have reasonably believed it was, against subprime lending.   Wachovia purchased Golden West knowing that it did not even require minimum credit scores from borrowers.   Moreover,

Wachovia fully embraced Golden West's approach after acquiring it by also not requiring minimum credit scores. Wachovia's "institutional bias" was towards selling as many high-interest loans as it could regardless of the credit-worthiness of its borrowers.

### O.    WACHOVIA'S THIRD QUARTER 2007 FORM 10-Q

224.    Wachovia filed its Third Quarter 2007 Form 10-Q with the SEC on November 9, 2007. In its 10-Q, the Company repeated materially false and misleading statements about its management of credit risk, "strong" underwriting, and level of collateralization:

> While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, our careful management of inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit environment.

225.    The foregoing statement was materially false and misleading when made, because, as explained herein, it overstated the Company's level of collateralization, management of credit risk, and utilization of underwriting standards.

### P.    NOVEMBER 9, 2007 CONFERENCE CALL

226.    Defendants made materially false and misleading statements during a November 9, 2007 conference call. By then, investors were concerned with the risks associated with Option ARMs, like Pick-a-Pay. Although Wachovia's Pick-a-Pay mortgages were "often compared with other option ARMS available in the marketplace," Defendant Truslow falsely asserted that "there really are very significant differences in the product" that insulated it from the risks inherent in other Option ARM products.

227.    Discussing the "safety" of Wachovia's Pick-a-Pay loans, Defendant Truslow stated:

> First of all, this is a portfolio product for us. We are a portfolio lender and that is important because everybody in the chain of these loans basically treats this with – these loans with a cradle to grave mentality. So the appraisers, the underwriters, the relationship managers to their management team, this is not an originate and dump into the capital market and be done with it sort of product. ***This is a product where people are measured and their performance rewarded or penalized, based upon the long-term quality and value of these loans that are being created.***

228.    Defendant Truslow's statement was materially false and misleading because Wachovia's compensation structure and origination practices incentivized employees to promote Pick-a-Pay loans, irrespective of the borrowers' needs and qualifications, and without regard to "long-term quality and value." Moreover, Wachovia's Pick-a-Pay loans were issued without income verification or a minimum credit score requirement. Thus, Pick-a-Pay was not distinguishable from other payment option ARMS, but instead involved the same risks of loss.

229.    Discussing the risk of "payment shock" in recasting Pick-a-Pay loans, Defendant Truslow stated:

> It is also a consumer friendly product from a resets standpoint. Obviously resets from the 2/28 and the 3/27[18] that are on the market are of significant concern, particularly in the subprime sector. Our product basically has a 7.5% payment cap on the minimum payment which protects consumers. ***So payment resets here just really aren't an issue….***

230.    Defendant Truslow's statement was materially false and misleading when made because Wachovia's 7.5% payment cap on Pick-a-Pay loans merely deferred, rather than eliminated, the risk of payment shock. Moreover, to prevent the accumulation of negative amortization, minimum payments on Pick-a-Pay loans automatically adjusted to a fully-amortizing levels when LTV ratios increased to pre-set limits. Defendants knew but failed to disclose that more Pick-a-Pay borrowers were electing to make only minimum monthly payments at the same time that housing prices were falling, which meant that Pick-a-Pay loans

would recast to fully-amortizing rates on an accelerated time table. Thus, Defendants' statements were false and misleading because Wachovia's Pick-a-Pay loan portfolio would eventually experience the same increased rates of default as other payment option ARM portfolios, but only at a slower rate as compared to Wachovia's competitors.

231. Defendant Truslow made additional materially false and misleading statements regarding the LTV ratios of Wachovia's Pick-a-Pay loans:

> So very different than some other products and then, of course, conservative loan to value is on top of the more conservative appraisal process that we have. Very few loans made above 80% and here we have lent above 80% we have required mortgage insurance. So on most properties at the outset we've acquired 20 to 30% real cash equity on the front end.

232. Defendant Truslow's foregoing statement was materially false and misleading when made, because although LTV ratios may have been low *at origination*, the then-current LTV ratios were significantly higher. Defendants knew but failed to disclose that since the majority of Pick-a-Pay borrowers paid the minimum monthly payment, which did not even cover the entire interest owed for a given month, their loan balances, and consequently their LTV ratios, were increasing. Simultaneously, property values, particularly in areas like California and Florida, where most Pick-a-Pay loans originated, were declining rapidly. Declining property values caused LTV ratios to increase even more. Thus, Defendants mislead investors because initial LTV ratios did not provide the safety net Defendant Truslow described.

233. Discussing Wachovia's exposure to subprime markets, Defendant Truslow made additional materially false and misleading statements:

Clearly we could have done a better job around subprime on – *for the company that has had such a negative bias towards subprime.* We didn't leap into the origination side. We stayed away from a lot of the businesses that evolved and grew beginning just a couple of years ago yet we found ourselves in this downdraft with pockets of subprime exposure that essentially, there were investments or positions taken in various places across the platform. Mostly in the form of what we believe to the very high-quality assets, AA, Super Senior, AAA, and adjunct to that is that where those decisions were made, they probably didn't involve the expertise and talent of the part of the platform that really had the most experience around residential mortgages and subprime, probably too reliant on the ratings and taking too much comfort in historical performance around securities with those ratings.

234. Defendant Truslow's foregoing statement was materially false and misleading when made because Wachovia did not have a "negative bias" towards subprime. On the contrary, Wachovia acquired Golden West knowing that it was heavily involved in subprime lending. Moreover, Defendants knew that after Wachovia acquired Golden West, Wachovia adopted Golden West's lax underwriting practices and expanded the Pick-a-Pay loan product throughout the organization, thereby substantially increasing Wachovia's subprime-related assets in its General Bank business segment. Defendants also knew but failed to disclose that Wachovia was accumulating subprime-related assets in its trading portfolio, because it was forced to retain the residuals of securitizations it had originated but could not sell into secondary markets. Thus, Defendants' statements were false and misleading, because Wachovia's holdings of subprime-related assets exposed the Company to greater levels of risk than Defendants indicated.

Q.    NOVEMBER 14, 2007 CONFERENCE CALL

235. On November 14, 2007, Defendants made additional materially false and misleading statements during a presentation at the Merrill Lynch Banking & Financial Services Investor Conference.

78

236.    Specifically, Ben Jenkins, Vice Chairman and President of Wachovia's General Bank, made materially false and misleading statements regarding the supposedly distinguishing features of Wachovia's Pick-a-Pay mortgages:

> From a credit perspective, we believe our work to build a low-risk, highly collateralized consumer portfolio and a wholesale portfolio that is very granular in size and very well balanced between geography and industry, that's the right strategy for us and it will pay off for us in 2008 …

> *****

> The appraisal process is, again, done by somebody on staff, a Wachovia appraisal, who knows the market, knows the submarket, and the only pressure that appraiser feels is the pressure to get it exactly right from a value standpoint….And we have protections built in for the borrower in terms of how much movement that can be in the payment rate.  The payment rate can only move up 7.5% year to year.  So if rates move up dramatically, the borrower's payment rate only goes up 7.5%....

> *****

> Now, the fourth fundamental for good performance is superb risk management, and that has, I think, long been the hallmark of our company....And with the addition of Golden West, our real estate portfolio has a loan to value at origination of 71%....

237.    The foregoing statements were materially false and misleading when made because: (i) lax underwriting standards created an inherently risky loan portfolio; (ii) Wachovia no longer employed the same appraisal process; (iii) payment caps did not prevent "payment shock" because loans would automatically recast to fully-amortizing levels as LTV ratios rose; and (iv) LTV ratios *at origination* were outdated and no longer representative of then-current market conditions.

R.    JANUARY 22, 2008 CONFERENCE CALL

238.    Wachovia released its fourth quarter 2007 earnings statements in a Form 8-K filed on January 22, 2008.  Following the release of its fourth quarter 2007 earnings, Defendants made materially false and misleading statements during a January 22, 2008 conference call.

239.    In particular, Defendant Thompson made several materially false and misleading statements during the call:

> Nevertheless, based on recent action in our stock price, I'm certain that investors are anxious about several questions on Wachovia which I want to address now.  The first question is, what is the level of losses in your Pick-a-Pay mortgage portfolio? … *[O]ur Pick-a-Pay portfolio will generate very meaningful bottom-line profits in 2008, and I do not believe that investors grasp that fact today.*
>
> The second question: does Wachovia have enough capital?  After our December preferred offering, Wachovia's capital levels were higher at year-end than at the end of the third quarter in spite of the marks and in spite of the reserve build that we did in the fourth quarter.  And we're confident that those capital levels will increase as we go through 2008.
>
> And the third question: will Wachovia cut its dividend?  And the answer to that question is *we have no plans to cut the dividend because we don't need to cut the dividend.*  We're confident in our ability to meet our 2008 business plan.  And that plan, as we have said before, will generate cash earnings that will cover our dividend payments, continue to build necessary credit reserves, improve our capital ratios and support growth in our business lines. (emphasis added).
>
> *****
>
> And of course we have contended that all along we've been lumped in with option ARM products of other companies, and *ours is vastly different. . . . So we think we're in good shape there*, and we think that product is going to be attractive going forward.  (emphasis added).

240.    Defendant Thompson's foregoing statements were materially false and misleading when made, because Defendants knew or recklessly disregarded the risks associated with the

Pick-a-Pay portfolio while simultaneously claiming that the Pick-a-Pay portfolio would generate profits.  Defendant Thompson repeatedly attempted to distinguish Pick-a-Pay loans from other Option ARMS when, in fact, Pick-a-Pay was subject to the same risks as other Option ARMS. Although Defendant Thompson claimed the Company was "good shape," Defendants knew that Wachovia was on the brink of total collapse.

241.    Defendant Wurtz made additional materially false and misleading statements during the same call:

> *[T]here's clear evidence that our Pick-a-Pay portfolio is to date performing very similar to that of the average prime portfolio* in the industry in terms of 60 day delinquency as an example….
>
> *****
>
> We feel very good about our execution from both an operating standpoint and on the integration front, and *believe we're poised for strong results* barring complete meltdown in the equity markets.  (emphasis added).

242.    Defendant Wurtz's foregoing statement was materially false and misleading for the reasons described above.

243.    Defendant Truslow made additional materially false and misleading statements during the same call:

> Given the stressed mortgage market, and the fact that *the underwriting for Wachovia's Pick-a-Pay product is different from what is a typical option payment ARM* and therefore admittedly a little difficult to categorize against other more common products, we've included the next two slides to provide some help in better understanding how this portfolio is performing in this market against traditional prime, Alt-A, and subprime loans.

So if you'll slip over to slide 18, this chart's the Wachovia Pick-a-Pay 90-day past due ratios. And the green diamond line, and the Wachovia overall mortgage portfolio inclusive of Pick-a-Pay is in the darker blue, small square line, against prime, Alt-A, and subprime industry results. And *you can see that the Wachovia results are performing well measured against Alt-A, and just modestly worse than prime.* And of course subprime performance has been rather dismal….

[W]e provided this to the extent that it would be helpful…. But we think that slide 18 in aggregate tells a story that is maybe not well understood in the market. (emphasis added)

244. Defendant Truslow's foregoing statement was materially false and misleading because Defendant Truslow knew or recklessly disregarded the fact that Pick-a-Pay loans would not continue to "perform[] well measured against Alt-A," because Pick-a-Pay loans eventually reset to the same "payment shock" levels that were triggering defaults in other payment option ARMs. Thus, Defendant Truslow's statement was materially false and misleading.

245. Defendant Truslow made additional false and misleading statements regarding the Company's underwriting practices and the LTV ratios for its Pick-a-Pay portfolio:

For the Pick-a-Pay product, the portfolio has an original loan-to-value of about 71% and an original FICO score of about 673. And as a reminder, *the Golden West underwriting practices focused on a rigorous appraisal process* and the borrower's ability to fund 20% to 30% of the purchase price up front. Using estimated current valuation updates that we ran in November, *the average current loan-to-value across the portfolio is basically unchanged from origination, coming in around 72%.* (emphasis added).

246. Defendant Truslow's foregoing statement was materially false and misleading because the LTV ratios across the Pick-a-Pay portfolio had already increased significantly since origination. Thus, the risk of loss to the Company was far greater than Defendant Truslow claimed.

We've begun experiencing higher loss rates where we have loans in markets that experienced rapid price appreciation since 1999, and are now seeing rapidly declining trends in housing values. Most of the build in the allowance for the Pick-a-Pay product was for the loans in those markets where the estimated current loan-to-values have risen or are expected to rise above 95%, were originated over the last three years, and are exhibiting a higher likelihood of default. So when you carve out this pool of loans, it constitutes about $8 billion of the $120 billion Pick-a-Pay portfolio.

In December, severities I believe, got to just under 25%. And so again you have to take that in light of where most of these sales have been, so the most severely impacted properties. ***And we have been helped by the fact that we had 20, 30% real equity on the front end…*** (emphasis added).

*****

That would be the loss against the value of the loan. So if you think about some markets in California that have given up 25, 30% from their peak, that could entirely take away the equity that the borrower put in on the front end, and maybe a little more. And then you take into account the foreclosure costs, cost of fixing up the property, going through foreclosure, the commissions that we're willing to pay to get the house moved. We've been willing to take some possibly higher severities in some markets to get the properties moved …

247. Defendant Truslow's foregoing statements were materially false and misleading when made because vastly more loans were at risk of default, and the at-risk properties were not sufficiently collateralized. Specifically, nearly 70% of Wachovia's Pick-a-Pay portfolio consisted of loans originated in California and Florida, places hit hardest by the declining housing market. Moreover, because most Pick-a-Pay borrowers were paying only the minimum monthly payment, negative amortization was accumulating and loan balances were increasing, not decreasing.

248. Towards the end of the conference call, Defendant Thompson made additional materially false and misleading statements:

And I think, in addition to that if you look at the provision expense in the fourth quarter and if you look at what we're planning going forward, I think *we're being very conservative from a credit standpoint moving forward.*

So I think we are being very conservative.  And I think we are optimistic about the future given the conservatism that we've already taken.  And that's why we feel comfortable giving the kind of guidance that we've given you as far as covering the dividend, growing capital ratios, growing our business.    And we're optimistic about Wachovia.  Frankly, *it's just hard for me to understand the impact that our stock price has taken over the last three months because I look at how we compare to others and I feel very good about where Wachovia is.*

249.    Defendant Thompson's foregoing statement was materially false and misleading when made because Wachovia had one of the largest portfolio of payment option ARMs, and it was precisely this type of mortgage that had the highest risk of default.  The risk of default in the Pick-a-Pay loan portfolio was the same, if not greater, than would be experienced in other payment option ARM portfolios, because Defendants knew that Pick-a-Pay's features delayed, but not eliminated, many of the defaults.  Defendants also knew that Wachovia had insufficient credit reserves to account for these impending losses.  Defendant Thompson's statement that Wachovia was "being very conservative from a credit standpoint moving forward" was therefore false and misleading.

250.    Wachovia's insufficient credit reserves were questioned by Kevin Fitzsimmons, an analyst participating in the conference call.  Fitzsimmons asked:

I know you've given a lot of detail today, but if you can help us reconcile how and why we shouldn't come away thinking the allowance is very low and specifically the ratio I'm looking at primarily is the allowance to NPA [non-performing asset] ratio being at only 88%, and which I'm sure is well below peer level….

251.    In response, Defendants merely repeated their false and misleading statements concerning the credit quality of Wachovia's loan portfolio and the level of collateralization associated with its Pick-a-Pay loans.

**S.    JANUARY 30, 2008 CONFERENCE CALL**

252.    Defendants made materially false and misleading statements during a January 30, 2008 conference call.

253.    Discussing the Pick-a-Pay portfolio, Defendant Thompson stated:

> So I know that potential credit losses are of concern for investors and I want to talk directly with you about that. ***Wachovia, as we see on this slide, has historically been a conservative underwriter and I can assure you that that's not changed***….[H]ere we underwrote, as did Golden West before us, with a substantial cash upfront, we were at 70, 71% loan-to-value on our mortgage portfolio. And we are confident, in fact, ***we are very confident that the loss content on these NPAs will not approach levels of loss content in other asset classes that you look at.***

> [T]his slide further illustrates that. It shows why we've got confidence in the statement I just made.

> Our mortgage portfolio loss rate will be manageable because as this slide shows [] the dark green line shows 90-day past-due performance for Wachovia's Pick-a-Pay mortgage portfolio … [Y]ou can see on this slide that it tracks most closely to the blue line, which is the entire mortgage industry prime performance. It's way below the red line which is subprime and it's tracking well below Alt-A which is the gray line. So that gives us confidence that our loss rate in the Pick-a-Pay portfolio is going to be good.

> I think you should take further comfort by focusing on this slide. This slide shows delinquency rates for Wachovia portfolios versus industry averages for the same portfolios. ***[I]n every category, mortgage, whether it be Pick-a-Pay or traditional mortgages, home equity, and in auto finance, Wachovia is demonstrably superior to the industry.*** (emphasis added).

254.    Defendant Thompson's foregoing statement was materially false and misleading for the reasons already explained above.

255.    When questioned about the high default rates in other Option ARM portfolios and whether Wachovia was concerned about defaults within its Pick-a-Pay portfolio, Defendant Thompson stated:

> *[O]ur option ARMs were totally different than other option ARMs in the market*. We've gone over this time and time again. We've got a cap on payment rates going up by more than 7.5%; we underwrote to the fully indexed rate, not to the teaser rates, our average go-in-on LTV was somewhere in the 70 to 72% range.  So we've got [ ] a cushion, and we're being hurt in California, where we've seen great price depreciation and in some other places.  But overall, I stand by what I've said about the NPA's are rising, but *our loss content in our NPA portfolio will not be anything close to other asset classes.*  (emphasis added).

256.    Defendant Thompson's foregoing statement was materially false and misleading when made because Defendants knew but failed to disclose that Wachovia's Pick-a-Pay loans were not fundamentally different than other payment option ARMs offered by competitors. Moreover, Defendants knew that Wachovia had relaxed underwriting standard to the point where Wachovia could not have known whether its borrowers could repay loans at the fully-indexed rate.  Finally, Defendant Thompson's reference to LTV ratios in the "70 to 72%" range was false and misleading because Defendants knew that current LTV ratios were much higher than LTV ratios at origination, because declining real estate values and increasing negative amortization were causing LTV ratios to increase at rapidly accelerating rates.

**T.    FEBRUARY 13, 2008 CONFERENCE CALL**

257.    Defendants made materially false and misleading statements during a February 13, 2008 conference call.

258.    During this call, Defendants repeated their false and misleading assurances that (1) only a small portion of their mortgage portfolio was at risk of default; (2) the current LTV ratios of Wachovia's mortgages were essentially unchanged since origination; (3) Wachovia's

loss reserves were sufficient; and that (4) Wachovia's Pick-a-Pay loans were immune from the same risks inherent with other Option ARM loans.

259.    A participant questioned Defendants about the risk of default once its loans fully recast, specifically whether ***"[Wachovia's] just delaying the inevitable by delaying the recast event to a later time period…"*** (emphasis added).

260.    Defendant Truslow gave a materially false and misleading response:

> So it really hasn't – it's a – it gets a lot of attention and we get a lot of questions about it but ***it just hasn't been a factor from an asset quality standpoint or a delinquency standpoint*** and again, we believe that it's actually very favorable from the consumer's vantage point in that it avoids some of the traps that are now popping up in some other products.  (emphasis added).

261.    Defendant Truslow's assertions were materially false and misleading because Wachovia's rate caps allowed it to defer, but not to avoid, the same default risks inherent in other payment option ARM products.

262.    Defendant Truslow made additional materially false and misleading statements regarding the LTV ratios within the Pick-a-Pay portfolio.  Defendant Truslow stated:

> The interesting thing is, I think the last run we did was in November and across the whole book, the actual loan to value for the portfolio went down by a couple of percent.  And even in the pick-a-pay portfolio, it was down by a little bit.

> We did give I believe in – I think it's in here, I know we did in the earnings report that of the non-performs in the pick-a-pay portfolio, the current average loan to values in the non-performs was, I believe, about 81% if I'm remembering that number correctly.   So we did try to give a little color as to what's happening on average in the non-perform category.

263.    Defendant Truslow's foregoing statement was materially false and misleading because average LTV ratios were higher than 81% for Wachovia's NPAs.   In fact, the Company's California loans LTV ratios averaged over 90%.

264.    Defendant Thompson made materially false and misleading statements during the

call.  Thompson stated:

> But, we feel good, actually about how [Pick-a-Pay] is performing
> relative to the rest of the industry.  Some of the characteristics just
> to keep in mind about the pick-a-pay product, and we like to
> continue reminding people about this. . . .
>
> [T]he minimum payment can only move by 7.5% per year . . . *So
> the pick-a-pay product is actually pretty consumer friendly, and
> that has had the effect of shielding consumers from some of the
> major payment shocks that are now really just coming about.*
> (emphasis added).
>
> *****
>
> And, in fact, what is happening o [sic] course, is rates are coming
> down, and that will, in fact, kind of ease pressure on the pick-a-pay
> product and reduce the amount of deferred interest that is
> accumulating where people opt to pay the minimum payment rate
> and probably make this (inaudible) what happens in the next
> couple years, *actually make the results better than what we show
> here.*  (emphasis added).
>
> *****
>
> So, again, I hope this helps just put it into context *the deferred
> interest nature of this product really has not stressed the
> portfolio, nor has it put additional stress on the borrowers, and
> really hasn't at all been either a causal effect of borrowers going
> delinquent or adding really in any kind of significant way to any
> sort of severity.*

265.    Defendant Thompson's foregoing statements were materially false and

misleading.  First, the 7.5% rate cap Thompson referred to did not, and could not, "shield

consumers from some of the major payment shocks" caused by recasting – it could only delay

the inevitable.  Second, precisely because of this feature, Defendant Thompson knew or

recklessly disregarded that the results from the Pick-a-Pay portfolio were not likely to get

"better;" they were likely to get worse.  And finally, Defendant Thompson's statement that the

"deferred interest nature of [Pick-a-Pay]" did not stress the portfolio or borrowers was materially

false and misleading because deferred interest was precisely what was stressing portfolios and borrowers in nearly all Option ARM products, including Pick-a-Pay.

### U.    WACHOVIA'S 2007 FORM 10-K

266.    Defendants made materially false and misleading statements in Wachovia's 2007 Form 10-K.  Defendants filed the 2007 10-K with the SEC on February 28, 2008.

267.    Discussing Wachovia's acquisition of Golden West, Defendant Thompson repeated his materially false and misleading assertions about the "quality" Golden West's business model and underwriting standards:

> With the benefit of hindsight, it is clear that the timing was poor for this expansion in the mortgage business.  Yet **_we have reconfirmed our opinion of the quality of the Golden West franchise, its underwriting and service model, and the quality of its people._**

268.    Defendant Thompson's foregoing statement was materially false and misleading because Golden West's business model and underwriting standards were deficient for the reasons discussed above.

### V.    MARCH 12, 2008 CONFERENCE CALL

269.    Defendants made materially false and misleading statements during a March 12, 2008 conference call.

270.    Defendant Truslow made materially false and misleading statements during the March 12, 2008 call:

> Given the serious weakness in the housing markets, we are looking for the non-perform level to climb as we move through 2008, and that's in part driven by the sticky nature of these non-performing loans and we can talk about that if you'd like.  The Pick-a-Pay non-accrual loan levels are up, but comparing with some recently reported results by some other option ARM lenders in the industry, we believe our levels sit at relatively attractive levels or levels pretty significantly below what we have seen some others report.

*And I think that is probably due very heavily to the way the Pick-a-Pay product is designed and we are somewhat insulated from the recast pressure* that some other option ARM lenders are facing right now. . .

And we do get a lot of questions about the Pick-a-Pay product and its features and how the product works, and *it doesn't appear that the features themselves are creating any significant issue for us. . . .*

And when we stand back and look at the deferred interest component on non-performing loans, the deferred interest component on non-performs is only slightly higher than the portfolio overall.  So, again *it doesn't appear that the deferred interest component is really a driver of loans defaulting. . . .*

*And again lot comes back to, I think, how our loans were originated versus some of the more problematic loans that others have been talking about.*  I think on a relative basis, we feel very good about how that position is – that loan portfolio is positioned.

**Khori Gembermini of John Hancock:**

In terms of your Pick-a-Pay portfolio, reading some of your disclosures, I think you give some opinion of a current loan-to-value, but you don't divulge bands per se.  I guess can you be more specific in terms of what you feel the current loan-to-value is based on your – however you do that and maybe a comment on how you do it would be great?  And secondly, what percentage would be over 100% and in terms of that product, when do you start choking-off people?

**Don Truslow:**

*I believe the average loan-to-value on the Pick-a-Pay portfolio came back at about 72% or so, which was about pretty close to the original loan-to-value surprisingly.*  What I will say is that on average we came in pretty close that the spread around the average is wider, so there is obviously more that is moved into the higher loan-to-values and then as our loans that have been and markets that have appreciated that haven't given back the appreciation or seasoned over time, there is more that is moved kind of the lower loan-to-value part of the spectrum.

But on the average it came back actually pretty close.

**Michael Mayo of Deutsche Bank:**

So, as of November, how much of Pick-a-Pay was loan-to-value of 90% or more?

Truslow:

*I don't think we've disclosed that number.*

271.    Defendant Truslow's foregoing statements were materially false and misleading because the Pick-a-Pay model was precisely what was "creating significant issues" for Wachovia.  Defendants repeated attempts to distinguish Pick-a-Pay from other Option ARMs were materially false and misleading as Pick-a-Pay suffered from the same deficiencies as other Option ARMs.  Defendant Truslow knew or recklessly disregarded that his foregoing statements were false and misleading as evidenced by the majority of Wachovia's loss reserves being set aside to cover losses from Pick-a-Pay loans.

## W.    APRIL 14, 2008 CONFERENCE CALL

272.    During an April 14, 2008 conference call, Defendants finally admitted that: (1) Wachovia incurred severe losses from Pick-a-Pay loans; (2) these losses were threatening the financial stability of Wachovia; and (3) Wachovia was making significant changes, including no longer originating Pick-a-Pay loans.

273.    The questions from conference call participants indicated a disconnect between what Defendants previously represented and their then-current disclosures.  For instance, a conference call participant, Jason Goldberg of Lehman Brothers, asked:

> *[Y]ou've been consistent in saying at least up until your 10-K in late February that you felt comfortable with your capital and dividend position.*  Obviously, something has changed dramatically.  Obviously, you went into February knowing the housing market was stressed.  Can you just kind of update us with your thoughts over the subsequent six weeks from the end of February?

274.    Similarly, Kevin Fitzsimmons of Sandler O'Neill asked:

> Could you give a little more detail on, you cited dramatic change in customer behavior or consumer behavior and that led to the decision to cut the dividend, increase capital.

275.    And Jonathan Adams of Oppenheimer Capital asked:

> **[I]t strikes me that there's nothing in the 90 days past due trends that would justify the kind of change that you have made in your outlook**.  You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut, and then five or six weeks later coming to a different conclusion, or it's some other metrics as well.  **But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically**.

276.    Defendants' responses were materially false and misleading because Defendants' responses indicated their "dramatic" change in outlook was due to a "new model" for projections, rather than information Defendants already knew, misrepresented, and failed to disclose:

**Defendant Thompson:**

> Over the past year, we've witnessed a consistent pattern of deterioration in credit statistics in our mortgage portfolio in stressed areas of the country and particularly in California and Florida….**The basis for our revised projections is a new model** which permits us to model home prices at the MSA level in conjunction with a behavioral model that captures changes n borrower's repayment behavior when their equity dissipates…

*****

**Defendant Wurtz:**

> As Ken mentioned, **we've changed considerably the modeling of our Pick-a-Pay portfolio** with far greater emphasis on forecasted future changes in housing markets and customer behaviors, and particularly in the stressed markets …but the results of that is we expect further robust provisioning in both 2008 and 2009.

*****

**Defendant Truslow:**

Ken and Tom mentioned for the Pick-a-Pay and the portfolio, *we have implemented a new modeling tool which will help us better estimate the outlook for credit costs for this portfolio*, and we have chosen to use the OFHEO Index at the MSA level weighted for our loan balances in order to calibrate the correlations of what we were observing and borrower propensity to default to housing price declines. And therefore using this as a backdrop for forecasting credit costs….

[A]s housing prices decline and borrowers lose their equity in their homes relative to their first mortgage balances, we are seeing borrowers default at a faster rate than historical trends and other quality measures such as FICO would suggest… *[W]e believe that this new approach, this new model better captures these linkages and home price trends and this new analysis and what we've been experiencing in the housing market in the first quarter led us to build the allowance by about $1.1 billion for the Pick-a-Pay mortgage portfolio….* [W]e have used the models output to help dimension for investors credit costs we [are] currently estimating for the Pick-a-Pay loan through the end of 2009. We're currently expecting charge offs including first quarter results for all of 2008 at about 1.3 billion to 1.7 billion rising to somewhere in the 2.5 billion range in 2009. In terms of reserves, we expect to continue adding another $800 million to $1 billion in addition to the $1.1 billion that was added in the first quarter across 2008 and this is in anticipation of the estimated charge offs in 2009 so the reserve has a forward look to it. [A]s you can see, these actions substantially build the loan loss reserves for this product.

*****

277. Defendants' foregoing statements were materially false and misleading when made because, as described herein, their disclosures were based on information Defendants knew, concealed, and misrepresented.

278. During the April 14, 2008 conference call, Defendants admitted that their loans were not as highly collateralized as Defendants previously represented. Thus, Defendants previous representations about low initial LTV ratios and up-front equity requirements were obviously false. In fact, for the first time, Defendants disclosed that many borrowers had zero or

near zero equity in their homes, and that because of this, many borrowers were simply abandoning their properties:

> **Defendant Thompson:**
>
> I would just say that what we are seeing is that **when equity in the home approaches zero, behavior changes.**   And that's what the model tries to do is to then take that behavior along with house price depreciation and factor that into future losses.  Don?
>
> **Defendant Truslow:**
>
> Ken, that's exactly right.  And Kevin, it's just this pattern almost that somewhere and I don't know where the tipping point is, but somewhere **when a borrower crosses the 100% loan to value, somewhat north of that.  And they presumably run into some sort of cash flow bump, whether it's reduced income or normal things in life that have created past dues before.   They're [sic] propensity to just default and stop paying their** mortgage **rises dramatically** and I mean really accelerates up.   It's almost regardless of how they scored, say, in FICO or other kinds of character, credit characteristics …
>
> [T]hat behavior is going on.  We're seeing in our portfolio the most significant declines and defaults activity in California, **and of course, it's the largest concentration for us in the Pick-a-Pay portfolio by far.**

279.    Betsy Graseck, an analyst with Morgan Stanley, questioned Defendant Truslow further regarding LTV ratios within the Pick-a-Pay portfolio:

> On page 21, **you've got the percentage of the Pick-a-Pay portfolio that [has] got an LTV above 100%, 14%.  Is this the first time you're giving that data?**

280.    Defendant Truslow responded:

> **It is.**   [W]e wanted to provide that just to, number one, that's the most stressed stratification in the portfolio.  And also just exhibit that we recognize there's been severe deterioration in several of our markets where we have the Pick-a-Pay loans.

281.    Although Defendants' foregoing statements were partial corrective disclosures, Defendants made additional materially false and misleading statements.

282.    Specifically, Defendants falsely stated that: (1) LTV ratios had only risen slightly; (2) losses within the Pick-a-Pay portfolio would not exceed 7.5%; and (3) Wachovia had sufficient capital to fund a dividend payment representing approximately 60% of Wachovia's prior dividend.

283.    The false and misleading nature of Defendants' foregoing statements was not fully known until new Wachovia CEO Robert Steel admitted: (1) current LTV ratios were significantly higher than previously claimed; (2) losses from Pick-a-Pay would be almost twice as high as Defendants previously claimed; and (3) Wachovia could not fund its dividend as previously claimed.

## X.    JULY 22, 2008 AND SEPTEMBER 9, 2008 CONFERENCE CALLS

284.    During a conference call on July 22, 2008, Defendant Steel admitted that Pick-a-Pay LTV ratios were significantly higher than previously claimed; that Pick-a-Pay losses would be significantly higher than previously claimed; and consequently, that Wachovia would have to eliminate its dividend.

285.    Although Steel's admissions constituted partial disclosures, Defendant Steel's statements were false and misleading when made because Defendants continued to understate LTV ratios and conceal the full extent of losses within the Pick-a-Pay portfolio.

286.    During a September 9, 2008 conference call, an analyst questioned Defendant Steel about his representations regarding Pick-a-Pay:

> I believe that the last time you offered projections with respect to the Pick-a-Pay portfolio, the bank was looking at about a 12% estimated cumulative loss rate. ***When I apply the same estimated projections that come out of both Lehman and other firms fixed income research groups by vintage, I come up with a number much closer to something close to 20%.*** [Y]ou've now been at the bank longer than the initial call, has your view on estimated cumm losses on a Pick-a-Pay changed? Or are you still looking at around 12% or perhaps something higher than that?

287.    CEO Steel and another unidentified Wachovia executive replied that the Company's figures were correct.    However, that representation was materially false and misleading, because within a few weeks, the full extent of Wachovia's fraud was revealed as Wachovia was nearly forced into receivership by the FDIC and new and significantly higher projected losses within the Pick-a-Pay portfolio were announced.

## IX.    WACHOVIA'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER

288.    The Individual Defendants, by virtue of their receipt of information reflecting the improper and fraudulent behavior described above and/or their failure to review information they had a duty to monitor, their actual issuance of and/or control over Wachovia's materially false and misleading statements, and their association with Wachovia, which made them privy to confidential proprietary information concerning Wachovia, were active, culpable, and primary participants in the fraudulent scheme and issuance of material misrepresentations alleged herein. The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the public.

289.    The Individual Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Wachovia's public statements would adversely affect the integrity of the market for Wachovia's common stock and would cause the price of Wachovia's common stock to be artificially inflated.    The Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

290.    The scienter of Wachovia and the Individual Defendants is supported by the following facts, which are described in detail herein.

**A.  DEFENDANTS KNEW THAT WACHOVIA DID NOT EMPLOY STRICT UNDERWRITING STANDARDS IN ITS ORIGINATION OF PICK-A-PAY LOANS**

291.    From the moment the acquisition of Golden West was announced in May 2006, Defendants repeatedly emphasized that Pick-a-Pay loans were distinguishable from other payment option ARMS because of the strict underwriting standards employed at the time of origination.

292.    Furthermore, the Individual Defendants made numerous public statements concerning Wachovia's underwriting standards.  Although these statements were designed to perpetuate the misleading impression that Wachovia continued to employ conservative underwriting practices, the Individual Defendants knew that Wachovia was originating Pick-a-Pay loans without verification of borrower income or requiring minimum credit scores.  The Individual Defendants also knew that Wachovia began to utilize outside appraisers.

293.    Because Wachovia's underwriting standards were an essential characteristic of the Pick-a-Pay loan program, and were therefore fundamental to Wachovia's overall financial condition, Wachovia's senior management, including the Individual Defendants, monitored and managed Wachovia's underwriting guidelines and operations.

**B.  DEFENDANTS KNEW THAT EMPLOYEES WERE INCENTIVIZED TO PROMOTE PICK-A-PAY LOANS WITHOUT REGARD TO RISK MANAGEMENT STRATEGIES**

294.    Wachovia, at the direction of the Individual Defendants, established a system of financial rewards for originating higher risk loans, with corresponding negative consequences for those who did not follow the system.  Wachovia loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-a-Pay loans.  Commissions earned by Wachovia employees who sold Pick-a-Pay loans were substantially higher than those resulting from the sale of more traditional loan products.

295.    Defendants received reports detailing the Company's loan origination statistics, including information concerning compensation of loan personnel who sold Pick-a-Pay loans. As discussed, *supra* at Section XIII, Defendants also made numerous statements indicating that loan personnel were being specially trained to promote Pick-a-Pay loans and that the Pick-a-Pay product was being expanded throughout the organization.

**C.    HIGHLY UNUSUAL AND SUSPICIOUS INSIDER STOCK SALES BY THOMPSON AND OTHER INDIVIDUAL DEFENDANTS CREATE A STRONG INFERENCE OF SCIENTER**

296.    From 2006 through 2008, sales of Wachovia stock by Defendants Thompson, Wurtz, and Truslow were highly unusual and suspicious as measured by (1) the amount and percentage of shares sold, (2) a comparison with the Individual Defendants' own prior trading history and that of other insiders, and (3) the timing of stock sales.  These sales therefore create a strong inference of scienter.

297.    Based on publicly available trading data required to be reported to the SEC, as compared with trading activity taking place prior to 2006, Individual Defendants' stock sales from 2006 to 2008 were extremely large and highly unusual.

298.    From 2006 to 2008, the Individual Defendants owned and sold the following Wachovia shares:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Thompson | 02/06/07 | 29,712 | $57.32 | 1,703,118.58 |
| Thompson | 3/30/2007 | 9,521 | $55.05 | 524,131.05 |
| Thompson | 4/18/2007 | 9,604 | $55.87 | 536,575.48 |
| Thompson | 4/19/2007 | 9,606 | $55.52 | 533,325.12 |
| Thompson | 4/20/2007 | 7,129 | $55.85 | 398,154.65 |
| Thompson | 2/20/2008 | 15,074 | $34.08 | 513,721.92 |
| Thompson | 3/31/2008 | 9,521 | $27.00 | 257,067.00 |
| Thompson | 4/18/2008 | 19,210 | $27.24 | 523,280.40 |
| Thompson | 4/22/2008 | 7,129 | $26.20 | 186,779.80 |
| **Total** | | **116,506** | | **5,176,154.00** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 10/23/06 | 23,358 | $55.95 | 1,306,880.10 |
| Wurtz | 12/16/06 | 6,368 | $57.04 | 363,230.72 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 2/5/2007 | 442 | $56.46 | 23,824.56 |
| Wurtz | 2/5/2007 | 1,984 | $56.50 | 112,090.84 |
| Wurtz | 2/5/2007 | 28,014 | $57.30 | 1,605,143.37 |
| Wurtz | 3/20/2007 | 1,684 | $55.05 | 92,704.20 |
| Wurtz | 4/18/2007 | 582 | $55.87 | 32,516.34 |
| Wurtz | 4/19/2007 | 431 | $55.52 | 23,929.12 |
| Wurtz | 4/20/2007 | 409 | $55.85 | 22,842.65 |
| Wurtz | 2/20/2008 | 2,133 | $34.08 | 72,692.64 |
| Wurtz | 3/31/2008 | 1,287 | $27.00 | 34.749.00 |
| Wurtz | 4/18/2008 | 775 | $27.24 | 21,111.00 |
| Wurtz | 4/22/2008 | 313 | $26.20 | 8,200.60 |
| **Total** | | **67,760** | | **3,719,915.14** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Truslow | 10/18/2006 | 16,980 | $55.14 | 936,277.20 |
| Truslow | 3/20/2007 | 1,429 | $55.05 | 78,666.45 |
| Truslow | 4/18/2007 | 1,552 | $55.87 | 86,710.24 |
| Truslow | 4/18/2007 | 37,334 | $55.52 | 2,072,783.68 |
| Truslow | 4/18/2007 | 1,789 | $55.87 | 99,951.43 |
| Truslow | 4/19/2007 | 1,682 | $55.52 | 93,384.64 |
| Truslow | 4/20/2007 | 1,498 | $55.85 | 83,663.30 |
| Truslow | 2/20/2008 | 1,816 | $34.08 | 61,889.28 |
| Truslow | 3/31/2008 | 1,092 | $27.00 | 29,484.00 |
| Truslow | 4/18/2008 | 2,473 | $27.24 | 67,364.52 |
| Truslow | 4/22/2008 | 1,145 | $26.20 | 29,999.00 |
| **Total** | | **68,790** | | **3,640,173.74** |

299.    Defendant Thompson sold just over 61,000 shares of Wachovia common stock in the 16 months prior to May 2006, but sold over 116,500 shares in the 14 months between February 2007 and April 2008.

300.    Defendant Wurtz sold just 8,255 shares of common stock in the 16 months prior to May 2006, but sold over 67,700 shares in the 18 months between October 2006 and April 2008.

301.    Defendant Truslow sold just 25,730 shares of Wachovia common stock in the 16 months preceding May 2006, but sold almost 68,000 shares in the 18 months between October 2006 and April 2008.

**D.    GOVERNMENT INVESTIGATIONS CREATE A STRONG INFERENCE OF SCIENTER**

**1.    The SEC's Investigation Into Defendant Steel**

302.    The SEC is investigating whether Mr. Steel misled investors when he appeared on CNBC's "Mad Money" program on Monday, September 15, 2008.  Financial stocks plunged across the board that day as Lehman Brothers filed for bankruptcy protection and Bank of America Corp. announced a deal to buy Merrill Lynch & Co.  Host Jim Cramer asked Mr. Steel whether his goal was to sell the bank.  Defendant Steel responded that Wachovia had a "great future as an independent company."  He added, "[B]ut we're a public company.  So we're going to do what's right for shareholders, I can promise you that.  But we're also focused on the very exciting prospects when we get things right going forward."

303.    Defendant Steel made those statements, amazingly, right before Wachovia's shares fell off a cliff.  Defendant Steel apparently thought he  could "spin" his way to survival by putting on a happy face despite knowing the materially adverse effect of the worsening financial condition on the Company.

304.    Steel spoke of Wachovia's efforts to raise money by cutting its dividend, cleaning up its balance sheet and reducing expenses.  That day, shares of Wachovia fell by about 25%.

305.    The next day, September 16, 2008, Wachovia's board met by telephone to discuss strategic options for the company, including raising money, selling core businesses and merging with another company, according to an SEC filing.

306.    On September 17, 2008, Mr. Steel called Morgan Stanley CEO John Mack to discuss a potential merger, according to people familiar with the matter.

307.    By the week of September 22 2008, under pressure from regulators and with customers starting to withdraw deposits, Steel was immersed in merger negotiations with Citigroup Inc. and Wells Fargo & Co. executives.

308.    After initially agreeing to sell its banking operations to Citigroup, Wachovia on October 3, 2008, agreed to sell the full company to Wells Fargo.  In the deal, valued at about $15.4 billion, Wachovia shareholders received Wells Fargo stock then valued at $7 for each Wachovia share they owned.  That was about 35% below Wachovia's $10.71 closing stock price on the day of Mr. Steel's CNBC interview.

### 2.    The SEC Launches an Investigation into Golden West's Lending Practices

309.    On November 19, 2008, federal prosecutors and the SEC announced that they were launching an investigation to determine whether Golden West had employed improper lending practices that mislead borrowers and investors.  Specifically, investigators stated that they were examining whether borrowers had been lured into mortgages that they could not afford, whether terms and conditions of loans had been adequately disclosed, and whether financial data had been falsified so that borrowers could qualify for larger, more expensive mortgages.

310.    On the day the investigation was announced, Wachovia's stock lost 13% of its remaining value.  The investigation remains ongoing.

### 3.    The SEC Recovers More Than $7 Billion From Defendant Wachovia Securities

311.    On February 5, 2009, the SEC announced a settlement with defendant Wachovia Securities in the amount of more than $7 billion to thousands of customers who invested in auction rate securities ("ARS").

312.    The SEC alleged Wachovia Securities violated Section 15(c) of the Securities Exchange Act by, *inter alia*, marketing ARS as highly liquid securities through mid-February 2008 even though Wachovia Securities employees knew or were reckless in not knowing that the risk of auction failures had materially increased.  Beginning in August 2007, monocline insurers

were experiencing credit problems as a result of the subprime crisis because they had insured mortgage-backed bonds.

**E.    WACHOVIA'S NUMEROUS AND EGREGIOUS VIOLATIONS OF GAAP AND SEC REGULATIONS IN ITS FINANCIAL REPORTING CREATE A STRONG INFERENCE OF SCIENTER**

313.    As explained, *infra* at Section X, Wachovia violated numerous provisions of GAAP, as well as SEC Regulations, in its financial reporting from May 2006 to October 2008. These violations include, but are not limited to: (i) failing to take adequate loan loss reserves; (ii) failing to write-down to fair value subprime-related assets in the Company's trading and loan portfolios in a timely manner; (iii) failing to adequately disclose risk; (iv) failing to properly consolidate certain off-balance sheet entities; and (v) failing to maintain proper internal accounting controls.

314.    As a result, Wachovia's financial statements failed to accurately portray the Company's financial position and results of operations.  In fact, Wachovia's financial statements presented such a distorted picture of Wachovia's earnings and liquidity that each of its statements from May 2006 to October 2008 should have been restated as provided by GAAP and applicable SEC Regulations.

315.    As set forth, *infra* at Section X, the Individual Defendants certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements. However, the nature and extent of Wachovia's accounting violations, in conjunction with the Individual Defendants' own statements, suggest that as senior executives with oversight of the Company's financial reporting, the Individual Defendants knew that Wachovia was perpetrating a fraud by concealing mounting losses and hiding its actual holdings of subprime-related assets.

X.    **WACHOVIA'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS**

A.    **OVERVIEW OF WACHOVIA'S GAAP AND SEC REGULATION VIOLATIONS**

316.    As detailed herein, each of Wachovia's annual and interim financial reports issued from May 2006 through October 2008 violated numerous Generally Accepted Accounting Principles ("GAAP"), Generally Accepted Accounting Standards ("GAAS"), and SEC Regulations.    As a result of these violations of GAAP, GAAS and SEC Regulations, Defendants caused Wachovia to materially misstate its financial position and results of operations during the relevant period.    Wachovia's accounting violations were so numerous and egregious that Defendants should have caused Wachovia to issue re-statements of its publicly-filed financial statements from May 2006 through October 2008.

317.    Defendants caused Wachovia to violate GAAP by: (1) failing to properly consider all relevant factors in developing and recording the allowance for loan losses on its Pick-a-Payment loan portfolio; (2) failing to write-down to fair value the Company's subprime related direct positions and auction rate securities in its financial statements; (3) failing to disclose the existence and risk exposure of its subprime related direct positions; (4) failing to properly consolidate certain off-balance sheet entities; and (5) failing to maintain proper internal accounting controls, which resulted in the material misstatements to the Company's financial statements.

318.    Specifically, Wachovia's violations of GAAP include, *inter alia*, the following:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions, (SFAC 1);

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources, (SFAC 1);

c.   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general, (SFAC 1);

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance, (SFAC 1);

e.   The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (SFAC 2);

f.   The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting, (SFAC 2);

g.   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions, (SFAC 2);

h.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered, (SFAC 2);

i.   The principle that losses be accrued for when a loss contingency exists, (SFAS 5);

j.   The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred, (SFAS 5);

k.   The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports, (APB 28);

l.  The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial, (APB 28);

m.  The principle that management should provide commentary relating to the effects of significant events upon the interim financial results. (APB 28); and

n.  The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements, (APB 22).

**B.  APPLICABLE ACCOUNTING PRINCIPLES AND SEC REGULATIONS**

319.  GAAP are generally accepted principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accounting practice at a particular time.  GAAP is promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA.  The highest level in the hierarchy includes Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), Financial Accounting Standards Board Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP") and SEC Staff Accounting Bulletins ("SAB"). GAAP provide other authoritative pronouncements, including, among others, Statements of Financial Accounting Concepts ("SFAC"), which are standards that form the conceptual framework for financial accounting and reporting.

320.  Management is responsible for preparing financial statements that conform to GAAP.  As noted by AICPA auditing standards ("AU"), § 110.02:

Financial statements are management's responsibility…

> [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

321.    Furthermore, as a publicly-traded company, Wachovia was required to maintain books and records in sufficient detail to reflect the transactions of the Company and therefore prepare financial statements in accordance with GAAP.  Specifically, under the Exchange Act public companies must:

> a.  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> b.  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that; i. transactions are executed in accordance with management's general or specific authorization; ii. transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets….

*See* Section 13(b)(2)(A) and (B).

322.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. § 210.4-01(a)(1).

323.    Defendants also failed to comply with Item 303 of Regulation S-K, which requires, among other things, that the registrant provide information in the Management Discussion and Analysis (MD&A) section of the appropriate filings provide the reader with an understanding of what the financial statements show and do not show and highlight important trends and risks that have shaped the past or are reasonably likely to shape the future.  The

MD&A rules require that the registrant provide information, where appropriate, not otherwise required under GAAP and/or which cannot be found in the financial statements. Specifically, Item 303 requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

324. Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."

325. In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations: "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

326. The SEC requires in every Form 10-Q filing in Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), that the issuer furnish information required by Item 303 of Regulation S-K. The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future. To further explain what must be included by Item 303 in MD&A, the SEC issued an interpretive release as follows:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

327.    The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

328.    SAB 101, Revenue Recognition in Financial Statements, also reiterates the importance of MD&A in financial statements:

Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.  The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."**  (emphasis added) (footnotes omitted).

329.    The Instructions to Paragraph 303(a) of Regulation S-K further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

330.    Item 303 also specifically addresses, inter alia, disclosures regarding off¬balance-sheet arrangements (including guarantees and variable interests).  These rules require a registrant to disclose all material facts and circumstances that provide investors with a clear understanding of a registrant's off-balance-sheet arrangements and their material effects.  Specifically, Item 303, ¶4(ii) states the following concerning MD&A:

> The disclosure shall include the items specified in paragraphs (a)(4)(i)(A), (B), (C) and (D) [below] of this Item to the extent necessary to an understanding of such arrangements and effect and shall also include such other information that the registrant believes is necessary for such an understanding.
>
> A.    The nature and business purpose to the registrant of such off-balance sheet arrangements;
>
> B.    The importance to the registrant of such off-balance-sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;
>
> C.    The amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred by the registrant in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise; and*
>
> D.    Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination, or material reduction in availability to the registrant, of its off-balance-sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances.

331.    Moreover, a recent Final Rule promulgated by the SEC entitled "Disclosure in Management's Discussion and Analysis about Off-balance-sheet Arrangements and Aggregate Contractual Obligations," amends Item 303 of Regulation S-K to clarify the MD&A disclosures required relating to off-balance-sheet arrangements.  This amendment reaffirms the definition of

"off-balance-sheet arrangements" in Item 303, ¶4(ii)(A)-(D) to include guarantees, such as the guarantee arrangements at issue here. Section III of the Final Rule prescribes the disclosure threshold for such off-balance sheet arrangements at subsection B as follows:

> The amendments require disclosure of off-balance-sheet arrangements that either have, or are reasonably likely to have, a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. That disclosure threshold is consistent with the existing disclosure threshold under which information that could have a material effect on financial condition [Item 303 of Regulation S-K], changes in financial condition or results of operations must be included in MD&A.

332.    The Final Rule goes on to state:

> If management concludes that the known trend, demand, commitment, event or uncertainty is not reasonably likely to occur, then no disclosure is required in MD&A. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources is not reasonably likely to occur.

333.    As a result of these violations of GAAP and SEC Regulations, the Defendants caused Wachovia to materially misstate its financial position and results of operations from May 2006 to October 2008. The Company's financial statements, and related Forms 10-K, for the years ended December 31, 2006 and December 31, 2007 and interim financial statements, and related Forms 10-Q, for the quarterly periods ended March 31, 2006; June 30, 2006; September 30, 2006; March 31, 2007; June 30, 2007; September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008 did not present fairly the Company's financial position and results of operations, and were not presented in conformity with GAAP and SEC rules, as applicable.

C.    **WACHOVIA'S SPECIFIC VIOLATIONS OF GAAP**

334.    Wachovia's financial statements during the period from June 2006 through September 2008 violated GAAP and SEC regulations, in that they failed to (i) disclose facts necessary to present a fair and truthful representation of it's financial position and operating results, (ii) provide those disclosures that were required by GAAP, (iii) record adequate loan loss reserves, (iv) record investments at fair value, (v) record goodwill impairment, and (vi) consolidate controlled entities all of which were necessary for a financial understanding and evaluation of the Company.  Consequently, the overall impression that Wachovia was a going concern was not consistent with the business realities of a company on the brink of collapse.

1.    **Mounting Loan Losses Went Unrecorded**

335.    In connection with the acquisition of Golden West, Wachovia was saddled with $120 billion of subprime Pick-a-Pay mortgages.  Wachovia continued to expand and originate Pick-a-Pay mortgages, even as the real estate market by distributing throughout its franchise. Although Wachovia repeatedly touted the Pick-a-Payment product and its related underwriting as conservative, the mortgage terms combined with the location of the collateral made these loans no more resilient to the real estate crisis than other types of subprime mortgages.

336.    Wachovia was required under SFAS 114, *Accounting by Creditors for Impairment of a Loan*, to measure loan impairment for the Pick-a-Pay portfolio based on the present value of expected future cash flows or the fair value of the collateral.  A loan is impaired when it was probable that Wachovia would be unable to collect all amounts due according to the contractual terms of the loan agreement.

337.    Under SFAS 5, *Contingencies*, recording a loan loss allowance is required if it is probable that the loan has been impaired and that the amount of loss can be reasonably estimable.  Probable is defined in SFAS 5 as a future event that is likely to occur.

111

338.    In addition to accounting for loan losses in accordance with GAAP, Wachovia was also required under SAB 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, to implement a methodology for determining allowances for loan losses in accordance with generally accepted accounting principles.    SAB 102 focuses on the documentation to be prepared and maintained in support of the allowances for loan losses.    The documentation should include a systematic methodology to be employed each period in determining the amount of loan losses to be reported and the rationale supporting each period's determination that the amounts reported were adequate.

339.    Up until April 2008, Wachovia's loan loss allowance accounting and methodology violated GAAP and SEC standards with respect to recording the probable losses incurred as a result of the deterioration in its Pick-a-Pay mortgage portfolio.    Not until the third quarter of 2008 did Wachovia finally admit the extent of losses in its Pick-a-Pay mortgage portfolio.

340.    In April 2008, Wachovia implemented a loan loss allowance methodology that captured for the first time relevant indicators necessary to measure the likelihood of default by borrowers in its Pick-a-Payment subprime portfolio.    These indicators were not new, but rather were gauges used by all lenders to determine the extent of probable loan losses.    However, Wachovia chose to hide the fact that the Pick-a-Pay subprime portfolio was susceptible to non-payment as a result of these same indicators.

341.    Had Wachovia complied with GAAP and SEC standards, they would have recorded loan loss reserves against the Pick-a-Pay mortgage portfolio in late 2006 and in early in 2007 to coincide with the expected loss in value as a result of the sharp declines in residential

real estate and the related effects on Wachovia's ability to collect and or salvage the value of the mortgage portfolio through foreclosures and subsequent sales of the underlying collateral.

342.    An analysis of Wachovia's loan loss allowance, after consolidating the Golden West acquisition in the fourth quarter of 2006, shows that as a percentage of loans the amount dropped by 23 bps and remained at that level until an up-tick in the first quarter of 2008, returning to its pre-acquisition levels.  This 20% drop is betrayed by the rise in non-performing loans and Wachovia's loan loss allowance decreasing from four times the amount of non-performing loans prior to the Golden West acquisition to less than 80% of non-performing loans in the first quarter of 2008.  Based on the trends in the housing and subprime markets Wachovia should have been increasing rather than decreasing its reserve for loan losses.

343.    The factors Wachovia cited in 2008 as reasons for dramatically increasing the provision for loan losses were known by Defendants in 2006 and 2007, and therefore, the loan losses recorded in 2008 should have been recorded during the period from the fourth quarter of 2006 through the second quarter of 2007 instead of during the first three quarters of 2008.  The effects of correctly recording the loan loss allowance at the time Wachovia knew that the Pick-a-Pay subprime mortgage portfolio was suffering severe losses would have had a material effect on its earnings for those earlier periods.  For instance, had Wachovia starting using a SEC-compliant loan loss methodology and calculated a loan loss allowance in accordance with GAAP in the fourth quarter of 2006, instead of belatedly in the first quarter of 2008, the fourth quarter 2006 reported income before income taxes of $3.3 billion would have been reduced by $1.1 billion or 33% and the income before income taxes for the entire year of 2006 would have been reduced by almost 10%.  Likewise, Wachovia's reported income before income taxes of $3.5 billion in the first quarter of 2007 would have been nearly completed eliminated, the $2.2 billion

income before income taxes in the second quarter of 2008 would have turned into a $1.2 billion loss and the income before income taxes for the entire year of 2007 would have been reduced by nearly 75%.

344.    It is not simply the benefit of hindsight that suggests Wachovia should have recorded significantly higher loss reserves on the Pick-a-Pay loans.  In fact, in the Form 10-K filed by Wells Fargo on February 27, 2009 – its first public filing following the completion of its acquisition of Wachovia – Wells Fargo stated *"The more significant fair value adjustments in our purchase accounting for the Wachovia acquisition were loans.  Certain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments."*  Wachovia concealed that these loans were bad from origination.  However, Wells Fargo caused Wachovia to reflect the true value of the Pick-a-Pay portfolio by taking a $2.9 billion write down the portfolio in the fourth quarter of 2008 and charging off another $24.3 billion (the "Wells Fargo Write Down").  The Wells Fargo Write Down is an objective indication of the Pick-a-Pay portfolio's fair value, as it follows an acquisition by a buyer, Wells Fargo, with no incentive to retain an over-valued asset on its books.  The Wells Fargo Write Down further substantiates that had Wachovia accounted for the Pick-a-Pay loan losses in accordance with GAAP, the carrying value of the portfolio would have been written down by even more substantial amounts than what Wachovia recorded in the first three quarters of 2008.

## 2.    Goodwill was Carried at Amounts Far in Excess of Realizable Value

345.    Throughout 2006, the ominous indicators of the residential real estate housing debacle were accumulating.  However, instead of performing rigorous due diligence to determine the fair value of Golden West, Wachovia irrationally concluded that it would pay a premium for Golden West's Pick-a-Pay portfolio of subprime option ARMs, underwritten using liberal

114

criteria, and record $15 billion of goodwill.  The Pick-a-Pay subprime mortgage portfolio comprised 100% of Golden West's loans.  Therefore, as the value of the Pick-a-Pay portfolio declined, so did the $15 billion of recorded goodwill.

346.    In February 2008, Wachovia admitted that the Golden West acquisition was poorly timed, but still clung to the value of the franchise.  Defendant Thompson's resignation in June 2008 was primarily the result of Wachovia's inability to effectively manage the Pick-a-Pay portfolio albatross inherited from Golden West.  Then, in July 2008, Wachovia admitted that the Pick-Payment loss indicators previously disclosed were woefully deficient and that the losses would be three times more than what had been revealed.  As a result, Wachovia stopped originating Pick-a-Payment mortgages.  This series of events undermined any claim that Wachovia had not substantially overpaid to acquire Golden West.

347.    Under GAAP, specifically SFAS 142, *Goodwill and Other Intangible Assets*, impairment occurs when the carrying amount of goodwill exceeds its fair value. A two-step impairment test is used to identify potential goodwill impairment and the amount to be recognized. The first step in a goodwill impairment test compares the fair value of a reporting unit with its carrying amount.  The $15 billion of goodwill from the Golden West acquisition was recorded in Wachovia's General Bank Retail and Small Business reporting unit.  SFAS 142 stipulates that if the recorded amount of a reporting unit exceeds its fair value, then the second step of the goodwill impairment test is performed to measure the amount of impairment.  The second step compares the fair value of goodwill in the reporting unit with the carrying amount of that goodwill.  The fair value of goodwill is determined by allocating the fair value of a reporting unit to all of the assets and liabilities of that unit.  The fair value of a reporting unit is the amount at which the unit as a whole could be sold in a current transaction between willing parties. The

excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the fair value of goodwill. If the carrying amount of reporting unit goodwill exceeds the fair value of that goodwill, an impairment loss is recognized.

348.    Had Wachovia recorded the loan losses related to the Pick-a-Payment subprime portfolio in accordance with GAAP then its calculation of the value of the General Bank reporting unit would have reflected these losses resulting in goodwill impairment write downs in periods much earlier than the third quarter of 2008. Wachovia's fair value calculations were flawed because the calculations did not take into consideration the cumulative losses in the Pick-a-Payment subprime portfolio thereby materially overstating the fair value of the General Bank Reporting unit and the related goodwill.

349.    The mounting Pick-a-Payment losses were critical in the determining the fair value of the General Bank reporting unit. By deferring the recognition of the Pick-a-Payment losses Wachovia was also able to defer the goodwill impairment charge. If the Pick-a-Payment loan losses were recorded in accordance with GAAP, then the goodwill associated with the Golden West acquisition would have been written down during the same time period by similar amounts.

350.    Wachovia's third quarter 2008 goodwill write-down was $18.8 billion of which $12.3 billion related to the General Bank Retail and Small Business reporting unit which housed the Pick-a-Payment portfolio and the $14.9 billion of goodwill related to the Golden West acquisition. The third quarter 2008 goodwill write-down was equal to 51% of the General Bank Retail and Small Business reporting unit's total goodwill. Since Wachovia no longer separately maintained the goodwill associated with the Golden West acquisition it follows that the 51% write down for the entire reporting unit can also be applied to the Pick-a-Payment / Golden West

goodwill recorded at the time of the acquisition. Therefore, of the $12.3 billion write down $7.6 billion related to Golden West. Had Wachovia recorded the Pick-a-Payment losses timely, then such losses would have been included in the fair value calculations resulting in goodwill impairment charges during the similar time from the fourth quarter of 2006 and the first two quarters of 2007.

351.    The effects of recording goodwill impairment charges at the time Wachovia knew that the Pick-a-Payment subprime mortgage portfolio was suffering severe losses would have had a material effect on its earnings for those earlier periods. For instance, had Wachovia calculated a goodwill impairment charge in accordance with GAAP in the fourth quarter of 2006 instead of belatedly in the third quarter of 2008, the fourth quarter 2006 reported income before income taxes of $3.3 billion would have been reduced by $1.1 billion or 33% and the income before taxes for the entire year of 2006 would have been reduced by 9%. Likewise, Wachovia's reported income before income taxes of $3.5 billion in the first quarter of 2007 would have all but been eliminated, the $2.2 billion income before income taxes in the second quarter of 2008 would have turned into a $1.2 billion loss and the income before income taxes for the entire year of 2007 would have been reduced by 75%.

### 3.    Wachovia Consistently Overstated the Value of Certain Investments

352.    Wachovia significantly overstated the fair value of its ABS CDO and other subprime related assets in its publicly filed financial statements between March 31, 2007 and June 30, 2008. The Company overvalued ABS CDO and other subprime related assets by failing to properly value these positions as of the current measurement date.

353.    Wachovia had traditionally been a major participant in structuring and underwriting fixed income investment products backed by pools of loans, such as commercial mortgage-backed securities (CMBS) and residential mortgage-backed securities (RMBS), as well

as collateralized debt obligations (CDOs), which are typically backed by pools of bonds including CMBS and RMBS, loans and other assets. Prior to November 19, 2007, Wachovia never disclosed that it accumulated in excess of $7 billion in gross exposure in ABS CDO and other subprime related assets primarily as the result of interests retained from mortgage-backed securitizations it had structured and were unable to completely sell.

354. The majority of Wachovia's subprime positions were identified in public filings as "trading positions."[19] Pursuant to SFAS 115, *Accounting for Investments in Certain Debt and Equity Securities*, securities that are bought and held principally for the purpose of being sold in the near term are to be classified as "trading securities." This includes all mortgage-backed securities retained after the securitization of mortgage loans held for sale, regardless of whether the enterprise intended to sell those securities or hold them as long-term investments, (SFAS 134, *Accounting for Mortgage-Backed Securities Retained after the Securitization of Mortgage Loans Held for Sale by a Mortgage Banking Enterprise, an amendment of FASB Statement No. 65*). GAAP requires such trading securities to be carried at fair value in the statement of financial condition and all mark-to-market (unrealized) gains and losses on trading securities are recognized in the current period's income statement. Consequently, Wachovia was required to carry its subprime positions at "fair value" on its Statement of Financial Position.

355. Prior to the issuance of SFAS 157, *Fair Value Measurements*, SFAS 107, *Disclosures about Fair Value of Financial Instruments*, provided procedures for estimating fair value. SFAS 157 did not significantly change the concept of fair value from SFAS 107, but simply established a GAAP framework for measuring it. SFAS 107 indicates quoted market prices are the best indication of fair value. In the absence of quoted market prices, companies

---

[19] *See, e.g.*, Wachovia's consolidated financial statements, dated December 31, 2005, December 31, 2006 and December 31, 2007, Note 1, Summary of Significant Accounting Policies – Trading Account Assets and Liabilities.

are required to develop its best estimate using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services.

356.    Wachovia ignored readily available market data in pricing its ABS CDO and other subprime related assets beginning in early 2007.  The ABX and TABX indices were shared market standards of the value of representative subprime RMBS and Mezzanine CDO tranches. The ABX index was designed to track the value of subprime RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-).  The TABX index consists of standardized tranches of the ABX Index, replicating the structure of a subprime-backed CDO.

357.    The ABX and TABX indices were objective, directly observable indicators of the value of these instruments, exactly the preferred valuation methods contemplated by both SFAS's 107 and 157. Wachovia was not only aware of these indices at all times, but in fact was one of the consortiums of 15 banks who originally developed them, made a market in them, and provided price quotations that served as their basis. In fact, Wachovia repeatedly disclosed the direct link the ABX indices had to the valuations of subprime RMBS and ABS CDOs. According to its initial reference to the ABX index in its Form 8-K filed on November 9, 2007:

> In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

358.    It was commonly known in the industry that the standard in tracking and valuing CDO and RMBS transactions and values was the independent ABX indices. According to Citigroup Chairman CEO, Gary Crittendon[20], in an interview regarding the extent of subprime

---

[20] CNNMoney.com article "Behind Wall Street's Subprime Fear Index", by Grace Wong, dated July 7, 2007.

troubles and the decline in the AAA rated mortgage-backed debt, "the best way to kind of get an outside perspective on this is to look at the ABX Indices."

359.    Despite Wachovia's knowledge that the ABX index was a direct market pricing source for its subprime RMBS and ABS CDOs, the Company failed to use the data to properly value them. Wachovia's first disclosed a write-down of the value of its subprime positions in its Form 8-K on October 19, 2007. At that time, Wachovia disclosed a total of $1.3 billion in "Market Disruption Related Loss" that included a $347 million loss directly related to subprime mortgage investments; the vast majority in AAA rated securities. These write-downs for the quarter-ended September 30, 2007 were the first recorded by Wachovia, yet during February and March 2007, the market consensus had already recognized that subprime losses were going to impair even the super senior tranches of ABS CDOs as evidenced by the ABX and TABX indices, which both suffered substantial declines by that time, with some BBB- ABX indexes having dropped to approximately 60% of par and TABX junior Mezzanine CDO tranches dropping to between 40-60% of par.

360.    Had Wachovia properly measured the value of its ABS CDO and other subprime related assets during the first three quarters of 2007, they would have significantly accelerated the mark-to-market write-downs recorded by the Company during the quarter-ended December 31, 2007, as evidenced below:

| *ABS-CDO and other subprime related losses (in millions)* | Q/E 3/31/07 | Q/E 6/30/07 | Q/E 9/30/07 | Q/E 12/31/07 | Q/E 1/31/08 | Q/E 3/31/08 |
|---|---|---|---|---|---|---|
| **Wachovia write-down** | $0 | $0 | $350 | $1,028 | $339 | $238 |

| Losses based on ABX/TABX indices | $198 | $210 | $574 | $549 | $469 | $219 |
|---|---|---|---|---|---|---|
| Under (over) stated losses | $198 | $210 | $224 | ($479) | $130 | ($19) |
| Cumulative understated losses | $198 | $408 | $632 | $153 | $283 | $264 |

361.    Based on information available, as of September 30, 2007, Wachovia had failed to take losses during 2007 on its ABS CDO and other subprime-related assets by at least $632 million. By failing to properly value these positions using the market benchmark ABX and TABX indices, the Company overstated the value of these assets in its statement of financial position by this same amount.

362.    After failing to recognize any write-downs on its ABS CDO and other subprime-related assets in the quarters ended March 31, 2007 and June 30, 2007 and significantly under-recording losses in the quarter-ended September 30, 2007, the Company actually recorded write-downs in the fourth quarter ended December 31, 2007 that exceeded the decrease in the respective ABX and TABX indices during the 4th quarter.  It is apparent that Wachovia now recognized that the value of its subprime securities was not going to rebound, and Wachovia needed to get the recorded fair values in more in sync with the observable benchmark indices for its year end financial statements, as the valuations in these statements would be subject to a much higher level of scrutiny by its auditors than were the interim statements.

363.    Additionally, Wachovia overstated the value of its ABS CDO assets by failing to consider the counterparty credit risk associated with the significant amount of financial guarantee hedges it maintained on its super senior positions.

364.    Wachovia's accounting policies included in the 2007 Form 10-K stated that "The determination of fair value (of securities) includes various factors such as exchange or over-the-counter market price quotations; time value and volatility factors for options, warrants and derivatives; observed prices for equivalent or synthetic instruments; and counterparty credit quality." Yet, Wachovia failed to make timely adjustment to the fair value of the financial guarantees on the ABS CDO super senior positions.

365.    On January 22, 2008, Wachovia first disclosed that it held $4.8 billion in super senior ABS CDO exposures, $4.2 billion of which were hedged under financial guarantee contracts, including $2.2 billion with monoline insurers, Ambac Financial and MBIA and another $1.1 billion with crumbling insurance giant AIG.

366.    In reality, Wachovia had every reason to record significant reserves against these monoline financial guarantees back in 2007. In the fall of 2007, high levels of delinquencies and defaults within residential mortgage loans prompted each of the rating agencies to review the capital adequacy of the financial guarantee industry. In the second half of 2007, Wachovia recorded losses of $330 million related to BluePoint Re Limited, its own consolidated subsidiary that operated as a financial guaranty re-insurer licensed in Bermuda even though it wasn't until February 1, 2008 that Moody's Investor Service announced that it had placed BluePoint Re on review for possible downgrade.

367.    Wachovia wrote-off substantially all of its investment in BluePoint Re, but failed to recognize the need for any reserves on its guarantees with other monolines, namely Ampac and MBIA, who Wachovia disclosed were hedging $2.2 billion of ABS CDO super senior positions. In late December 2007, following the rating agency reviews, Fitch placed Ambac Assurance on "rating watch negative" and stated that Ambac Assurance had a modeled $1 billion

capital shortfall. On January 16, 2008, Moody's put Ambac Assurance's rating on review for possible downgrade. On January 18, 2008, S&P placed Ambac Assurance's financial strength rating on Credit Watch Negative. On January 18, 2008, Fitch downgraded Ambac Assurance's insurance financial strength rating. Additionally, On February 25, 2008, S&P placed the long held ratings of MBIA on negative outlook as well.

368.    It was not until the filing of its Form 10-Q for Q1 2008 on May 11, 2008 that Wachovia disclosed that it recorded $166 million of reserves based on monoline exposure profiles and its assessment of the credit quality of each monoline. A similar disclosure in its Form 10-Q for Q2 2008 filed on August 11, 2008 revealed Wachovia recorded additional reserves of $245 million for monoline exposure. Plaintiffs are unable to determine whether further reserves were taken in the fourth quarter on 2008, either through earnings or as part of purchase accounting adjustments made by Wells Fargo. Yet, Wachovia, as a competitor to Ambac and MBIA through BluePoint Re, knew or should have known that the financial stability and ability to cover the guarantees on its ABS CDO super senior positions was seriously at risk prior to December 31, 2007. The reserves eventually recorded by Wachovia represented approximately 20% of the gross value of the ABS CDO super senior positions that only months before Wachovia had suggested were completely hedged by monolines.

369.    Wachovia's representations do not square with the monolines' own disclosures of their guarantees. Wachovia claims that it "transferred" $2.2 billion of super senior risks to the monolines and a further $2 billion to more creditworthy counterparties. But data released by the two largest monolines alone - Ambac and MBIA- indicates that Wachovia "transferred" in excess of $7 billion of super senior risks just to those two monolines, more than three times greater than Wachovia indicated. Should it be determined that the counterparties disclosure of the risk "in

excess of $7 billion" is correct, Wachovia's 2007 loss reserves for monoline insurers should have been at least $1.4 billion.

370.    Wachovia's 2007 interim financial statements lacked the required GAAP disclosures regarding the Company's significant concentration in subprime-related securities. In fact, in the Company's Form 10-Q filed on July 30, 2007, the word "subprime" was used only 5 times within the entire filing, each of which simply referred to a Wachovia mortgage servicing company. No mention was made of Wachovia's exposure to subprime related assets that it retained and held on its balance sheet.

371.    Only a short time later, Wachovia issued a Form 8-K on October 19, 2007, disclosing for the first time $1.3 billion in "Market Disruption-Related Losses" for the quarter-ended September 30, 2007. Still it was not until another Form 8-K filed on November 9, 2007 that Wachovia actually disclosed that it had remaining net exposure on ABS CDO-related positions of $3.84 billion and $2.73 billion, as of September 30, 2007 and October 31, 2007, respectively.

372.    Disclosure violations include:

- *Failure to Comply With Regulation S-X-* The SEC requires GAAP presentation in Regulation S-X, 17 C.F.R. §210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP, except quarterly statements are not required to have the same level of footnote disclosure. If the filings do not comply with GAAP, they are "presumed to be misleading and inaccurate," despite footnote or other disclosure. See Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

- *Failure to Comply With Regulation S-K, Item 303-* Disclosure is mandatory where a known trend or uncertainty is reasonably likely to have a material effect on a company's financial condition or results of operations. Wachovia violated the MD&A requirements by materially omitting disclosure of the significant net exposure the Company had as a result of its subprime positions and its potential future losses associated with these positions.

- *SAB 101, Revenue Recognition in Financial Statements* - citing Financial Reporting Release No. 36 (promulgated by the SEC), explained that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

- *SOP No. 94-6, Disclosure of Certain Risks and Uncertainties* - requires disclosures to be made in financial statements any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on its future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity." SOP 94-6 requires, among other things, disclosure existing as of the date of those statements regarding: (a.) Nature of operations; (b.); Use of estimates in the preparation of financial statements (c.); Certain significant estimates; and (d.) Current vulnerability due to certain concentrations.

### 4.    Wachovia Misrepresented and Failed to Follow Its Disclosed Accounting Policies

373.    As stated in APB 22, *Disclosure of Accounting Policies*, the accounting policies adopted by a company can affect significantly the presentation of its financial position and results of operations.  Accordingly, the usefulness of financial statements for purposes of making investment decisions depends considerably upon the investor's understanding of the accounting policies followed by the company.  In 2006 and 2007, Wachovia disclosed "Significant Accounting Policies" and "Critical Accounting Policies" in each of its filings on Form 10-K.  However, a review of Wachovia's actual accounting reveals that Wachovia violated GAAP and SEC Regulations by failing to adhere to its own published accounting policies.  The following chart compares Wachovia's "Significant Accounting Policies," as disclosed by Wachovia, with Wachovia's actual accounting for certain transactions:

| Transaction | Disclosure | Actual Accounting |
| --- | --- | --- |
| Loan losses | "The allowance for loan losses … is maintained at levels that are adequate to absorb probable losses inherent in the loan portfolio."  (*See* Wachovia's | Pick-a-Pay loans were materially overvalued for two years. |

| | Consolidated Financial Statements, 2005-2007, Note 1, "Summary of Significant Accounting Policies – Allowance for Loan Losses and Reserve for Unfunded Lending.") | |
|---|---|---|
| Loan loss methodology | "Wachovia uses a variety of modeling and estimation tools for measuring credit risk that are used in developing an appropriate allowance for loan losses … The allowance for loan losses consists of formula-based components for both the commercial and consumer portfolios, each of which includes an adjustment for historical loss variability …" (*Id.*) | A GAAP and SEC-compliant loan loss methodology was not employed until the first quarter of 2008. Even then, Wachovia failed to fully implement the loan loss methodology to accurately reflect the risk of loss inherent in its loan portfolio. |
| Consumer loans | Consumer loans delinquent by greater than 180 days are charged off. (*Id.* at "Summary of Significant Accounting Policies – Loans.") | Pick-a-Payment loans were not charged off until the underlying collateral was sold resulting in a $63 million catch-up charge in the fourth quarter of 2007 |
| Investment valuation | "Trading account assets and liabilities are recorded … at fair value with realized and unrealized gains and losses recorded in trading account profits in the results of operations." (*Id.* at "Summary of Significant Accounting Policies – Trading Account Assets and Liabilities.") | Losses on ABS CDO and other subprime-related positions understated throughout 2007 as Wachovia failed to properly value its positions at the measurement date. |
| Investment valuation | "The fair value of securities is based on quoted market prices, or if quoted market prices are not available, then the fair value is estimated using quoted market prices for similar securities, pricing models or discounted cash flow analyses using observable market data where available." (*Id.* at "Summary of Significant Accounting Policies – Securities and Trading Activities.") | In valuing its ABS CDO and other subprime related positions, Wachovia failed to use observable benchmark pricing data in the form of the ABX and TABX indices. |
| Counterparty risk | "The determination of fair value of investments includes an assessment of certain factors, including counterparty | The hedge portion of the undisclosed CDO positions was placed with non-creditworthy monoline financial guarantors. |

|  | | |
|---|---|---|
| | credit quality." (*Id.*) | Such credit risk concentrations should have been disclosed in accordance with GAAP, specifically the provisions of SFAS 107, *Disclosures About Fair Value of Financial Instruments* |
| Consolidation | Wachovia consolidates variable interest entities in which Wachovia is deemed to be the "primary beneficiary." (*Id.* at "Summary of Significant Accounting Policies – Consolidation.") | Entities in which Wachovia was the primary beneficiary were not consolidated in accordance with GAAP, specifically the provisions of FIN 46(R) *Consolidation of Variable Interest Entities* |
| Goodwill | "Goodwill assets are subject to impairment testing on an annual basis, or more often if events or circumstances indicate there may be impairment." (*Id.* at "Summary of Significant Accounting Policies – Goodwill and Other Intangible Assets.") | Goodwill associated with the Golden West acquisition was not written down even though the Pick-a-Payment portfolio on which the $15 billion of goodwill was based deteriorated rapidly in 2006 and 2007. |
| Underwriting fees | "Revenue is recognized when the transaction is complete." (*Id.* at "Summary of Significant Accounting Policies – Revenue Recognition.") | Wachovia was unable to sell 77% of CDOs underwritten in 2006 and 2007. The positions that Wachovia did not sell were never disclosed. The revenue recorded was not earned, therefore under GAAP should not have been recorded. |

### 5.    Wachovia Failed To Consolidate Certain Off-Balance Sheet Arrangements

374.    Wachovia was a major participant in structuring and underwriting fixed income investment products backed by pools of loans, such as commercial mortgage-backed securities (CMBS) and residential mortgage-backed securities (RMBS), as well as collateralized debt obligations (CDOs), which are typically backed by pools of bonds including CMBS and RMBS,

loans and other assets.[21]  As such, Wachovia regularly used certain off-balance sheet arrangements known as variable interest entities ("VIEs") to transform mortgage loans into securities.

375.    FIN 46(R), *Consolidation of Variable Interest Entities*, provides that the assets, liabilities and results of activities of VIEs should be consolidated in the financial statements of their "primary beneficiaries."  For purposes of FIN 46(R), the determination of whether an enterprise is the primary beneficiary, and thereby required to consolidate the VIE in its financial statements, should be performed when the enterprise initially becomes involved with the VIE and subsequently upon certain "reconsideration events."  (*See* FIN 46(R), ¶15).

376.    As early as December 31, 2006, Wachovia had significant variable interests in unconsolidated VIEs where it was the primary beneficiary. Wachovia should have consolidated the activities of each of these VIEs resulting in the inclusion of a significant amount of assets and liabilities in Wachovia's consolidated balance sheets, potentially causing default on certain loan covenants or negatively affecting already troubled capital ratios.

377.    Specifically, Wachovia violated GAAP by failing to consolidate certain Evergreen money market funds and certain structured lending vehicles in which Wachovia was the primary beneficiary.

378.    With respect to the Evergreen Money Market Funds, Wachovia purchased $1.1 billion of asset-backed commercial paper from the Evergreen money market funds in the third quarter of 2007 and again in the third quarter of 2008.  These asset purchases in Evergreen money market funds ultimately resulted in significant valuation losses to Wachovia. The Company recorded losses of $40 million and $17 million as of September 30, 2007 and

---

[21] *See, supra*, Section VI.D.

December 31, 2007, respectively, and an additional $761 million in the first nine months of

2008, including $432 million of losses on a Lehman Brothers bond that Wachovia purchased as

of September 30, 2008 from the funds.

379.    As to the structured lending vehicles, Wachovia disclosed in its Form 10-Q, filed

on November 9, 2007 that:

> On September 30, 2007, as a result of the disruption in the capital
> markets, the Company consolidated a structured lending vehicle
> we administered, adding $4.9 billion of assets to our consolidated
> balance sheet. The structured lending vehicle was considered a
> VIE. The Company consolidated the structured lending vehicle
> because our expectation of the variability associated with our
> variable interests changed, primarily due to a decline in the fair
> value of the entity's assets.

380.    Consistent with the Company's failure to properly value its ABS CDO and other

subprime related positions held on its consolidated balance sheet beginning in the first quarter of

2007, the assets within this structured lending vehicle would have been similarly overstated at

the earlier periods. As a result, the FIN46(R) tests to determine the primary beneficiary would

have required consolidation beginning in with the quarter-ended March 31, 2007.

381.    Moreover, Wachovia failed to properly disclose the implicit and explicit liquidity

guarantees it had provided to certain VIEs. The risks posed by Wachovia's VIEs were not

disclosed to investors in violation of GAAP and SEC regulations.

### 6.    Wachovia's Financial Statements Should Have Been Restated

382.    As a result of Wachovia's multiple, intentional and reckless GAAP violations in

2006 and 2007, Wachovia's annual audited financial statements and quarterly financial

statements were materially misstated.  SFAS 154, *Accounting Changes and Error Corrections*

and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying*

*Misstatements in Current Year Financial Statements*, provide that material financial statement

errors, which are defined as mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared, that are discovered subsequent to the issuance of the financial statements should be reported as prior period adjustments by restating the prior period financial statements.   In addition to restating the financial statements the entity is required to disclose (i) the description and nature of the error; and (ii) the effect of the correction on each financial statement line item and per share amounts.  A major feature of a correction of an error is that the financial statements of the affected prior period, when originally issued, should have reflected the adjustment.

383.    In applying SFAS 154 and SAB 108, financial statements are only to be restated for error corrections that are considered material.  Materiality is defined in SFAC 2, *Qualitative Characteristics of Accounting Information*, as the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

384.    The corrections that were required to bring Wachovia's financial statements in line with reality from May 2006 to October 2008 were material.  Wachovia misused facts that existed at the time the 2006 and 2007 financial statements were prepared in connection with the accounting for loan losses, investment valuations and goodwill impairment.    Wachovia understated Pick-a-Pay loan losses by $7.8 billion; overvalued CDOs by $600 million; failed to record $411 million for counterparty risk; overvalued ARS by $1 billion; and overvalued goodwill by $7.6 billion.  Had Wachovia complied with GAAP and recorded these amounts when the losses occurred rather than deferring these amounts to subsequent periods, its earnings

in the annual and quarterly financial statements would have been drastically reduced, as depicted in the following chart:

| Period | Reported Income (Loss) before income taxes | Restatement adjustments | Restated Income (Loss) before income taxes | Reported Income (Loss) before income taxes was overstated by |
|---|---|---|---|---|
| Q4 06 – 10-Q | $3,295 | ($2,100) | $1,195 | 176% |
| FY 06 – 10-K | $11,470 | ($2,100) | $9,370 | 22% |
| Q1 07– 10-Q | $3,300 | ($6,598) | ($3,298) | NM |
| Q2 07– 10-Q | $3,481 | ($7,011) | ($3,530) | NM |
| Q3 07– 10-Q | $2,226 | ($723) | $1,503 | 48% |
| Q4 07– 10-Q | $(234) | ($429) | ($663) | NM |
| FY 07– 10-K | $8,773 | ($14,761) | ($5,998) | NM |

385.   In addition to these restatement adjustments, further downward adjustments to reported earnings would have been required in connection with the consolidation of the VIEs and unearned CDO underwriting fees and securitization gains.   However, further discovery is required to quantify the adjustments to earnings attributable to these factors.

386.   Finally, Wachovia operated with capital barely above the 'well capitalized' requirement.   Thus, had Wachovia complied with GAAP and properly accounted for Pick-a-Pay loan losses, declining values on its CDO positions, losses related to counterparty risk on its hedged, but undisclosed, CDO positions, and valuation losses related to ARSs, not only would it have been necessary to restate earnings, but Wachovia's capital base would have been depleted in 2007.

387.   Therefore, Wachovia's 2006 and 2007 financial statements, containing numerous violations of GAAP, presented a distorted picture of Wachovia's true financial condition.   In

actuality, Wachovia was grossly undercapitalized. By the end of 2007, Wachovia's financial statements should no longer have assumed that Wachovia would remain a going concern.

### 7.    Overstated Underwriting Revenue on CDO Securitizations

388.    Throughout 2006 and 2007, Wachovia underwrote more than $10 billion of CDOs. Unbeknownst to investors, Wachovia did not sell 77% of these CDOs, but instead retained $7.8 billion, of which $5.7 billion was purportedly hedged with creditworthy counterparties. In addition to the massive investment valuation losses that Wachovia concealed as a result of holding, but not disclosing, its $7.8 billion CDO position, Wachovia was compelled to cover up losses by recording commensurate underwriting fees it had not earned. This practice violated GAAP.

389.    Wachovia recognized a total of $1.5 billion and $1.3 billion in advisory, underwriting and other investment banking fees in 2007 and 2006, respectively. A portion of the underwriting fees in 2007 and 2006 related to CDO securitizations.

390.    According to Wachovia's financial statements, its accounting policy related to underwriting fees provided that revenue was recognized when the transaction was complete. Based on this accounting policy, underwriting fees related to CDO securitizations should not have been recognized, because Wachovia's retention of most of the securitization meant that the purported "underwriting" was incomplete and had only served to saddle Wachovia with huge CDO positions.

391.    SFACs set forth the primary guidelines of how to account for transactions, including the recognition and measurement of transactions in financial statements. SFAC 2, *Qualitative Characteristics of Accounting Information*, SFAC 5, *Recognition and Measurement in Financial Statements of Business Enterprises* and SFAC 6, *Elements of Financial Statements*,

outline the fundamental principles that are to be used to prepare financial statements in accordance with GAAP.

392.    With respect to recording revenue, these three SFACs state that amounts recorded in financial statements and described as revenue must be reliable, meaning that revenue amounts, the description as revenue, and what the description and amounts purport to represent all correspond.  Further, the amounts recorded and described as revenue must be relevant, *i.e.*, the amounts recorded and described as revenue are useful in making financial decisions and are realizable, meaning that the resources the revenue represents are available to be used by the company to generate future economic benefit.

393.    Under GAAP,  the revenue recognized by Wachovia in connection with CDO securitizations should not have been recorded as revenue since neither the resources of the Company increased nor was the revenue described without bias.   The characterization of amounts recorded in connection with securitizations as revenue violated GAAP for the following specific reasons:

- Had Wachovia disclosed the CDO positions it retained, investors would have realized that Wachovia had recast what were portrayed as underwriting transactions to overvalued investments, resulting in an actual overall decrease in resources;

- The amounts described as underwriting fees did not accurately reflect the risk to investors of Wachovia's inability to underwrite CDO securitizations; and

- By recording underwriting fees on CDO securitizations it couldn't sell, investors were unable to make relevant decisions about Wachovia's financial position and operating results.

394.    Had Wachovia complied with GAAP, they would not have recorded the amounts as revenue until they had completed the transaction by selling the securities to third parties. Wachovia knew that once investors became aware of its inability to sell CDOs, it would have

had to record significant investment losses on its CDO positions.  By recording the amounts as revenue, investors were lead to believe that the amounts were realized by Wachovia, that its operating results relating to CDO underwriting were significant, that its assets would be realized at the full amounts as recorded in the balance sheet and that its future prospects were promising. Nothing could have been further from the truth.

### 8.    Wachovia Manipulates ARS Auctions to Hide Losses

395.    Auction Rate Securities ("ARS") are municipal bonds, corporate bonds, and/or preferred stocks often with maturity periods of thirty years, with interest rates and dividend yields that are reset and determined regularly through auctions, typically every 7, 28, or 35 days.

396.    Reportedly, the ARS market was built on assurances from companies like Wachovia that ARS were investments that were near cash equivalents because investors could liquidate their positions on a regular basis.   As such, ARS provided a means for investors to obtain a slightly better rate of interest by buying high yielding ARS rather than investing in money-market funds, with the same convenience of being able to liquidate funds as needed.

397.    Because of the investors' expectations of liquidity in their ARS holdings, unbeknownst to the investing public, Wachovia routinely prevented auctions from failing in 2007 by buying ARS from sellers when there weren't enough buyers.

398.    2007 was not the first time Wachovia and A.G. Edwards were involved with unsavory ARS auction practices.  In 2006, Wachovia and A.G. Edwards each paid a $125,000 penalty to the SEC to settle charges that each had manipulated ARS auctions in 2003 and 2004. In connection with the settlement, Wachovia was required to implement procedures to prevent and detect violations in the auction rate securities areas.  Obviously, Wachovia ignored the requirements of the SEC order and continued to manipulate ARS auctions, initially to add

liquidity expected by customers, and later, to hide valuation losses and the related negative effects on operating results.

399.    Beginning in 2007, as the subprime market was unraveling, the demand for ARS began to dwindle.  This was caused in part by the lack of confidence in the soundness of the ARS being sold, as the bond insurers which insured these municipal securities were facing the threat of downgrades themselves, and a general lack of liquidity in the marketplace.

400.    Also, in March 2007, Wachovia was aware that the FASB had decided that the notion of cash equivalents should not be retained in financial statement presentation which had a spill-over effect on the ARS market.  As a result, the elimination of cash equivalents would force organizations to move cash out of certain financial instruments permanently or to liquidate their cash equivalents position on a quarterly basis.  Wachovia knew the ramifications of the FASB decision meant that assets currently classified as cash equivalents would be reclassified the same way as other short-term investments.  Corporations would respond by moving out of ARS to maintain their balance sheet cash positions.  As corporate demand diminished, Wachovia would be left holding more ARS.

401.    Wachovia was also aware of industry concerns with ARS practices.  In April 2007, the Securities Industry and Financial Markets Association issued ARS guidance called the Best Practices for Broker-Dealer of Auction Rate Securities.  The best practices included, among others: education of issuers and investors as to the material features of ARS, inform issuers and investors that Wachovia can place a bid for its own account to avoid having a failed auction; disclose to issuers and investors that it routinely places bids in auctions with the knowledge of other orders; and disclose the current auction procedures to inform investors of the salient features of the program.

402.    Again, similar to the requirements of the SEC order, Wachovia disregarded industry ARS recommendations in order to keep investors and issuers in the dark about the conflicts it had in the ARS process so it could manipulate ARS auctions to initially add liquidity expected by customers, and later, to hide valuation losses and the related negative effects on operating results.

403.    Facing mounting failed auctions, Wachovia was creating a façade of a liquid ARS market by buying up excess ARS without disclosing that they themselves were a significant source of demand for these securities. While maintaining assurances of liquidity to the investors in these auctions until the end, in February 2008, the ARS market crashed when Wachovia and other market participants, which had previously been buyers of ARS, began selling them, leaving a dearth of willing buyers in the market.

404.    An investigation launched by the SEC into Wachovia's conduct with respect to ARS markets, reveals that by the fall of 2007, Wachovia was well aware of the failing ARS markets but nevertheless continued to advise its clients that these markets were liquid.

405.    In addition to misleading its own customers, Wachovia was misleading investors as well.  Despite the accumulation of illiquid ARS during 2007 and the spring of 2008, Wachovia first disclosed any exposure with respect to ARS in its June 30, 2008 Form 10-Q and recorded a $500 million charge for expenses and valuation losses related to its role in manipulating the ARS market.

406.    Even though this was the first disclosure concerning Wachovia's exposure to ARS risk, this disclosure was hardly truthful as Wachovia had been propping up ARS auctions during 2007.  Furthermore, the disclosure that the first auction failed in February 2008 was materially false and misleading, because Wachovia failed to disclose that earlier auctions would

have failed had it not manipulated the results, and that this recent failure was directly due to its inability to no longer manipulate the auctions and not through independent market forces impacting ARS.

407.    Wachovia recorded a further $497 million charge in its September 30, 2008 Form 10-Q for expenses and valuation losses related to its role in manipulating the ARS market.

408.    Shortly after the crash of the ARS market, the SEC commenced an investigation into Wachovia's conduct.    Wachovia quickly reached a settlement with the SEC.    Under the settlement, announced on August 15, 2008, Wachovia agreed to the following:

- Purchase at par ARS held by all individuals, charities and religious organizations, as well as ARS held by small and medium-sized businesses with account values and household values of $10 million or less, that were purchased at Wachovia on or before Feb. 13, 2008.  These purchases will commence no later than November 10, 2008, and conclude no later than Nov. 28, 2008, for clients who accept this offer;

- Purchase at par ARS held by all other clients that were purchased at Wachovia on or before Feb. 13, 2008.  These purchases will commence no later than June 10, 2009, for clients who accept this offer and conclude no later than June 30, 2009;

- Reimburse investors who can reasonably be identified and who would have been covered by the offer but who sold their ARS below par, between Feb. 13, 2008, and the date of entry of the settlement, for the difference between par and the price at which the investor sold the ARS. The reimbursement will be made by Nov. 28, 2008.

- Offer loans to affected clients in need of liquidity until the ARS repurchases occur;

- Refund refinancing fees to municipal ARS issuers who issued ARS in the initial primary market between Aug. 1, 2007, and Feb. 13, 2008, and refinanced those securities after Feb. 13, 2008; and

- Pay a fine of $50 million to the state regulatory agencies.

409.    The repurchase of ARS under the agreement was estimated at $8.5 billion with an estimated $3.9 billion remaining on Wachovia's balance sheet at June 30, 2009.

410.    Wells Fargo, in its December 31, 2008 financial statements, disclosed that as a result of the settlement it purchased $3.7 billion of ARS which was held in its balance sheet.  In the fourth quarter of 2008 Wells Fargo recorded an additional $93 million of losses for anticipated future losses on ARS yet to be purchased under the settlement.  Wells Fargo went on to say that if it purchases all remaining ARS subject to the settlement then the estimated maximum exposure to loss is $620 million.

411.    In total, as a result of Wachovia manipulating the ARS market, it recorded over $1 billion of losses through December 31, 2008, will eventually purchase more than $8 billion of ARS and may record an additional $620 million of losses.

412.    Under GAAP, Wachovia was required to write down the value of the illiquid ARS held in its balance sheet to fair value when it was apparent that these assets were overvalued and illiquid.  The impaired value of ARS was implicitly acknowledged when Wachovia began manipulating ARS auctions in 2007.

413.    SFAS 115, *Accounting for Investments in Certain Debt and Equity Securities*, requires that securities which are purchased and held with the intention of being sold in the near term are to be classified as "trading securities." GAAP requires companies to record trading securities in its balance sheet at fair value, and further requires that all mark-to-market (unrealized) gains and losses on trading securities be recognized in the current period's income statement.

414.    As set forth above, however, significant ARS liquidity concerns existed during 2007, when Wachovia first began manipulating auctions.  Under GAAP, once the market for such assets became illiquid and Wachovia began manipulating auctions, the Company was required to mark down the value of these assets to reflect their fair value.  Nevertheless, in

violation of GAAP, Wachovia failed to write down the value of its ARS electing instead to carry these assets in its balance sheet at artificially inflated amounts.

415.    In addition, Wachovia failed to make adequate disclosures of the risks posed by its ARS portfolio in violation of SEC regulations.  Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."  The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

416.    Despite the SEC requirement that Wachovia discuss significant aspects of the Company's operating results and financial condition, the Company failed to disclose its overvalued ARS portfolio.  Additionally, though it had a duty to describe unusual and/or significant transactions "that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue," the Company failed to inform investors that during 2007, it was manipulating the liquidity of ARS auctions.

417.    An integral part of manipulating ARS auctions was the selling of ARS to customers at prices Wachovia knew were inflated.  As a result Wachovia was contingently liable for potential claims made by customers who got stuck paying above market prices for their ARS. Therefore, under GAAP, specifically SFAS 5, *Contingent Liabilities*, a company is required to record contingent liabilities when the occurrence of a possible claim is probable and can be reasonably estimated.    At the time Wachovia bilked customers; Wachovia was required to

record a liability in compliance with GAAP for the amount they overcharged customers. An estimate of the amount Wachovia overcharged customers should have been recorded by Wachovia during 2007 when they began to manipulate ARS auctions.

418.    Furthermore, Wachovia was recording revenue in connection with manipulated ARS auctions which they hadn't earned. Under GAAP, specifically, SFAC 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, revenues are not recognized until earned. SFAC 5 goes on to say that a company's revenues are considered to have been earned when the company has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Under GAAP, an amount described as revenue in financial statements is meant to convey that a transaction has occurred; a service has been provided that a customer needed and was willing to pay for; and a reciprocal exchange of value has taken place, i.e. a company has given up something of value and in return has received something of value. In connection with ARS, Wachovia recorded fees for underwriting ARS and recorded commissions for selling ARS while delivering a service purported to be an auction but was nothing more than a scam. Wachovia was not providing any valuable underwriting services to the ARS issuer or any valuable investment services to customers. In other words, issuers and customers were exchanging valuable consideration for worthless services. It is clear that Wachovia's clients and customers paid for services that they did not receive; Wachovia did not perform the service that their clients and customers thought they were doing and therefore Wachovia did not give up anything of value; and that Wachovia's clients and customers paid money, i.e. gave up something of value to Wachovia, but did not receive anything of value in return. As a result of the ruse Wachovia was recording revenue in connection with ARS auctions that they hadn't earned in violation of GAAP.

419.    The proof that Wachovia had not earned revenue related to ARS auctions is contained in the settlement.  Not only did Wachovia have to repay customers for the amounts they were overcharged by Wachovia but the issuers were repaid all the refinancing fees they had paid to Wachovia.

420.    The reason Wachovia gave for the write-offs related to ARS was as a result of failed ARS auctions driven by the deterioration in the credit markets.  However, the record is clear, ARS auctions would have first failed in 2007 had the auctions not been revived by Wachovia's manipulation.  Therefore, given the reason for the write-off disclosed by Wachovia, the write-offs should have been recorded by Wachovia not in the second and third quarters of 2008 but rather in 2007 at the time of the first instance of a failed ARS auction.  Had Wachovia complied with GAAP and appropriately recorded the ARS write-offs in the third and fourth quarters of 2007, instead of the second and third quarters of 2008, the 2007 third quarter pre-tax earnings of $2.2 billion would have been materially reduced by $500 million or 29%, the 2007 fourth quarter pre-tax loss of $234 million would have tripled to a pre-tax loss of $731 million and for the 2007 fiscal year pre-tax earnings of $8.8 billion would have been materially reduced by nearly $1 billion or 11%.  Earnings would have been reduced even further had Wachovia not recorded the unearned ARS underwriting fees and commissions and on the other hand recorded a contingent liability associated with defrauding their customers by overcharging for ARS.

9.    **Wachovia Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting**

421.    Deficient internal controls over financial reporting allowed Wachovia to issue financial statements that were not in accordance with GAAP. The SEC defines "disclosure controls and procedures" as:

> ...controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms...

(SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02).

422.    Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB ) Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements,* ("AS 2"), as follows, in relevant part:

> A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and;
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.
>
> Note: This definition is the same one used by the SEC in its rules requiring management to report on internal control over financial reporting, except the word "registrant has been changed to "company to conform to the wording in this standard.

*See* Securities Exchange Act Rules 13a-15 (f) and 15d-15(f).2/) (AS 2 ¶7).

423.    Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer ) is required to include in its annual report a report of management on the company' s internal control over financial reporting ... The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company' s internal control over financial reporting is effective ... (AS 2 ¶2).

424.    From May 2006 to October 2008, the Company misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting.  During this period, Wachovia failed to maintain effective internal controls and procedures over financial reporting, despite contrary certifications signed by Defendants Thompson and Wurtz in both the 2006 and 2007 Form10-K.

425.    The Company's disclosure controls and procedures, and internal control over financial reporting were ineffective throughout the relevant period.  Wachovia materially misstated the valuation of its exposure to subprime-related positions, and lacked full disclosure of the holdings as well.  As a result of the Company's failure to maintain effective disclosure controls and procedures and internal control over financial reporting, it was not only able to delay recognizing material losses on its subprime-related positions, but was also able to avoid even disclosing that the Company had such a significant subprime exposure, in violation of GAAP. The Company's true financial condition and results of operations were only further

masked with false reassurances that the Company had an effective risk management process and adequate disclosures.

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

426.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concern Wachovia's financial statements and historical and/or current conditions affecting the Company.    Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.    To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

427.    Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Wachovia who knew that the statement was materially false and misleading when made.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

428.    At all relevant times, the market for Wachovia securities was an efficient market for, *inter alia*, the following reasons:

      a.    Wachovia's common stock met the requirements for and was listed on the New York Stock Exchange;

b.    Wachovia's trading volume was substantial, trading at an average of 19.6 million shares per day from May 2006 through September 2008;

c.    As a regulated issuer, Wachovia filed periodic public reports with the SEC and NYSE;

d.    Wachovia regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

e.    The market reacted swiftly to public information disseminated regarding Wachovia; and

f.    Wachovia was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

429.    As a result of the foregoing, the market for Wachovia securities promptly digested current information regarding Wachovia from all publicly available sources and reflected such information in Wachovia's securities prices at all relevant times.  Under these circumstances, Plaintiffs, as a purchaser of Wachovia securities, suffered injury through their purchase or acquisition of Wachovia's securities at artificially inflated prices and a presumption of reliance applies.

430.    In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Wachovia's business, financial results and business prospects.

## XIII.  LOSS CAUSATION

431.    Plaintiffs were damaged as a result of the Defendants' fraudulent conduct as set forth herein.  From May 2006 to October 2008, Defendants engaged in a scheme to deceive the market by issuing a series of misrepresentations (and omitting material facts) relating to, *inter*

*alia*, (i) the credit quality of Wachovia's Pick-a-Pay loan portfolio; (ii) the extent to which Wachovia was protected from losses as a result of the Pick-a-Pay product features and Wachovia's purportedly conservative underwriting standards; (iii) the amount and value of Wachovia's subprime-related holdings in its trading portfolios; and (iv) the extent to which Wachovia was exposed to a substantial degree of risk in connection with the downturn in the real estate and capital markets.

432.    As a result of the Defendants' scheme, misrepresentations, and omissions of material facts, the price of Wachovia's stock was artificially inflated from May 2006 until October 2008.

433.    In reliance on Defendants' materially false and misleading statements and/or omissions, Plaintiffs purchased Wachovia stock at artificially inflated prices.  But for the Defendants' misrepresentations, omissions and fraudulent acts, Plaintiffs would not have purchased Wachovia stock, nor would they have purchased it at the artificially inflated prices at which it traded prior to October 2008.  As the Defendants' material misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on July 20, 2007, Wachovia stock steadily declined, culminated in a drop of over 80% on September 29, 2008, when Wachovia's precarious financial position was fully exposed and the artificial inflation caused by Defendants' conduct was removed from Wachovia's price.

434.    The declines in Wachovia's stock price between July 20, 2007 and September 29, 2008, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting the Defendants' fraudulent misrepresentations and omissions (and/or the materialization of risks concealed by Defendants).

435.    Plaintiffs suffered economic losses as the price of Wachovia's stock fell in response to the issuance of partial corrective disclosures and/or the materialization or risks concealed by the Defendants, as summarized herein.

436.    On July 20, 2007, Wachovia released its second quarter 2007 results, which included a dramatic increase in loan loss reserves.  Defendant Thompson conceded that Wachovia was "going through a little pain" as a result of the acquisition of Golden West.  While the July 20, 2007 earnings release continued to conceal the full extent of risk contained in Wachovia's Pick-a-Pay loan portfolio, the release partially corrected the Defendants' misrepresentations concerning the timing of the Golden West acquisition and the "pristine credit quality" of the inherited Golden West subprime loan portfolio.

437.    As the market absorbed the information in the July 20, 2007 earnings release, Wachovia's stock price fell 3.16%, from $51.61 on July 19, 2007 to close at $49.98 on July 20, 2007.  This decline exceeded the drop in the S&P 500 Index, which fell by 1.22%, on the same trading day.

438.    October 19, 2007, Wachovia announced its third quarter results, which included $1.3 billion in write downs on certain subprime CDOs and increases in loan loss reserves.  The October 19, 2007 earnings release was corrective in that: (i) it disclosed for the first time that Wachovia was holding subprime-related securities in its trading portfolio; (ii) it attempted to bring Wachovia's valuations of its Pick-a-Pay loan portfolio and its subprime-related assets in line with reality; and (iii) it acknowledged that Pick-a-Pay loans were not as insulated from changing market conditions as Defendants previously represented.  However, Defendants knew but did not disclose at that time that Wachovia's holdings of subprime CDOs were actually much greater and continued to be overvalued based on then-current market indices.  Likewise,

147

Defendants knew that Wachovia's Pick-a-Pay loan portfolio was still overvalued. Following the October 19, 2007 disclosure, Wachovia's stock price fell from $48.14 to $46.40, a decline of 3.61%, representing a loss of $3.3 billion in market capitalization. This decline exceeded the decline in the S&P Index, which dropped by 2.56% on the same day.

439.    On December 10, 2007, Merrill Lynch downgraded Wachovia's stock on the belief that Wachovia's net credit losses would rise "significantly" in 2008 because of rapidly deteriorating non-conforming mortgage exposure in California. This continued to correct Defendants' previous misstatements that the Pick-a-Pay loan portfolio was low risk and protected from losses due to its unique product features and conservative underwriting at origination. Based on this news, and on the announcement on December 12, 2008 that Wachovia would increase its loan loss reserves, Wachovia's stock price fell over the next two days from $44.46 on December 10, 2007 to $40.53 on December 12, 2007, a decline of 8.84%, or $7.5 billion in market capitalization. In the same period, the S&P Index declined 1.92%.

440.    On February 4, 2008, Merrill Lynch demoted Wachovia to a "sell" rating due to the weakening California housing market. As the market absorbed this information, Wachovia's stock price declined by 8.33%, from $38.76 to close at $35.53 on February 4, 2008. This decline exceeded the decline in the S&P Index, which fell 1.05% on the same day.

441.    On February 28, 2008, Wachovia announced that it had increased its loan loss reserves, primarily due to increasing defaults in its Pick-a-Pay loan portfolio. Defendant Thompson admitted in the annual report that "[w]ith the benefit of hindsight, it is clear that the timing was poor for this expansion into the mortgage business." The February 28, 2008 announcement was partially corrective in that it continued to expose the fact that Pick-a-Pay loans were not really different from other payment option ARMs and were at risk to incur the

same degree of losses as market conditions deteriorated.   Nevertheless, Defendants reassured investors that conservative underwriting standards and Pick-a-Pay's product features would save the day, and that Wachovia "will be ready for a market with far fewer irrational participants."

442.    Over the course of the next two days, Wachovia's stock dropped from $34.10 to $30.62, a decline of 10.21% or $6.9 billion in market capitalization.  The S&P Index declined by 3.6% during the same period.

443.    On March 12, 2008, Defendant Truslow announced that the housing market "appears to be getting worse."  Wachovia's stock dropped from $29.78 to $27.24 over a two-day period, a decline of 8.53% or $5 billion in market capitalization.

444.    On April 14, 2008, Wachovia shocked analysts and investors when it announced a series of actions "to further enhance its capital base and operational flexibility."   First, Wachovia planned to sell $7 billion worth of stock in a dilutive stock offering at 14% less than its closing price in the prior week in order to raise capital.  Second, Wachovia lowered the quarterly common stock dividend, which Wachovia stated would "preserve $2 billion of capital annually."   This corrected Defendants' misstatements just weeks earlier, which reassured investors that Wachovia was adequately capitalized.

445.    In addition, Wachovia corrected several misstatements and omissions concerning expectations for Pick-a-Pay loans.  First, credit loss reserves were increased by $2.8 billion increase, which included a build of $1.1 billion specifically for Pick-a-Pay loans.  Second, Wachovia revealed serious credit deterioration in the Pick-a-Pay portfolio, as LTV ratios for 14% of the $120 billion in Pick-a-Pay loans exceeded 100%, late payments had doubled to 3.1% and an increasing number of borrowers were electing to make only minimum payments.  Third, Wachovia reported that lending standards would be tightened.  Finally, Wachovia disclosed that

it would update its credit reserve modeling to take into account deteriorating market conditions, and specifically, the impact of rising LTV ratios and negative amortization on borrower behavior.

446.    Analysts pressed Defendants to identify the reasons for the sudden change in outlook from just a few months earlier:

> [Y]ou've been consistent in saying at least up until your 10K in late February that you felt comfortable with your capital and dividend position.    Obviously, something has changed dramatically.    Obviously, you went into February knowing the housing market was stressed.    Can you just kind of update us with your thoughts over the subsequent six weeks from the end of February?

447.    Defendants attempted to blame deteriorating market conditions, but as another analyst pointed out, "[T]here's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook . . . [I]t just strikes me as difficult to understand how management's view of the environment has changed so dramatically."    In other words, no external market condition was responsible.    Instead, Defendants knew that the Pick-a-Pay portfolio was a ticking time bomb, but they had hidden that insidious truth from investors by hailing Pick-a-Pay as a superior payment option ARM and obfuscating statistics that would have revealed to investors the actual levels of risk.

448.    As a result of Wachovia's issuance of these corrective disclosures, its share price fell 8.13% from $27.81 to $25.55 on abnormally high volume, a decline of $4.5 billion in market capitalization.    From April 14, 2008 to April 16, 2008, Wachovia's stock price declined another .54%.    In the same period, the S&P Index increased 2.73%.

449.    On June 2, 2008, Wachovia announced that its board of directors forced Thompson to retire from the company.    Defendant Thompson's ouster was largely attributed to the now-apparent failure of the Golden West acquisition.    Wachovia's stock dropped from

$23.40 on June 2 to $21.92 on June 3, 2008, a decline of 6.342% or $3.0 billion in market capitalization.

450.    On June 4, 2008, BUSINESS WEEK published an article describing Wachovia's questionable and previously undisclosed business practices following the Golden West acquisition:

> In most mergers, it's the acquirers that exert their will.  But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending.  And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-a-Payment" loans. …
>
> Former brokers say they were given sales targets for the Pick-a-Payment loans and were told to downplay the fact that making the minimum payment would cause the loan balance to rise – a phenomenon known as "negative amortization."  In one trading video reviewed by BUSINESS WEEK, brokers were instructed to avoid terms like "negative amortization" in favor of euphemisms like "deferred interest."  (Wachovia has said it does not set sales quotas by mortgage type.) …
>
> Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. …[22]

451.    In response to this disclosure, which continued to correct investors' belief that Wachovia had employed strict underwriting standards and risk management strategies in its origination of Pick-a-Pay mortgages, Wachovia's share price fell another 1.55% on June 4, 2008 to close at $21.58.  Thus, in three days of trading, from June 2 to June 4, 2008, as the market absorbed information concerning Thompson's forced retirement and Wachovia's lending practices, Wachovia's stock price declined a total of 9.55%.  The S&P Index declined by 1.66% during the same period.

452.    On June 30, 2008, Wachovia announced that Pick-a-Pay mortgages would no longer include a payment option that allowed borrowers to pay less each month than the amount

---

[22] *See* Foust, *supra* at fn. 8.

of accrued interest.  In addition, pre-payment penalties on Pick-a-Pay mortgages were suspended in an effort to reduce defaults by allowing borrowers to re-finance loans they could not afford. The June 30, 2008 announcement was partially corrective, because it continued to dispel the Defendants' misrepresentations concerning the strength of Wachovia's underwriting practices and the damaging effects of negative amortization.  In fact, analysts considered the announcement "an admission that a lot of borrowers were put into loans they either didn't understand or couldn't afford."[23]   On the day of the announcement, Wachovia's stock price declined 4.25%, from $16.22 to close at $15.53.  The S&P Index climbed .13% on the same day.

453.    On July 9, 2008, Wachovia forewarned the market that it expected $2.6 to $2.8 billion in losses for the second quarter of 2008, largely as the result of additional provisions in its loan loss reserves due to the recently-defunct Pick-a-Pay product.  Defendants also reported that Wachovia would take a long overdue write down on impaired goodwill, conclusively acknowledging that the Golden West franchise had been substantially overvalued.  On July 10, 2008, during an investor conference call, Lanty Smith admitted that, "[t]here has been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it."   As a result of these disclosures on July 9 and 10, 2008, Wachovia's stock declined by 8.04% and 8.12%, respectively, from $15.54 at the close of trading on July 8, 2008, to $13.13 at the close of trading on July 10, 2008.  In the same period, the S&P Index declined by 1.58%.

454.    Then, on July 11, 2008, Wachovia fell the most it fell in 20 years after an analyst from Fox-Pitt Kelton lowered his rating on the stock stating that Wachovia may raise up to $7 billion and cut its dividend.  On July 15, 2008, well-known financial analyst Meredith Whitney

---

[23] *See* Dean Foust, "Pick-a-Pay Goes Away…," BUSINESS WEEK, June 30, 2008, available at: http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

of Oppenheimer & Co. reduced her rating on Wachovia to "underperform" from "perform" stating that the earnings outlook for Wachovia had "dramatically diminished" and bank stocks would keep falling until asset prices "get real." Whitney stated that prospects for shareholders of Wachovia were "bleak" and that mortgage assets were still priced too high on U.S. banks' balance sheets. From July 10, 2008 to July 15, 2008, Wachovia's stock price dropped over 30% wiping out approximately $8.75 billion in market capitalization.

455. On September 29, 2008, the true value of Wachovia, which Defendants had concealed in each of its prior disclosures, was finally revealed, when it was announced that Citigroup, Inc. agreed to acquire Wachovia's banking operations for $2.1 billion in stock and the assumption of $53 billion in Wachovia debt. The deal was negotiated as federal banking regulators threatened to place Wachovia into receivership. The proposed Citigroup acquisition valued Wachovia's banking operations at merely $1 per share. This low valuation was due to Wachovia's failure to properly value its subprime-related assets, particularly its $120 billion Pick-a-Pay loan portfolio, which was projected to incur substantial losses as the truth concerning rising LTV ratios and borrower defaults came to light.

456. Following the announcement of the proposed Citigroup acquisition, Wachovia's stock lost nearly all of its remaining value, plummeting from $10 per share to close at an all-time low of $1.84 per share on September 29, 2008. This represented a decline of over 80%, which was nearly ten times greater than the decline in the S&P Index, which fell by 8.79%, on the same day.

# COUNTS

## COUNT I

### For Violation Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder For Issuing Materially False And Misleading Statements

457. Plaintiffs repeats and reallege each and every allegation contained above as if fully set forth herein.

458. From May 2006 through September 2008, the Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Wachovia's securities; and (c) caused Plaintiffs to purchase or otherwise acquire Wachovia securities at artificially inflated prices.

459. Each of the Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by the Rule 10b-5(b) Defendants not misleading, and/or substantially participated in the creation of the alleged misrepresentation, which operated as a fraud and deceit upon Plaintiffs, in an effort to maintain the artificially inflated price of Wachovia's securities. The Defendants' false and misleading statements (and omissions of material facts) are set forth in Section VIII, *supra*.

460. As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

461. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth

herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

462.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew or with extreme recklessness disregarded that the statements set forth in Section VIII, *supra*, were materially false and misleading for the reasons set forth herein.

463.    The Defendants carried out a deliberate scheme to misrepresent the value of Wachovia's assets, the risks the Company's investors were being exposed to, the effectiveness of Wachovia's controls and Wachovia's compliance with applicable laws.

464.    In addition to having actual knowledge, and/or with extreme reckless disregard for the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive to engage in the fraudulent scheme set forth herein.

465.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wachovia's securities was artificially inflated throughout the relevant time period.  Unaware that the market price of Wachovia's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which Wachovia's securities traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the Defendants but not disclosed in their public statements, Plaintiffs purchased or acquired Wachovia's securities at artificially inflated prices. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases

and sales of Wachovia securities from May 2006 through September 2008, when the inflation in the price of Wachovia's securities was gradually corrected as the truth regarding Defendants' conduct was revealed.

466.    By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with their transactions in Wachovia's securities during the relevant time period.

**COUNT II**
**For Violation Of Section 20(a) Of The Exchange Act**
**(Against The Individual Defendants)**

467.    Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Individual Defendants.

468.    Wachovia is primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

469.    The Individual Defendants acted as controlling persons of Wachovia within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reason of their positions as officers and/or directors of Wachovia, their ability to approve the issuance of statements, their ownership of Wachovia's securities and/or by contract. As such, the Individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. The Individual Defendants were provided with or had unrestricted access to copies of the Company's reports, press releases, public filings and other statements alleged by to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same. The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles and conference calls. The Individual Defendants controlled Wachovia and each of its employees.

470.    By virtue of their positions as controlling persons of Wachovia, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling primary a violator of the federal securities laws. The facts set forth herein establish that the Individual Defendants culpably participated in the fraudulent activities detailed herein.

471.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's securities from May 2006 through September 2008.

### COUNT III
### Common Law Fraud For Inducing Plaintiffs
### To Purchase Wachovia Stock

472.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

473.    This cause of action is asserted by Plaintiffs against the Defendants, based on common law principles of fraud and conspiracy.

474.    As alleged herein, each of the Defendants made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding Wachovia's financial condition.

157

475.    In addition, the Defendants each conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding Wachovia's financial condition, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

476.    The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

477.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

478.    The aforesaid conduct by Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

479.    Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to purchase Wachovia's common stock.

480.    At the time Wachovia's common stock was purchased by Plaintiffs, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

481.    As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their purchases of Wachovia's common stock.

482.    Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, until late 2008.

**COUNT IV**
**Common Law Fraud For Inducing Plaintiffs**
**To Hold Their Wachovia Stock**

483.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

158

484.    This cause of action is asserted by Plaintiffs against the Wachovia Defendants, based on common law principles of fraud and conspiracy.

485.    As alleged herein, each of the Defendants made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding Wachovia's financial condition.

486.    In addition, the Defendants each conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding Wachovia's financial condition, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

487.    The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

488.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

489.    The aforesaid conduct by Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

490.    Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to hold (and refrain from selling) Wachovia's common stock.

491.    Specifically, with respect to deciding whether to hold (and refrain from selling) Wachovia's common stock, Plaintiffs and/or their agents continued to rely on Defendants' statements regarding Wachovia's financial condition.  Defendants knew or had reasonable ground to believe that these and other statements were false and such statements lacked any reasonable basis.  Had Plaintiffs known the truth about Wachovia's financial condition, which

was materially worse, Plaintiffs would have immediately sold all of their shares of Wachovia's common stock. Defendants fraudulently concealed Wachovia's financial condition from Plaintiffs and did not reveal the full extent of such liability until late 2008.

492. At the time Wachovia's common stock was held by Plaintiffs, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

493. As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

494. Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, until late 2008.

## COUNT V
### Negligent Misrepresentation For Inducing Plaintiffs To Purchase Wachovia Stock

495. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all Defendants.

496. This cause of action is asserted by Plaintiffs against the Defendants based on common law principles of negligent misrepresentation.

497. The Defendants made the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

498. The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

499.    Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Wachovia.  Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Defendants' statements disseminated to Plaintiffs and their agents.

500.    As a result of Plaintiffs' position as stockholders of the corporation, the Defendants had a special relationship with Plaintiffs so as to constitute "privity" or "near-privity."

501.    Plaintiffs and/or their agents justifiably relied to its detriment upon the integrity of Wachovia's statements in purchasing Wachovia common stock.

502.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the financial condition of Wachovia from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by the Defendants' overstatements and misstatements of the financial condition of Wachovia, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

503.    The Plaintiffs, as Wachovia investors, were entitled to rely and justified in relying on the representations made by the Defendants, set forth above, regarding the financial condition of Wachovia.  Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to purchase Wachovia's common stock.  Plaintiffs had no actual knowledge of the false and misleading nature of the Defendants' statements when purchasing Wachovia's stock.

504.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their purchases of Wachovia's common stock.

505.    In ignorance of the fact that market prices of Wachovia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, and/or in the absence of knowledge of material adverse information that was known to the Defendants, Plaintiffs purchased Wachovia's common stock and were damaged when the price of that stock declined.

## COUNT VI
### Negligent Misrepresentation
### For Inducing Plaintiffs To Hold Wachovia Stock

506.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this  Complaint as if fully set forth herein.

507.    This cause of action is asserted by Plaintiffs against the Wachovia Defendants, based on common law principles of negligent misrepresentation.

508.    The Defendants made the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

509.    The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

510.    Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Wachovia.  Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Wachovia's statements disseminated to Plaintiffs and/or their agents.

511.    As a result of Plaintiffs' position as stockholders of the corporation, the Wachovia Defendants had a special relationship with Plaintiffs so as to constitute "privity" or "near-privity."

512.    Plaintiffs and/or their agents justifiably relied to their detriment upon the integrity of Wachovia's statements when deciding to hold (and refrain from selling) Wachovia's common stock.  Had Plaintiffs and/or their agents been aware of the true facts, they would not have retained Wachovia's stock.

513.    Specifically, with respect to deciding whether to hold (and refrain from selling) Wachovia's common stock, Plaintiffs continued to rely on Defendants' statements regarding the financial condition of Wachovia.  Defendants knew, or had reasonable ground to believe, that these and other statements were false and that such statements lacked any reasonable basis.  Had Plaintiffs known that the financial condition of Wachovia was so materially worse, Plaintiffs would have immediately sold all of their shares of Wachovia's common stock.  Defendants fraudulently concealed the true nature of the financial condition of Wachovia from Plaintiffs and

did not reveal the full extent of Wachovia's capital and liquidity problems until September 29, 2008.

514.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Wachovia's operating condition and future business prospects from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by the Defendants' overstatements and misstatements concerning Wachovia's lending practices, its exposure to subprime markets, its adherence to its accounting policies, and its valuation of its assets, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

515.    The Plaintiffs, as Wachovia shareholders, were entitled to rely and justified in relying on the representations made by the Defendants, set forth above, regarding the financial condition of Wachovia.   Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to hold (and refrain from selling) Wachovia's common stock. Plaintiffs had no actual knowledge of the false and misleading nature of the Defendants' statements when deciding to hold and then continuing to hold Wachovia's stock.

516.    As a direct and proximate result of the dissemination of the materially false and misleading information and the failures to disclose material facts, as set forth above, the market

price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

517.    In ignorance of the fact that market prices of Wachovia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, and/or in the absence of knowledge of material adverse information that was known to the Defendants, Plaintiffs held Wachovia's common stock and were damaged when the price of that stock declined.

### COUNT VII
### Civil Conspiracy

518.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this  Complaint as if fully set forth herein.

519.    This cause of action is asserted by Plaintiffs against the Defendants based on common law principles of civil conspiracy.

520.    The Defendants acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, by making the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

521.    In making their false and misleading statements concerning, *inter alia*, the financial condition of Wachovia, the Defendants agreed to take actions that inflicted a wrong against or injury upon Plaintiffs.

522.    The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

523.    Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Wachovia's statements disseminated to Plaintiffs and/or their agents.

524.    Specifically, with respect to deciding whether to purchase and hold (and refrain from selling) Wachovia's common stock, Plaintiffs continued to rely on Defendants' statements regarding the financial condition of Wachovia.  Defendants knew, or had reasonable ground to believe, that these and other statements were false and that such statements lacked any reasonable basis.  Had Plaintiffs known that the financial condition of Wachovia was so materially worse, Plaintiffs would never have purchased such shares and/or would have immediately sold all of their shares of Wachovia's common stock.  Defendants' agreed to fraudulently conceal the true nature and extent of the financial condition of Wachovia from Plaintiffs and did not reveal the full financial condition of Wachovia until late 2008.

525.    As a direct and proximate result of the Wachovia Defendants' agreement to disseminate materially false and misleading information and the failures to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiffs and for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

C.     Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: New York, New York
      September 15, 2009              **GRANT & EISENHOFER P.A.**

By:   *James R. Banko*
            JAY W. EISENHOFER
            GEOFFREY C. JARVIS
            JAMES R. BANKO
            MICHELE S. CARINO
            485 Lexington Avenue, 29th Floor
            New York, NY 10017
            Telephone: (646) 722-8500
            Facsimile: (646) 722-8501

            *Attorneys for Plaintiffs*
            *Deka Investment GmbH, Deka*
            *International S.A. Luxemburg, Deka*
            *Fundmaster Investmentgesellschaft mbH,*
            *International Fund Management S.A.*
            *Luxemburg, and Metzler Investment*
            *GmbH*

*Of Counsel:*

ALEXANDER REUS
DIAZ REUS LLP
Bank of America Tower
100 S.E. Second Street, Suite 2600
Miami, Florida 33131
Telephone: (305) 375-9220
Facsimile: (305) 375-8050